# United States District Court
# for the District of Columbia

NATALIA GOMEZ
2819 Kanawha Street, N.W.
Washington, D.C. 20015

    and

SYLVIA CORREA AND MANUEL
GOMEZ
2819 Kanawha Street, N.W.
Washington, D.C. 20015,

       Plaintiffs

    v.

CLIFFORD B. JANEY, Superintendent,
District of Columbia Public Schools
825 North Capitol Street, NE,
Washington, D.C. 20002

    and

DISTRICT OF COLUMBIA, a municipal
corporation
John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004,

       Defendants

Civil Action No.

## COMPLAINT
### (Appeal of hearing officer's determination, injunction)

1.     This action is brought under the Individuals with Disabilities Education Act, 20 U.S.C. §1400 *et seq.* ("IDEA") and the Rehabilitation Act of 1973, 29 U.S.C. §794, as amended ("Rehabilitation Act"). This Court has jurisdiction over the subject matter of this complaint pursuant to IDEA and the Rehabilitation Act, and pursuant to 28 U.S.C. §§1331 and 1343.

2.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

3.    Plaintiff Natalia Gomez resides in the District of Columbia at the address listed in the caption of this complaint.

4.    Plaintiffs Sylvia Correa and Manuel Gomez are Natalia Gomez's parents and are adult residents of the District of Columbia who live at the address listed in the caption of this complaint.

5.    Defendant District of Columbia is a municipal corporation which, through its Board of Education, receives federal funds and therefore is subject to the provisions of the IDEA and the Rehabilitation Act.

6.    Defendant Clifford B. Janey is the Superintendent of the District of Columbia Public Schools ("DCPS"). As such, he is charged with supervising DCPS's operations and functioning, including its compliance with the IDEA, the Rehabilitation Act and all other governing laws.

7.    Natalia was born July 21, 1987 and has lived in the District of Columbia all her life. Until September 2003, she received all of her formal education in District of Columbia public schools. She initially performed well both academically and socially; however, as Natalia aged her behavior and academic performance deteriorated. Neither Natalia's parents nor the District of Columbia Public Schools ("DCPS") suspected that Natalia's problems might be attributable to a disability until the spring semester of 2003, when Natalia was a 10th grade student at Woodrow Wilson Senior High School ("Wilson"), a public high school operated by DCPS.

2

8.      The 2002-03 school year was Natalia's first in high school. Beginning with the start of the school year and continuing until its end, Natalia's performance–both academic and behavioral–accelerated its downward slide.   In the first marking period Natalia, who is exceptionally bright and capable of high achievement, earned three grades of C, one C-, one D, one D-, and one F.  Ms. Correa and Mr. Gomez first learned of her academic difficulties at parent-teacher conferences in November 2002.  At the same time, they learned for the first time that Natalia was regularly skipping classes.  They immediately tried to take steps address Natalia's problems and to persuade her to attend classes and do her school work.  They did not at first recognize that Natalia might have underlying disabilities, and no one at DCPS suggested this to them.

9.      In a letter dated January 8, 2003, DCPS warned Ms. Correa and Mr. Gomez that Natalia was at risk for removal from a special program in which she was enrolled unless she pulled her grades up.  At that point, her grade point average was 1.4, approximately equivalent to a D+.

10.      In January 2003, Dr. Alexandra Cargo, a clinical psychologist, performed an educational and psychological evaluation of Natalia. Dr. Cargo did not formally diagnose Natalia with a disabling condition, but found weaknesses in her organizational and attending skills, restlessness, inefficiencies in her perceptual organization, a tendency toward distractibility, lack of attention to details and deadlines, some trouble with word retrieval, weaknesses in math fluency and problem solving, poor coping resources, emotional lability, chronic irritability and mild anxiety.  Dr. Cargo noted Natalia's "avoidant style," difficulty in admitting her own distress, appearance of aloofness and tendency to oversimplify.   Dr. Cargo made the following recommendations to improve Natalia's school performance and overall functioning:

•      Individual tutoring

3

- Consultation with a psychiatrist for a possible medication trial to reduce Natalia's emotional lability, chronic mild depression, anxiety and tendency to pick her skin
- Family therapy
- Participation in an extracurricular activity
- Regular physical exercise
- Consultation with a college advisor during Natalia's 11th grade.

11.     Natalia's parents provided a copy of Dr. Cargo's report to DCPS, which took no action in response.

12.     Following up on one of Dr. Cargo's suggestions, in April 2003 Natalia began seeing a therapist, Dr. Carol Robbins. Dr. Robbins is a licensed clinical psychologist who specializes in attention deficit hyperactivity disorder ("ADHD") and also treats patients with depression, anxiety, relationship and self-esteem issues. After reviewing Dr. Cargo's report and evaluating Natalia clinically, Dr. Robbins diagnosed Natalia with ADHD and major depression.

13.     Dr. Robbins determined that Natalia's ADHD had a severe impact upon Natalia's education and that it was the cause of her poor academic performance. This, in turn, was causing Natalia's depression, because she was fully aware of her innate capabilities and did not understand why she could not live up to her potential. In a therapy session in April 2003, Natalia revealed strong suicidal ideation to Dr. Robbins, resulting in Natalia's emergency admission to Children's Hospital, where she remained for approximately 10 days.

14.     Following Natalia's hospitalization (which caused her to miss two weeks of school), Mr. Gomez, Ms. Correa and Dr. Robbins all informed DCPS of Natalia's medical conditions and

ongoing treatment. They immediately requested help for Natalia in catching up with the school work she had missed. One teacher responded with a list of assignments.

15.    After Natalia was discharged from Children's Hospital, Ms. Gomez and Dr. Robbins separately asked Wilson to prepare a "504 plan" for Natalia, pursuant to §504 of the Rehabilitation Act (29 U.S.C. §794). On May 4, 2003, Dr. Robbins sent Wilson's principal a letter informing him of her diagnoses, explaining how Natalia's conditions manifested themselves on a day-to-day basis, and outlining the accommodations she recommended for Natalia. These included:

- Preferential classroom seating
- Organizational assistance
- Reminders to hand in homework
- Academic assistance or tutoring as needed
- Extended time on tests
- Modification of academic requirements
- Access to a crisis counselor
- Designation of a safe place for Natalia to go during the school day when she felt overwhelmed

16.    Neither Dr. Robbins nor Natalia's parents was familiar with IDEA, and neither named that statute in their requests for help for Natalia.

17.    In May 2003, Wilson convened a meeting in response to the requests from Dr. Robbins, Ms. Correa and Mr. Gomez. Dr. Robbins was not invited and did not attend. Only some of Natalia's teachers were present. The sole topic discussed at the meeting was whether and how the school could modify Natalia's 10th grade requirements to allow her to pass her courses. DCPS

5

did not take any steps to determine whether Natalia was disabled or eligible for services under the Rehabilitation Act or for special education under IDEA. It did not develop a 504 plan for her, as requested, nor commence the process of doing so. None of the accommodations recommended by Dr. Robbins in her May 4, 2003 letter was discussed. Mr. Gomez and Ms. Correa were not informed of IDEA's existence nor of Natalia's rights as a student who might fall within its purview. DCPS sought no additional information about Natalia's medical conditions nor requested consent to perform any assessments of its own.

18.     On August 8, 2003, Ms. Correa returned to Wilson to register Natalia for the coming school year. She asked the school counselor whether Wilson would be able to provide any services for Natalia in light of her problems, but nothing was offered or suggested. The school counselor did not notify Ms. Correa of Natalia's IDEA rights nor advise her to request either Rehabilitation Act or IDEA services. Accordingly, Mr. Gomez and Ms. Correa, who were unaware of the options available to eligible disabled students in public schools, decided not to return Natalia to Wilson. They were concerned that her experiences in 2003-04 would replicate those of 2002-03, thus exposing her to physical and mental danger and making further academic progress unlikely.

19.     Mr. Gomez and Ms. Correa searched for a school on their own. Without DCPS or private professional input, they found the Saint James School ("Saint James"), in Saint James, Maryland, a small private school that offers the type of setting recommended by Dr. Robbins although it is not formally certified for special education. Saint James accepted Natalia on condition that she repeat 10th grade due to her poor performance the year before, which raised concerns that she was not ready for the 11th grade curriculum. She successfully attended that school for a year and achieved greater academic success than she had had at Wilson. She also made progress in treating her depression and learning to live with her ADHD.

6

20.    After her year at Saint James, Natalia transferred to Buxton School ("Buxton") in Williamstown, Massachusetts, an even smaller school which also offers the environment recommended by Dr. Robbins although it, too, is not formally certified for special education. Natalia enrolled in Buxton for the 2004-05 school year and successfully completed the 11th grade, making both academic and therapeutic progress in the process. She is currently enrolled in Buxton for 12th grade.

21.    DCPS has previously funded at least one special education student at Buxton.

22.    In November 2004, Ms. Correa returned to DCPS to re-register Natalia and to request special education and related services on her behalf. After some delay–some of it attributable to DCPS–DCPS convened on May 16, 2005 a multidisciplinary team (MDT) meeting at which it determined that Natalia was not disabled within the meaning of IDEA and therefore was not entitled to special education or related services. DCPS did not consider at this meeting whether the Rehabilitation Act applied to Natalia.

23.    At the MDT, DCPS acknowledged its 2003 default in failing to evaluate Natalia when it first learned of her disabling conditions and their effect upon Natalia's school performance, but declined to consider a remedy at that time, stating that retroactive relief had to be addressed separately. DCPS later ignored a May 24, 2005 request, made on Natalia's behalf, to convene such a meeting.

24.    DCPS based its ineligibility determination entirely upon Natalia's recent good academic performance at Buxton, an appropriate educational environment, and evaluations by its own staff members, some of whom had never met Natalia. It declined to consider the context of

7

Natalia's success. Although it later claimed to have had insufficient information to find eligibility, it did not seek to perform additional assessments of its own, ask Ms. Correa and Mr. Gomez for further information, or postpone the eligibility determination pending receipt of the allegedly missing information.

25.    On June 30, 2005, Ms. Correa and Mr. Gomez requested a due process hearing to challenge both DCPS's 2003 violation of its IDEA "child find" obligations in failing to recognize Natalia's disabilities or to provide appropriate programming for her, as well as its more recent determination of ineligibility. They sought reimbursement for tuition and other expenses they had incurred in placing Natalia at Saint James and Buxton, and an order directing DCPS to assume prospective responsibility for Natalia's education until she earns her high school diploma or otherwise becomes ineligible for further education or services.

26.    The requested hearing took place in pieces, on the following dates: September 14, 2005; November 28, 2005; December 9, 2005; and January 13, 2006. On January 23, 2006, the presiding hearing officer issued a determination in DCPS's favor on all issues. A copy of that determination is attached hereto as Exhibit 1.

## COUNT ONE
### (Appeal of hearing officer's determination)

27.    Plaintiffs repeat and reallege the allegations contained in ¶¶1-26 as if fully set forth.

28.    The January 23, 2006 hearing officer's determination was against the weight of the evidence, found facts that were not in evidence, was inconsistent with the governing law and decided issues not presented.

8

29.     Plaintiffs are entitled to an order reversing the January 23, 2006 determination and ordering DCPS to assume both retroactive and prospective responsibility for Natalia's placements at Saint James and Buxton, as well as for all related services incident to her placements there. Alternatively, if the Court determines that the record is insufficient to support any ruling sought by plaintiffs, the Court should either hear additional evidence in support of plaintiffs' requests or remand the matter to the hearing officer for additional appropriate proceedings.

## COUNT TWO
### (Violations of Rehabilitation Act)

30.     Plaintiffs repeat and reallege the allegations contained in ¶¶1-26 as if fully set forth.

31.     If Natalia is not disabled within the meaning of IDEA or is otherwise not entitled to special education and related services under that Act, she nevertheless is disabled within the meaning of the Rehabilitation Act and should have been recognized as such by DCPS in 2003 and again in 2005.

32.     DCPS's failures to identify Natalia as disabled or to provide Rehabilitation Act services for her forced her parents to remove her from DCPS and to enroll her in private schools at their own expense.

33.     Plaintiffs are entitled to an injunction ordering DCPS to reimburse them for the costs they incurred in providing Natalia's education after DCPS defaulted in its Rehabilitation Act obligations, as well as prospective relief ordering DCPS to assume responsibility for Natalia's education (including providing appropriate accommodations for her under the Rehabilitation Act) until she earns her high school diploma or otherwise becomes ineligible for further services.

9

*Wherefore,* based upon the foregoing, plaintiffs demand judgment against defendants as follows:

a.    Entry of an order reversing the January 23, 2006 hearing officer's determination and imposing upon DCPS full retrospective and prospective responsibility for Natalia's education, including as appropriate her private school placements, as well as for all related services provided incident thereto and other expenses incurred in connection with those placements or, alternatively, entry of an order vacating the January 23, 2005 determination and remanding the matter to the hearing officer to receive additional evidence and to reconsider his decision;

b.    Alternatively, entry of an order finding DCPS in violation of the Rehabilitation Act and imposing upon DCPS full retrospective and prospective responsibility for Natalia's education, including as appropriate her private school placements, as well as for all related services provided incident thereto and other expenses incurred in connection with those placements;

c.    An award of pre- and post-judgment interest at the highest legal rate available on all sums to be paid to plaintiffs;

d    An award of the attorney's fees and other costs reasonably incurred in pursuing this action; and

10

e.     Such other and further relief as the Court deems just and proper.


Diana M. Savit #244970
**SAVIT & SZYMKOWICZ, LLP**
7315 Wisconsin Avenue
Suite 601N
Bethesda, Maryland 20815
(301) 951-9191
Attorneys for plaintiffs

11

*Exhibit 1*

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## STATE ENFORCEMENT & INVESTIGATONS DIVISION

David R. Smith, Due Process Hearing Officer
825 North Capital Street, 8th Floor, N.E.
Washington, DC 20002
(202) 442-5432 (phone); (202) 442-5556(fax)

| | | |
|---|---|---|
| In the Matter of | ) | **IMPARTIAL DUE PROCESS** |
| | ) | |
| Natalia Gomez ("Student") | ) | **HEARING OFFICER'S DECISION**[1] |
| Date of Birth:  July 21, 1987 | ) | |
| Petitioner, | ) | Hearing Dates:  December 9, 2005; |
| | ) | January 13, 2006 |
| v. | ) | Held at:  825 North Capitol Street, NW |
| | ) | 8th Floor |
| | ) | Washington, DC 20002 |
| District of Columbia Public Schools | ) | |
| 825 North Capitol Street, NW | ) | Attending School: |
| Washington, DC 20002 | ) | Buxton School |
| ("DCPS" or "District") | ) | Williamstown, Mass |
| | ) | Due Process Complaint Notice: |
| Respondent. | ) | June 30, 2005 |


Counsel for Parent:                     Diana M. Savit, Esq.
                                        Savit & Szymkowicz, LLP
                                        7315 Wisconsin Avenue
                                        Suite 601 North Tower
                                        Bethesda, MD 20814-3202


Counsel for DCPS:                       Quinne Harris-Lindsey, Esq.
                                        District of Columbia Public Schools,
                                        9th Floor
                                        825 North Capitol Street, NW
                                        Washington, DC 20002

---

[1] An index of names is attached hereto for the benefit of the parties. The index will permit the parties to identify specific witnesses and other relevant persons. The index is designed to be detached before release of this Hearing Officer's Determination as a public record.

1

## INDEX OF NAMES

Natalia Gomez v. DCPS

| | |
|---|---|
| Parents: | Mr. Manuel Gomez , Father |
| | Ms. Sylvia Correa, Mother |
| Parent/Student's Representatives: | Diana M. Savit, Esq. |
| | Loretta Garcia, Esq. |
| Parents' Witness: | Carol Robbins, Ph.D., Psychologist |
| Parents' Witness: | Ms. Sandra Pollock, St. James School* |
| Parents' Witness: | Ms. Pilar Ciriza El Cid Gale, Buxton* School |
| Parents' Witness: | Mr. Edward Gale, Buxton School* |
| DCPS Representative: | Quinne Harris-Lindsey, Esq. |
| DCPS Witness: | Ms. Linda Ann Flynn, School Psychologist |
| DCPS Witness: | Ms. Denise White-Jennings, Clinical Psychologist |
| DCPS Witness: | Ms. Gloria T. Everett, Case Manager |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

\*    Affidavit

2

# INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### IMPARTIAL DUE PROCESS HEARING

## INTRODUCTION:

A Due Process Hearing was convened on December 9, 2005 and continued to January 13, 2006. The Hearing was held at the District of Columbia Public Schools ("DCPS"), 825 North Capitol Street, N.E. Washington, D.C. 20002. The Hearing was held pursuant to a Complaint submitted by counsel for the parents dated June 30, 2005.

## ISSUES:

1.    Whether the student was eligible for special education during the 2002-2003 school year and if so, whether DCPS should reimburse the parents for their unilateral placement of the student in a private school?

2.    Whether the student is entitled to compensatory education?

3.    Whether the student is currently eligible for special education, and if so, whether her current placement at the Buxton School is appropriate?

4.    Whether DCPS should be prospectively responsible for the student's special education?

## JURISDICTION:

The Hearing was held and this decision was written pursuant to the *Individuals with Disabilities Education Improvement Act* (I.D.E.I.A.), 20 U.S.C. 1400, et. seq. and the *Rules of the Board of Education of the District of Columbia.*

## DUE PROCESS RIGHTS:

Counsel for the parents waived a formal reading of the due process rights.

## FINDINGS OF FACT:

1.    The student is currently attending the Buxton School in Williamstown, Massachusetts ("Buxton"). She was unilaterally placed at Buxton by her parents. Buxton is a private college preparatory school having approximately 90 students.[2] Buxton is not a special education school.[3]

2.    The parents filed a Due Process Hearing Request on June 30, 2005 contending that DCPS denied the student a Free and Appropriate Public Education ("FAPE") by, among other things, failing to determine that she was a student with a disability and therefore entitled to special education and related services relating back to the 2002-2003 school year when the student was in the 10th grade at

---

[2]    Parents' Exhibit NG-36 and attachments thereto
[3]    Testimony of the mother and Dr. Carol Robbins

3

the Wilson Senior High School ("Wilson"). The student had attended her neighborhood DCPS schools until the end of the 2002-2003 school year. Prior to Wilson, she attended the Deal Junior High School ("Deal") and prior to Deal she attended the Lafayette Elementary School.

3.    At the Hearing, the mother testified that the student enjoyed school while attending Lafayette. At Deal however, the mother testified that the student began to have problems and her grades began to suffer. The mother testified that in the 8th grade, the student started to have problems and started saying that she did not like school, that her teachers did not like her. She got into trouble at Deal whereby she was suspended for the last month of her 8th grade year and spent the remainder of the school year at Hardy JHS.[4]

4.    The mother further testified that in the 9th grade at Deal, the student began to have self esteem issues; saying that she was stupid and that no one likes her and she was often sad. The mother testified that in April/May timeframe of her 9th grade year (2002-2003), the student was hospitalized at Georgetown Childhood Mental Health Hospital as a result of her taking a bottle of aspirin. The mother testified that the student remained hospitalized for 5 days and diagnosed with depression. The student received therapy in the hospital and also after she was released. Even so, the student' grades were reported as "OK."[5] The mother's statements are consistent with a Psychological and Educational Evaluation conducted by Alexandra P. Cargo, Ph.D, on January 17, 21 and 30, 2003[6] and therefore credible here. There is no indication that special education services were requested by the parents, or that the student's behavior had impacted her educational performance.

5.    Beginning in December 2002, the father communicated with Ms Monique Morton at Wilson via e-mail about his concerns with the student's performance at Wilson. Ms. Morton responded stating in a return e-mail that the student had missed classes and never made up the work. Ms. Morton stated that the student never asked questions in class, but seemed to be paying attention. Some of the failure to pay attention was attributed to the student sitting next to a friend. The father responded by stating that he would be talking to the student and that he thought the student was trying to get "on a better road."[7]

6.    Dr. Cargo stated in his 2003 evaluation that the student periodically skipped school while at Deal, continuing to when she entered Wilson. Dr. Cargo reported that the student would cut school, always in the company of a friend and that they would go out for food or to someone's house.[8]

7.    Dr. Cargo further reported that the student was distracted by her peers that her grades had suffered due to excessive absences and missing assignments. Dr. Cargo also reported that the student received therapy in the 7th grade for depressive symptoms related to difficult with ostracism by peers and her sister's diagnosis with muscular dystrophy and that the student had experimented with alcohol and marijuana.[9]

---

[4]    Testimony of the mother; NG-1
[5]    NG-4, Psychological and Educational Evaluation, Alexandra P. Cargo, Ph.D
[6]    NG-4
[7]    NG-3
[8]    NG-4
[9]    Id.

4

8.    Dr. Cargo concluded in the report that there was no formal diagnosis of ADHD, and that the student's distraction was due to her interest in her peers. Also, that the student did not exhibit symptoms of major depression or anxiety, but poor coping skills, among other things.[10]

9.    The mother testified that she let DCPS know about the report issued by Dr. Cargo and sent a letter to Mr. Jeffrey Schultz, Director of the Wilson International Studies Program ("WISP") at Wilson and gave Mr. Schultz a copy of Dr. Cargo's report as well as the student's Spanish teacher and other teachers at Wilson and the principal and vice principal. The mother testified that Wilson did not make any adjustments in the student's program after she had provided them with the report. The mother testified that Dr. Cargo's report speaks to ADD as a diagnosis and this prompted the parents to seek a therapist. They got in touch with Dr. Carolyn Robbins in Silver Spring, Maryland.

10.    The mother testified that also in around April 2003, after seeing Dr. Robbins on one occasion, Dr. Robbins said that it was her opinion that the student should be hospitalized. Consequently, the student was placed in a psychiatric hospital the next day. Dr. Robbins had suggested that the student be immediately placed in a psychiatric hospital so that she would not hurt herself. The parents were concerned that the student would harm herself before taking her to the hospital the next day so the student had to sleep with them so that they could maintain a watch over her. The next morning they went to Children's Hospital and saw a psychiatrist who did an assessment and concluded that the student should be in the hospital.  The student also started therapy with Dr. Robbins once a week. The mother testified that Dr. Robbins diagnosed the student with clinical depression.

11.    By letter dated April 23, 2003, the mother informed Ms. Morton at Wilson that the student had been hospitalized due to depression and requested help with her assignments.[11] A subsequent e-mail was sent to Ms. Morton on April 25, 2003, again requesting assistance with the student's school work.[12] Ms. Morton responded by e-mail dated April 28, 2003 in which she listed the student's homework assignments.[13]

12.    The student was admitted to the Children's National Medical Center. The discharge summary report indicated that the student had been admitted on April 22, 2003 due to a chief complaint of suicide with a plan to skip school and overdose.[14] The mother testified that as a result of the hospitalization, the student missed 2 weeks of school.

13.    The mother wrote a letter dated April 26, 2003 to Dr. Stephen P. Tarason, Principal of Wilson. In the letter, the mother informed Dr. Tarason of the student's hospitalization and requested that a "504 plan" be prepared for the student upon her return to school. The mother also informed Dr. Tarason that Dr. Carol Robbins would be sending him a letter summarizing the issues that prompted her request for the meeting.[15]

14.    In a letter dated May 4, 2003, Dr. Carol Robbins wrote Dr. Tarason informing him that she had recently evaluated the student "through clinical interviews, a developmental history, and

---

[10]    Id.
[11]    NG-6
[12]    NG-9
[13]    NG-7
[14]    NG-8
[15]    NG-7

5

standardized self-report measures." Dr. Robbins stated that she had diagnosed the student with ADHD and Major Depression. Also, that at the time Dr. Robbins wrote the letter, the student was a in inpatient treatment at Children's National Medical Center and that upon discharge she would need to have her handicapping conditions addressed by the school, with appropriate accommodations. Dr. Robbins continued by stating the student would benefit from some "standard educational accommodations (a 504 Plan), such as being seated near the front of the classroom, being provided organizational assistance, being reminded to hand in homework assignments, being provided academic assistance/tutoring when needed, and being given extended time on tests. Also that the student would need to make use of a crisis counselor, or have a safe place to go to if she becomes overwhelmed or upset during the school day. Dr. Robbins did not request that the student be evaluated for special education.[16]

15.    The student had also been treated by Dr. Lawrence A. Brain, Psychiatrist, from May 2003 through November 2003, at the request of Dr. Robbins. This treatment was documented in a letter dated April 18, 2005;[17] there is no indication in the record that DCPS had knowledge in 2003 of Dr. Brain treating the student prior to the date of his letter in 2005 to the parent's counsel. The mother had also testified that Dr. Brain's April 18, 2005 letter was made available to DCPS at the MDT meeting at the C.A.R.E. Center on May 16, 2005, but it was not presented to Wilson in 2003.

16.    The mother testified that she spoke with Ms. Jean-Marie Hansen at Wilson about the student, but no one told them about testing for special education. There was however, a meeting set up by Ms. Hansen in May 2003. The mother testified that she thought the purpose of the meeting was to discuss the student's disability and put her in a situation she could do well in; she said that she thought the meeting would have something to do with the Americans with Disabilities Act. The mother testified that the attendees at the meeting included the parents, Ms. Hansen, the English and Spanish teachers, the student's private tutor and another teacher. At the meeting, the team discussed the impact of the student's absences from class on her grades.

17.    The mother testified that she was not aware that the meeting that Ms. Hansen had arranged was a 504 meeting and that it had not been identified to her as such. She said that the first time she heard of a 504 Plan was from Dr. Robbins who told her about this and the ADA, this was before the May 2003 meeting. The mother testified that at the May 2003 meeting at Wilson she did not ask for any accommodation for the student in the class room. At the meeting, the discussions concerned things that the student needed to do to pass to the next grade, e.g. get past due assignment completed, etc. The mother testified that there was no mention of a 504 plan or special education services for the student. The mother testified that there was no finalization to the discussions at this meeting. The mother's testimony regarding convening of a 504 Plan conference is inconsistent with the series of e-mails in parents' exhibit NG-9 and on this point is not credible. The documentation in the record supports the finding that DCPS did convene a 504 Plan meeting at the request of the parents and Dr. Robbins.

18.    The mother testified that based on the student's final report card, she passed the 10th grade at Wilson. Her final report card confirms this, but that the student had also missed many of her classes.[18]

---

[16]      NG-10
[17]      NG-23
[18]      The "Report to Parents on Student Progress" dated 7-14-03 is included in NG-1

6

19.  The mother sent an e-mail to Ms. Morton on May 12, 2003 stating her disappointment with not seeing Ms. Morton "at the 504 conference."[19]  In the third paragraph of the e-mail the mother states "At the 504 conference Ms. Hansen raised the possibility of perhaps testing (the student) on specific themes related to what she should have learned this year or to find some way that she can do enough work to earn a passing grade from you keeping in mind that with her disability, her doctor's appointments, the medicine she is taking etc, she will not be able to make up each and every paper or assignment."

20.  In the 4th paragraph, the mother states: "Once again, Ms. Morton, thank you. We know that (the student) has had an impressive group of teachers this year, but unfortunately a lot of the acting out that you saw was spurred on by her undiagnosed depression and ADHD." Ms. Morton responded to the e-mail on the same date apologizing for not attending the 504 conference.[20]

21.  By letter dated May 13, 2003, the mother requested that Children's National Medical Center provide her with a copy of the discharge summary report.[21] The record is not clear as to when the mother received a copy of the discharge summary report or when the report was provided to DCPS.

22.  In a letter dated June 3, 2003, Dr. Robbins wrote Ms. Gaines at Wilson requesting that in view of the student's "newly diagnosed depression and AD/HD" that the student be permitted to drop math without penalty for medical reasons and that "she be give permission to retake it in the fall."[22] On June 23, 2003, the mother sent a letter to Ms. Morton concerning the request of Dr. Robbins to have the student drop algebra due to medical reasons.[23]

23.  The mother said that she tried to find a private school for the student and spoke with Children's Hospital about what was needed for the student. She was advised that the student needed small classes. The mother testified no one with DCPS told her about options within DCPS. She did not however testify that she requested that DCPS evaluate her or that she asked DCPS for a different placement or for options within DCPS.

24.  On August 8, 2003, the mother testified that she went to Ms. Hansen and spoke with her and mentioned to her the recommendation by Children's that the student needed one-on-one services. There was no testimony however that the parents informed DCPS that they intended to place the student in a non-public school. In fact the parents did not provide DCPS with notice that the student would not be returning to Wilson in the fall of 2003. Based on Dr. Robbins' June 3, 2003 letter[24] however, there was an indication that the student would be returning to Wilson for the 2003-2004 school year.

25.  The mother testified that the parents then decided that the student would not go back to Wilson and they decided to check out private schools for the student instead. The parents did not ask to meet with DCPS to discuss placement options or to meet and discuss special education services prior to deciding to remove the student from Wilson.[25]

---

[19]  Enclosed in NG-9
[20]  Enclosed in NG-9
[21]  NG-8
[22]  NG-11
[23]  NG-9
[24]  NG-11
[25]  Testimony of the mother

7

26.     The mother testified that they were not able to find a day school for the student that would admit the student and after inquiring about other possible placements, they were told about a residential placement called Saint James School in Saint James, Maryland, ("Saint James") that the mother described as a private catholic school in Maryland.  She also described Saint James as a regular education school.  The father and the student went to see it and they liked it; therefore, they placed the student there.  On August 21, 2003, the mother signed a "Transcript Release" on the letterhead of the Saint James School authorizing DCPS to release the student's transcript to Saint James.[26]  By letter dated August 27, 2003, the student was admitted at Saint James.[27]  The student started attending classes on September 2, 2003.[28]

27.     The mother testified that they had also met with several other private schools before placing the student at Saint James, including Georgetown Day School.  The mother said that she found schools listed in the Washingtonian Magazine.

28.     In lieu of testimony, the parents were permitted to submit affidavits of witnesses.  One such witness was Ms. Sandra Pollock, associate headmaster of Saint James.[29]  Ms. Pollock described the Saint James program as a college preparatory boarding school.  Ms. Pollock states in paragraph 5 of her affidavit that "The typical Saint James student should be able to handle the academic rigor of the school and should be planning to attend college...A student is appropriate for Saint James if s/he can participate fully in all aspects of our program, and enjoy and thrive in the company of peers and adults."  Ms. Pollock states in paragraph 6 of her affidavit that "Saint James has a structured pattern to its day" and goes on to describe the structure.  The academic classes at Saint James average 12 students per class (paragraph 9).  Ms. Pollock states in paragraph 15 of her affidavit that Saint James was aware of the student's diagnosis of ADHD and that they had been able in the past to accommodate such students through "small classes, structure and attentive teaching, coaching and dormitory supervision."  Ms. Pollock states in paragraph 20 of her affidavit that she understood that the student's therapist had recommended a structured environment, small classes, extended time, teachers who will work with the student, and an environment that will allow the student to build trust with her teachers and a provide a safe place for the student to go to when she feels overwhelmed.  Ms. Pollack states that this describes Saint James and as such she felt that Saint James was appropriate for the student.

29.     The mother testified that they liked Saint James because of the small class environment and supportive environment and that Saint James offered its students with a family type environment.  However, the mother testified that Saint James turned out not to be the right school due to a lack of diversity.  Also, they did not like the fact that Saint James wanted the student to repeat the 10th grade.  The student received psychological therapy at Saint James from a therapist who visited the school to see some of the other kids.  The school told her about the counselor, who was not a Saint James staff person.  The student also continued to see Dr. Robbins.

30.     Even though the student's placement at Saint James did not work out, the parents felt that the experience at Saint James was helpful in that it convinced them that the student would do well in a

---

[26]     Document enclosed in NG-1
[27]     NG-26
[28]     NG-27
[29]     NG-35

8

residential placement. Therefore, after looking into other schools, they placed her at the Buxton School in Massachusetts for the 2004-2005 school year. The parents did not request to meet with DCPS to discuss placements options following their decision to remove her from Saint James. The mother described Buxton as a small school with less than 100 students, and the teachers and staff are very supportive.

31.     The mother testified that Buxton is a residential school, but not a special education school. Buxton does not provide the student with counseling; the student receives counseling from a psychologist who visits the school, just like Saint James. The counselor that visits Buxton is Dwight Spiro, he does not work for the school, but the school told the parents about him.

32.     Information about Buxton was provided through affidavit by Ms. Pilar Ciriza El Cid Gale, who teaches the student Spanish literature and English at Buxton.[30] Ms. Gale described Buxton in paragraph 4 of her affidavit as "a college preparatory program which enrolls 90 students in the 9th through 12th grades." Ms. Gale states in paragraph 12 that the largest class at Buxton is 15-16 students and that a typical class would have 6 to 8 students. Ms. Gale states that she teaches the student Spanish and in paragraph 16 states that the student "can get distracted but can be focused by talking to her and pointing out that this affects her studies." Ms. Gale continues in paragraph 17 stating that the student is doing very well academically and is making appropriate academic progress as a Buxton student.

33.     Mr. Edward Gale also submitted an affidavit in lieu of testimony.[31] Mr. Gale teaches the student mathematics and science at Buxton. He also described the student as very bright and able, but with difficulty focusing. He states as an example that during his class, she has brought out homework for another class or attempted to finish another class's assignment. He states that when this happens in his class, he immediately reminds her to focus on the task at hand (paragraph 5).

34.     The mother went to Wilson on November 23, 2004 to register the student as a non-attending student. There is no record that the parents attempted to register the student as non-attending before this date. The mother testified that she went to the main office and wanted to reregister the student and asked for special education services and was told that this had to be suggested by a teacher.[32]

35.     The mother testified that following her visit to Wilson to attempt to register the student as non-attending, she went to the Central Assessment Referral and Evaluation ("C.A.R.E.) Center on Rhode Island Ave. She testified that she requested special services for the student and was given a brochure of the services that would be offered. The brochure mentioned testing, separate schools, etc, that she had not been made aware of before when she spoke with Wilson.

36.     On December 27, 2004, a Multidisciplinary/Eligibility meeting was held at the C.A.R.E. Center. The mother signed a "Consent for Evaluation – Initial or Reevaluation" form, consenting to DCPS conducting initial evaluations of the student.[33] The mother also signed a receipt indicating that

---

[30]   NG-36
[31]   NG-37
[32]   NG-12
[33]   NG-14

9

she received a copy of "A Procedural Manual for Parents" from Ms. Zondra Johnson at the C.A.R.E. Center.[34]

37.    On January 3, 2005, a Student Evaluation Plan ("SEP") was signed reflecting the assessments that were to be undertaken: psychological (to be reviewed), speech and language (if completed to be reviewed), educational (to be reviewed) and any other evaluation that had been completed to be reviewed.[35]  Additionally, a "Private-Religious School Student Referral for Special Education Services" form was signed by the mother.[36]

38.    The mother testified that she brought the student back to the C.A.R.E. Center for testing in January 2005. A Comprehensive Psycho-Educational Evaluation was conducted on January 28, 2005 at the C.A.R.E Center by Ms. Linda Ann Flynn. Ms. Flynn is a school psychologist employed with DCPS. Prior to working for DCPS, she was a regular education teacher and special education teacher in New York and is certified in New York and the District of Columbia in regular and special education.[37]

39.    Ms. Flynn testified that she met the student when the mother brought her to the C.A.R.E. Center to be tested. The tests that she conducted are mentioned in her report and included the Wechsler Adult Intelligence Scale, Third Edition, Woodcock Johnson Tests of Achievement-III, Beery Buktenica Developmental Test of Visual-Motor Integration, Reynolds's Adolescent Depression Scale (RADS) and a review of the student's records.[38]

40.    Based on her testing of the student, Ms. Flynn concluded that "Her verbal abilities fell in the very superior range and her performance abilities fell in the superior range ability." Ms. Flynn also concluded that the student's "verbal language skills are areas of exceptional strength. Her very superior scores on the Vocabulary and Similarities subtests substantiate her very superior cognitive abilities." Ms. Flynn further concluded that "based on the cognitive and academic test results and behavior observations, there is not a severe discrepancy between her intellectual abilities and academic achievement." This resulted in Ms. Flynn concluding that the student was not eligible for special education with a specific learning disability. Ms. Flynn testified that the mother mentioned ADHD when she brought the student to be tested, but she could not recall if the mother mentioned whether or not the student was on medication when she brought her to be tested. I find the testimony of Ms. Flynn credible.

41.    By letter dated April 25, 2005, Ms. Diana Savit, counsel for the parents wrote Ms. Gloria Everett, at the C.A.R.E Center. The letter refers to "psychiatric reports" relating to the student, but the reports are not listed. Also attached to the letter was a "Summary of Medications Prescribed" prepared by Larry B. Silver, M.D. listing the medications prescribed for the student from March 2004 through December 2004. Dr. Silver stated his last session with the student was December 15, 2004. Also enclosed with counsel's letter was a letter dated April 18, 2005 from Dr. Lawrence A. Brain, Child Psychiatrist, who had treated the student after being referred by Carol Robbins, Ph.D. Dr. Brain stated in his letter that the student and the family were seen by him from May 2003 through November 2003.

---

[34]    NG-15
[35]    NG-17
[36]    NG-16
[37]    Testimony of Ms. Flynn.
[38]    NG-18

10

Dr. Brain stated in his letter that he had diagnosed the student with ADHD and prescribed Trilptal, Lexapro and Adderall.[39]

42.    On May 3, 2005, DCPS sent the parents a "Letter of Invitation" to attend a Multidisciplinary Team ("MDT") meeting for the purpose of reviewing evaluations, determine manifestation and discuss the student's eligibility for special education. The date of May 16, 2005 at 1:30 p.m. was one of three dates and times listed in the Letter, which is the date the meeting was held.

43.    Prior to the MDT meeting, a Clinical Psychological Consultation was performed by Denise White-Jennings, Ph.D, who prepared her report dated May 11, 2005.[40] Dr. White-Jennings is a Clinical Psychologist employed with DCPS at the C.A.R.E. Center. Among the assessment instruments utilized by Dr. White-Jennings were a record review of the student's records, including Dr. Cargo's report of January 2003, Conner's Teacher Rating Scale – Revised (L) – 3-11-05 completed by Mr. Drew Geer of the Buxton School and Conner's Parent Rating Scale – Revised – 2-27-05.[41] Drew Geer also completed a Classroom Observation on April 18, 2005.[42]

44.    Dr. White-Jennings testified that she had not met either the student or her parents.  In preparing her conclusions, she was made aware that the student was attending Buxton and that she was performing well there academically.  She said that she checked to see what kind of school Buxton was and learned that it was not a special education school and that it was not providing counseling services to the student. I find the testimony of Dr. White-Jennings credible.

45.    Dr. White-Jennings included in her report "Diagnostic Impressions" of the student, that the student

"has a history of depression with past suicide attempts and hospitalization.  She has been diagnosed with Major Depressive Disorder and prescribed Lexapro and Keflex according to Children's Hospital records from her 2003 hospitalization.  **No current psychiatric/treatment records were made available.  According to parent report (the student) has also been diagnosed with ADHD although records were not made available indicating this diagnosis. Current parent and teacher rating scales are suggestive of ADHD symtomotology however symptoms of restlessness, inattention, distractibility can be associated with depression.** (the student) is reported to be in ongoing psychotherapeutic treatment.  Current reports have been requested but have not been provided.  Diagnosis is deferred pending treatment/progress notes from her therapist."

(Emphasis added)

46.    On May 16, 2005, the MDT meeting was held at the C.A.R.E Center.  Ms. Gloria Everett coordinated the meeting.  Ms. Everett is employed by DCPS as a social worker/case manager.  Among her duties is to gather information about a student, contact parent and hold an MDT and if the and IEP

---

[39]    NG-23
[40]    NG-21
[41]    NG-19
[42]    NG-30

11

meeting when a student is determined eligible for special education services. If a student is determined ineligible for special education, the meeting is concluded at the MDT process.[43]

47.    The attendees at the MDT meeting were Ms. Everett, as LEA representative, both parents, Ms. Linda A. Flynn, who signed as general ed teacher/school psychologist, Ms. Vecia O. Bammer, special education teacher and Ms. Savit, student's counsel.[44]

48.    Ms. Everett testified that she was assigned the case at an MDT meeting on December 27, 2004. She attempted to get information concerning the student from Buxton, but was not successful and had to seek the mother's assistance to get school reports. Ms. Everett testified that the MDT meeting did not go forward until May 2005 because the team needed information from Buxton and since the school was in Massachusetts, DCPS could not do a classroom observation which eventually was performed on April 18, 2005 by Drew Geer of Buxton. [45] Ms. Everett did get a report from Buxton for the fall 2004[46] and for the winter 2005,[47] but not current medical information. Ms. Everett testified that the team discussed the Buxton program and that the school was a private regular education school with small classes and that the student was doing quite well there making "A's". Also, the team did not get information about any related services for the student.

49.    Ms. Everett testified that the information that the MDT team had to review at the subsequently held May 16, 2005 meeting were the DCPS Psycho-Education report conducted by Ms. Flynn, the DCPS Clinical Psychological report conducted by Dr. White-Jennings, and Buxton school reports. Ms. Everett also testified that the first time she saw Ms. Savit's April 25, 2005 letter that enclosed the summary of medication prescribed by Dr. Silver and the April 18, 2005 letter from Dr. Brain was at the MDT meeting. Based on the information that the team reviewed, the student was determined to be ineligible for special education services. I find Ms. Everett's testimony credible.

50.    Ms. Everett also testified that the parent said that there was some information that the team should consider at Wilson. However, Ms. Everett testified that when she went to Wilson she only found a report card from the 10th grade that reflected the student's poor performance, but also her poor attendance record. Ms. Everett testified that she received a letter from Ms. Savit about information that the MDT did not consider and asked that the MDT be reconvened.[48] Ms. Everett responded to counsel's letter on June 1, 2005 stating that DCPS considered all the information that had been presented.[49] I find the testimony of Ms. Everett credible.

51.    The mother testified that Ms. Everett at the C.A.R.E. Center commented about the student's last year at Wilson and said that if they had seen her then, they may have provided services to her. Ms. Everett testified that the MDT based its decision at the May 16, 2005 MDT meeting on whether the student was eligible at that time and determined that the student was not eligible in view of the current information that it had. In any event, Ms. Everett was not a participant in the 2003 meeting and a determination of eligibility for special education is a team decision and not that of one person.

---

[43]    Testimony of Ms. Everett
[44]    NG-22
[45]    NG-30
[46]    NG-28
[47]    NG-29
[48]    NG-24
[49]    NG-25

12

52.     The mother had also testified that Dr. Brain's April 18, 2005 letter was made available to DCPS at the MDT meeting at the C.A.R.E. Center on May 16, 2005, but it was not presented to Wilson in 2003. Furthermore, the information that Wilson had in 2003 was Dr. Cargo's report that did not confirm a diagnosis of either depression or ADHD. However, the C.A.R.E. Center concluded that as the student presented to them in the present, they did not see any need for special education.

53.     Carol Ann Robbins, Ph.D., also testified at the Hearing, on behalf of the parents. Dr. Robbins was qualified as an expert in psychology. Dr. Robbins is experienced in the diagnosis and treatment of depression and ADHD.[50]

54.     Dr. Robbins prepared a Psychological Report dated September 6, 2005 stating that she had began treating the student in the spring of 2003 due to concerns regarding her declining academic performance and her emotional fragility. Dr. Robbins states in her report that the student was very unhappy at Wilson and that her "academic struggles contributed to her poor self-esteem, her skipping classes, and her social problems." Dr. Robbins further stated that she reviewed the student's then psycho-educational test which she was Dr. Cargo's January 2003 evaluation. Dr. Robbins however states in her letter that she diagnosed the student with ADHD and Major Depression.[51]

55.     Dr. Robbins stated in her letter that at the time she began treating the student, she was struggling academically because her school environment did not support her ADHD. Dr. Robbins stated that the student found the classes at Wilson large and overwhelming and that the student struggled to keep up with her work and acted out in frustration. Dr. Robbins further stated that at times the student felt too emotionally overwrought to stay in class and would panic and leave the classroom. The record does not indicate that this information had been presented to Wilson.

56.     Dr. Robbins recommended small classes and a highly structured environment for the student and that the student "should have received additional supports such as designation of a place she could have gone when she felt overwhelmed and needed counseling."

57.     Dr. Robbins testified that she was consulted about a school setting for the student and felt she needed a smaller environment and structured support. Dr. Robbins testified that she did not believe that a public school could provide the right kind of environment for the student. Dr. Robbins felt that the student could not go back to a school such as Wilson and supported the student attending Saint James because of its smaller size and more structured supports and small class sizes. Dr. Robbins also supported the student going to Buxton because it is a small school, more support and a cohesive community. Dr. Robbins said that the student is achieving academic success at Buxton due to the small class sizes small environment, support, a sense of belonging and that the student would be overwhelmed by a large setting. Dr. Robbins testified that she had seen the student 6 times since she had been to a private school with the last time being June 5, 2005. Dr. Robbins was not aware of accommodations that Buxton had been providing the student, if any. She also did not know if the student could leave class if she felt overwhelmed. Dr. Robbins testified that she was aware that the student had a substance abuse problem (alcohol) and testified that it had been addressed.

---

[50]     See NG33 and NG34
[51]     NG-32

13

58.    Dr. Robbins could not recall in her testimony if the parents had informed her about a 504 Plan conference.

## DECISION AND CONCLUSIONS OF LAW:

1.    The parents filed their Complaint contending that DCPS failed to offer the student a Free and Appropriate Public Education ("FAPE") in accordance with 34 C.F.R. §300.300. This obligation includes identifying, locating and evaluating children in all areas of suspected disabilities 34 C.F.R. §300.125, developing an IEP, 34 C.F.R. §300.340, convening a meeting to develop, review and revise the IEP of a student with a disability, 34 C.F.R. §300.340 and determining an appropriate placement 34 C.F.R. §300.552, et. seq. Four issues were presented in the complaint:

A.    Whether the student was eligible for special education during the 2002-2003 school year and if so, whether DCPS should reimburse the parents for their unilateral placement of the student in a private school?

B.    Whether the student is entitled to compensatory education?

C.    Whether the student is currently eligible for special education, and if so, whether her current placement at the Buxton School is appropriate?

D.    Whether DCPS should be prospectively responsible for the student's special education?

## A.    Whether the student was eligible for special education during the 2002-2003 school year and if so, whether DCPS should reimburse the parents for their unilateral placement of the student in a private school?

2.    In order to qualify for special education and related services under the IDEIA a student must meet a two-part test. First, the student must be a "child with a disability," that, pursuant to the IDEIA, means a child "with mental retardation hearing impairments (including deafness) speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this title as 'emotional disturbance'), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities.[52] Secondly, the student must be shown to be in need of special education and related services.[53] If the student has one of the above mentioned disabilities, but only needs a related service and not special education service, the student is not a child with a disability.[54]

3.    The disabling conditions are defined in the 1999 IDEA regulations[55] and include emotional disturbance, defined as "a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that **adversely affects a child's educational**

---

[52]    20 U.S.C. 1401(3) (A) (i)
[53]    20 U.S.C. 1401(3) (A) (ii)
[54]    Based on the 1999 IDEA regulations; 34 C.F.R. 300.7
[55]    As of the date of this decision the regulations implementing IDEIA 2004 have not been promulgated.

14

**performance:** An inability to learn that cannot be explained by intellectual, sensory, or health factors; An inability to build or maintain satisfactory interpersonal relationships with peers and teachers; Inappropriate types of behavior or feelings under normal circumstances, a general pervasive mood of unhappiness or depression, a tendency to develop symptoms or fears associated with personal or school problems.[56].

4. The term "other health impairment" is defined as "having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that is due to, among other things, attention deficit hyperactivity disorder and which **"adversely affects a child's educational performance."**

5. Special education is defined in IDEIA as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings…"[57]

6. The term "related services" means "transportation, and such developmental. Corrective, and other supportive services…as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children."[58]

7. The parents contend that the student is eligible for special education and that DCPS denied the student FAPE for violating the "Child Find" requirements of the IDEA, 34 C.F.R. §300.125. In this regard, it is alleged that DCPS was on notice in 2003 that the student was in need of special education due to a diagnosis depression and ADHD. This contention stems initially from a report developed by Dr. Cargo in January 2003[59]; however, Dr. Cargo did not diagnose the student with either disability. In May 2003, Dr. Robbins submitted a letter[60] to DCPS indicating that the student had been diagnosed with both disabilities, but her letter did not enclose any evaluations that she had conducted and furthermore, the record here does not reveal an evaluation supporting Dr. Robbins conclusions in her 2003 letter. Again the only evaluation presented during this period of time was that of Dr. Cargo. It is also noted that the student's grades prior to her attendance at Wilson were above average.[61] However, at Wilson not only did her grades suffer, but her attendance in classes was poor. Obviously, if a student fails to attend classes on a regular basis there is a likelihood that the student's grades and overall success in school may suffer as a result.

8. There was testimony and exhibits reflecting that the student had emotional issues, but based on the record and the testimony of the witnesses, the emotional issues as noted by the parents and her therapist did not manifest themselves in class at Wilson in 2003. Dr. Cargo reported that the student was skipping her classes to be with friends to get food or to go to someone's house. There was insufficient evidence that the student skipped her classes due to acting out in class because of her being

---

[56]  34 C.F.R. 300.7 (c)(4)
[57]  20 U.S.C. 1401(29)
[58]  20 U.S.C. 1401(26)
[59]  NG-4
[60]  NG-10
[61]  Enclosed in NG-1

15

overwhelmed with school work as suggested by the parents and Dr. Robbins, who, based on the record, did not interact with Wilson except by correspondence initially in May 2003.[62]

9.      The mother testified that Wilson failed to notify her about the student skipping her classes. I find this testimony not credible in view of the numerous pieces of correspondence between the parties where the parents as well as the school specifically mentioned that the student was doing poorly as a result of her not going to class.[63]

10.     The mother also testified that she was not aware that there had been a 504 Plan meeting held at her request as well as that of Dr. Robbins. I find this testimony not credible in view of the e-mails between the parties where the term "504 Plan Conference" were specifically mentioned.[64] What is not clear from the record is whether a plan was in fact developed. However, in this regard, it must be noted that in view of the date of the meeting, May 16, 2003 and that the school year was quickly coming to an end, that any plan developed would have been implemented in the following school year. Accordingly, there is no basis to conclude that DCPS failed to comply with the Child Find Obligations. What is clear is that the student had excessive absenteeism that quite clearly affected her performance in school.

11.     This Child Find obligation that the IDEA imposes on school districts is an affirmative obligation to identify, locate and evaluate children suspected of having disabilities and being in need of special education and related services. 34 C.F.R. §300.125(a)(ii). Because the "Child Find" requirement is an affirmative obligation, a parent is not required to request that a school district identify and evaluate a child. *Robertson County School System, v. King*, 24 IDELR 1036 (6th Cir. 1996. However, a local educational agency (here, DCPS) is not required to "guess" which children suffer from a handicap that renders them incapable of progressing in their education; nor does the Child Find obligation relieve a parent and others of an obligation to assist school officials in identifying children in need of special services. *Huntsville City Board of Education*, 22 IDELR 931 (SEA Ala. 1995)

12.     With respect to this Child Find obligation of DCPS, based on the evidence, the student had excessive absenteeism during the 2002-2003 school year which consequently hurt her grades. In any event, with so many absences, the student was clearly not available for learning. Therefore, with regard to Child Find, based on the evidence, DCPS has met its burden; there is no evidence to support DCPS failing to identify, evaluate and place the student pursuant to Child Find. Being absent from school does not mean that a child has a disability that warrants special education.

13.     Under the IDEA, parents who unilaterally decide to place their disabled child in private school, without consent of local school officials, "do so at their own risk." In *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993), *aff'g* 950 F.2d 156 (4th Cir. 1991); quoting *Sch. Comm. of Burlington v. Dep't of Educ. Of Mass.,*, 471 U.S. 359 at 372 (1985). The Supreme Court held in *Carter* that once it is determined that a school system has "defaulted" on its obligations under IDEA, the school district can be ordered to reimburse the parents of a student who was unilaterally placed for the cost of the tuition. Tuition reimbursement is warranted when the services offered by the district were inadequate or inappropriate and the services obtained by the parent are appropriate and equitable considerations

---

[62]      NG-1, NG-10 & NG-11
[63]      See NG-1, NG-3, NG-6 through NG-9
[64]      NG-9

16

support the parents claim. Here, there is no evidence that Wilson was not an appropriate placement or that Buxton is an appropriate placement for a special education student.

14.    Furthermore, a parent may be denied tuition reimbursement if they do not provide notice to the school district that they intend to remove the child from the public school, intending to instead to place the child in a private school:

> "If at the most recent IEP meeting the parents attended prior to removal of the child from Public school, they did not inform the IEP team that they were rejecting the placement proposed by the district, including stating their concerns and their intent to enroll the child in private school at public expense; or 10 business days prior to removal of the child from the public school the parents did not give written notice to the district of aforesaid concerns and intent to remove.[65]

> If prior to the parents removal of the child from the public school, the district informed them, through the notice requirements of Section 615(b)(3), of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation.[66]

> Upon a judicial funding of unreasonableness with respect to the actions taken by the parents."[67]

15.    Furthermore, the failure of the parents to give the school district notice that the student might be eligible for special education before enrolling the child in a private school cut off their entitlement to reimbursement. in *Greenland School District v. Amy N. ex rel. Kattie C.*, 40 IDELR 203 (1st Cir. 2004); *Ms. M. ex rel. K.M. v. Portland school Committee*, 40 IDELR 228 (1st Cir. 2004).

16.    See also *In re Owen J. Roberts Sch. Dist.*, 29 IDELR 742 (SEA Pa 1998) (administrative appeal denying reimbursement for a private school offering small class sizes, but no special education services); *Wise v. Ohio Dept. of Educ.*, 80 F.3rd 177, 185 (6th Cir. 1996); *Hines v. Tullahoma City Sch.*, No. 97-5103/04, 1998 WL 393814 (6th Cir. 1998)

17.    Here, the parents did not give notice to DCPS that they were removing the her from Wilson and placing her unilaterally at Saint James before enrolling her and before she started to attend classes. Furthermore, the parents did not give notice to DCPS that they had removed the student from Saint James and placed her at Buxton before she started to attend classes there. Based on the evidence, the first time DCPS was put on notice that the parents had placed the student in a private school was November 23, 2004, more than one full school year after doing so, when the student was at Buxton, after the student had started to attend classes. Accordingly, there is no basis to support reimbursement to the parents for the cost of their unilateral placement of the student in private schools.

## B.    Whether the student is entitled to compensatory education?

[65]    20 U.S.C. 1412 (a)(10)(C)(iii)(aaa)-(bb)
[66]    20 U.S.C. 1412 (a)(10)(C)(iii)(II)
[67]    20 U.S.C. 1412 (a)(10)(C)(iii)(III)

17

18.    In view of the fact that there is no finding of a denial of FAPE for violating the child find obligation, there is no finding that the student is entitled to compensatory education. Furthermore, there was no evidence as to what services the student was entitled to receive that she did not receive as a result of Wilson. The student did in fact miss classes, but due to her skipping her classes and hospitalization; in any event, the record here does not suggest that the student missed classes as a result of what DCPS did or failed to do. Again, the student had a record of skipping classes, which, as much as anything else, contributed to any educational activities she may have missed.

## C.    Whether the student is currently eligible for special education, and if so, whether her current placement at the Buxton school is appropriate?

19.    The student is currently attending Buxton which is not a special education school, but a college preparatory school. Before attending Buxton, the student attended Saint James, also a private college preparatory school. Based on the affidavits of Ms. Gayle[68] and Mr. Gayle,[69] the student is performing well. She has had focusing issues, which, based on their affidavits, the student corrects, apparently on her own, once she is told to stay on task.

20.    Based on the testimony and report of Dr. Robbins. The student has emotional issues due to her depression and therefore it was suggested that she meets the criteria of Emotional Disturbance. Additionally, the student has been diagnosed by Dr. Robbins with ADHD and therefore it is suggested that she meets the criteria of "Other Health Impaired." However, it is not sufficient to be diagnosed with one of the listed disabilities, but additionally, there must be an adverse impact on her on her educational performance. Based on her records from both Saint James and Buxton, the student's academic performance has not been adversely impacted, but in fact, she is doing well. The record is not clear as to the impact, if any, of any medication the student may be taking, but again, based on the affidavits of two of the student's teachers at Buxton, the student will get back on track by simply being told to do so, which does not suggest that her condition has an adverse impact on her educational performance.

21.    With regard to her emotional issues, as stated earlier, there was insufficient evidence that the student displayed such at school other than her skipping classes, which could have been the result of a multiplicity of reasons unassociated with Wilson. There was no evidence that Wilson had been advised of any emotional issues with respect to the student prior to the mother informing them of such. Also, there was evidence of attempted suicide during the Spring of 2003; however, instead of requesting special education services, Dr. Robbins, a highly qualified psychologist, recommended accommodations instead. It appears to this Hearing Officer, had the student remained at Wilson instead of being removed and placed by her parents at Saint James and then Buxton, there is no evidence to suggest that the student would not have received the accommodations suggested by Dr. Robbins and which apparently Saint James and Buxton can provide, due to the size of the school.

22.    With regard to the question of the appropriateness of Buxton as a placement, again, Buxton is not a special education school, but the evidence does not support that the student qualifies for special education services. Both Saint James and Buxton are residential placements, and it can be concluded that the student performs well in such an environment. However, that does not make Buxton an appropriate placement for the student if it were concluded that she requires special education

---

[68]    NG-36
[69]    NG-37

18

services, which, based on the evidence in this case, she does not. Without a determination that the DCPS has denied the student FAPE, a private placement at Buxton is not warranted.

23.     With regard to FAPE, in *Board of Education of the Hendrick Hudson Central School District v. Rowley,* 458 U.S. (1982), the Supreme Court provided guidance consisting of a two-part analysis: first, a determination must be made regarding a failure to comply with the procedural requirements of the IDEA; and secondly, whether the individualized educational program developed through the IDEIA's procedures is reasonably calculated to enable the student to receive educational benefit.

24.     Based on the facts here, there is no basis to conclude that Wilson is not an appropriate placement for the student. Also, the evidence shows that Wilson expected the student to return in the fall of 2003. Therefore, DCPS did comply with the procedural aspects of *Rowley* by having available an appropriate placement for the student. Accordingly, there is no basis to conclude that DCPS did not offer a program reasonably calculated to enable the student to receive educational benefit, satisfying the two-part analysis in *Rowley.*

25.     Also, it must be noted that academic results have been recognized as an important factor in determining whether an IEP is reasonably calculated to provide educational benefits. See Defendant I 898 F. 2d at 1191 (Quoting *Rowley,* 458 U.S. at 207 n. 28); *Roland M. v. Concord Sch. Comm.,* 910 F. 2d 983, 991 (1st Cir. 1990). Nonetheless, evidence of academic progress at a private school does not itself establish that the private placement offers adequate and appropriate education under the IDEA. *Rome Sch. Comm. v. Mrs. B.,* 247 F. 3d 29, 33 (1st Cir. 2001). Nor are parents entitled to reimbursement for private school just because the private placement is less restrictive than the public school placement. See *Milford Sch. Dist. v. William F.,* No. 97-1506, 1997 WL 696108, at ** 6 (1st Cir. Nov. 10, 1997) (unpublished disposition) ("Even if the private school was less restrictive, it would still have to be a placement deemed appropriate by an authorized decision maker in terms of educational benefit.").

26.     It must be kept in mind that retroactive reimbursement is an equitable remedy for the failure of the public school to provide a FAPE to a disabled student. *Burlington,* 471 U.S. at 371-74. As such, a private school placement must be consistent with the purposes of the IDEA. See *Gillette v. Fairland Bd. of Educ.,* 932 F. 2d 551, 554 (6th Cir. 1991) ("Removing a child from a partially mainstreamed program at a public school, which otherwise provides an appropriate academic instruction and the only objection to that program was a failure to fully mainstream, and placing that child in a non-mainstreamed program in a private school does not satisfy the goals of the Act.").

**D.    Whether DCPS should be prospectively responsible for the student's special education?**

27.     With regard to the question as to DCPS' prospective responsibility for the student's special education, since she is not eligible for special education as discussed above, DCPS is not responsible for her private school placement.

31.     The Rules of the D.C. Board of Education, Section 3030.3 requires that DCPS shall bear the burden of proof, based solely upon the evidence and testimony presented at the hearing, that the action or proposed placement is adequate to meet the educational needs of the student. Based on the evidence as discussed herein, DCPS met its burden, there was no denial of the "Child Find" obligation, the student is not eligible for special education as either emotionally disturbed or other health impaired,

19

therefore, there is no entitlement to compensatory education, nor are the parents entitled to be reimbursed for their unilateral placement of the student at Buxton, which may be an appropriate placement for this student, but which is not an appropriate placement as a special education placement. Buxton does not advertise itself as such and in fact is clearly a very good regular education residential school offering a college preparatory curriculum.

**ORDER:**

The complaint filed in this mater is **DISMISSED**.

**APPEAL PROCESS:**

**This is the final administrative decision in this matter.  Appeals on legal grounds may be made to a court of competent jurisdiction within 90 days of the rendering of this decision.**

Date: 1-23-06

Issued: 1/23/06

David R. Smith, Esq.
Impartial Hearing Officer

20

**INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400**

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**IMPARTIAL DUE PROCESS HEARING**

| | |
|---|---|
| In the Matter of ) | **CERTIFICATION OF RECORD** |
| ) | |
| Natalia Gomez ) | |
|      Petitioner, ) | |
| ) | |
| v. ) | |
| ) | |
| District of Columbia Public Schools ) | |
| 825 North Capitol Street, NW ) | |
| Washington, DC 20002 ) | |
| ("DCPS" or "District") ) | |
|      Respondent. ) | |

    I, David R. Smith, Impartial Due Process Hearing Officer in this matter, DO

HEREBY CERTIFY that the attached Record of Proceeding itemizes the record in

the above-entitled matter as of this date, consisting of the items admitted into evidence,

including disclosure exhibits and the audio tape recording of the Due Process Hearing.

    EXECUTED this 23 rd day of January 2006.

    DUE PROCESS HEARING OFFICER

21

01/23/2006  16:11    2024425556    STUDENT HEARINGS ⌐F    PAGE  23/23

## MATTER OF NATALIA GOMEZ V. DCPS

### RECORD OF PROCEEDING

| DATE | DESCRIPTION |
|------|-------------|
| 6-30-05 | Request for Due Process |
| | Notice of Pre-Hearing Conference (as applicable) |
| 11-28-05 | Notice of Hearing |
| 12-5-05 | DCPS Disclosure Exhibits: DCPS Letter and Exhibits 1 & 2 |
| 12-9-05 | Audio recordings of hearings |
| 1-13-06 | |
| 12-1-05 | Parent Disclosure Exhibits: NG-1 through NG-41 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

22