r

| | |
|---|---|
| **School Name** | Buxton School |
| **Bill Payer** | Mr. Manuel R Gomez |
| **Account #** | 802027937 |
| **Original Contract Amount** | 31,500.00 |
| **Previous Contract Amount** | |
| **Current Contract Amount** | 31,500.00 |
| **Total Paid to SMS** | 31,500.00 |
| **Total Disbursed to the School** | 31,500.00 |
| **Enrollment Fees** | 60.00 |
| **Account Status** | Completed |
| **Life Insurance** | Cancelled |

451

## Account Summary

top of page

| Contract Amounts | | | | | | | Fees | | | |
| Contract Total | Term | Balance Due | Paid to AMS | Currently Due | Disbursed to School | Next Due Date | Assessed | Paid | Amount to AMS | Amount to School |
|---|---|---|---|---|---|---|---|---|---|---|
| 31,500.00 | AN | 0.00 | 31,500.00 | 0.00 | 31,500.00 | | 0.00 | 0.00 | 0.00 | 0.00 |

## Account Detail

| Due Date | Invoice Amount | Amount Paid | Last Payment Received | Open Balance | Type | Term | Disbursed |
|---|---|---|---|---|---|---|---|
| 07/01/2004 | 3,937.50 | 3,937.50 | 07/27/2004 | 0.00 | Education Expenses | AN | 3,937.50 |
| 08/01/2004 | 3,937.50 | 3,937.50 | 07/27/2004 | 0.00 | Education Expenses | AN | 3,937.50 |
| 09/01/2004 | 3,937.50 | 3,937.50 | 08/23/2004 | 0.00 | Education Expenses | AN | 3,937.50 |
| 10/01/2004 | 3,937.50 | 3,937.50 | 10/06/2004 | 0.00 | Education Expenses | AN | 3,937.50 |
| 11/01/2004 | 3,937.50 | 3,937.50 | 10/25/2004 | 0.00 | Education Expenses | AN | 3,937.50 |
| 12/01/2004 | 3,937.50 | 3,937.50 | 11/24/2004 | 0.00 | Education Expenses | AN | 3,937.50 |
| 01/01/2005 | 3,937.50 | 3,937.50 | 12/29/2004 | 0.00 | Education Expenses | AN | 3,937.50 |
| 02/01/2005 | 3,937.50 | 3,937.50 | 01/31/2005 | 0.00 | Education Expenses | AN | 3,937.50 |

Only payments due are sent to the school.

Contract Information



**Payer Info**
**Student Info**
**Plan Info**
**Account Changes**
**Password Change**
  *Contract Change*
**One Time Payment**
  *Credit Card*
  *Electronic Check*
**Recurring Payments**
  *ACH*
  *Credit Card*
**Exit InfoLink**

InfoLink

**Student Contract Information for Miss Natalie P G▇▇▇**
**2005 - 2006 Plan No 900002608**

View Online Statement

skip down the page to: ACCOUNT DETAIL

MESSAGES

| | |
|---|---|
| School Name | Buxton School |
| Bill Payer | Mr. Manuel R Gomez |
| Account # | 902186527 |
| Original Contract Amount | 32,500.00 |
| Previous Contract Amount | 32,500.00 |
| Current Contract Amount | 31,500.00 |
| Total Paid to AMS | 23,675.01 |
| Total Disbursed to the School | 23,675.01 |
| Enrollment Fees | 55.00 |
| Account Status | Active |
| Life Insurance | In Force |

**Account Summary**

| Contract Amounts | | | | | | | Fees | | |
|---|---|---|---|---|---|---|---|---|---|
| Contract Total | Term | Balance Due | Paid to AMS | Currently Due | Disbursed to School | Next Due Date | Assessed | Paid | Amount to AMS |
| 31,500.00 | AN | 7,824.99 | 23,675.01 | 2,608.33 | 23,675.01 | 12/01/2005 | 0.00 | 0.00 | 0.00 |

https://secure.tuitionpay.com/cgi-bin/WebObjects/AMSInfoLink.woa/3/wo/B96GiciLc5oS2Ivuzs8mKNK54x1/0.4.1.5.20.3.7

11/29/2005

453

PLAINTIFF'S
EXHIBIT
NG 41

Contract Information

## Account Detail

| Due Date | Invoice Amount | Amount Paid | Last Payment Received | Open Balance | Type | Term | D |
|---|---|---|---|---|---|---|---|
| 03/01/2005 | 2,708.37 | 2,708.37 | 03/08/2005 | 0.00 | Education Expenses | AN | |
| 04/01/2005 | 2,708.33 | 2,708.33 | 03/29/2005 | 0.00 | Education Expenses | AN | |
| 05/01/2005 | 2,608.33 | 2,608.33 | 04/29/2005 | 0.00 | Education Expenses | AN | |
| 06/01/2005 | 2,608.33 | 2,608.33 | 05/31/2005 | 0.00 | Education Expenses | AN | |
| 07/01/2005 | 2,608.33 | 2,608.33 | 07/01/2005 | 0.00 | Education Expenses | AN | |
| 08/01/2005 | 2,608.33 | 2,608.33 | 07/27/2005 | 0.00 | Education Expenses | AN | |
| 09/01/2005 | 2,608.33 | 2,608.33 | 08/29/2005 | 0.00 | Education Expenses | AN | |
| 10/01/2005 | 2,608.33 | 2,608.33 | 09/22/2005 | 0.00 | Education Expenses | AN | |
| 11/01/2005 | 2,608.33 | 2,608.33 | 10/27/2005 | 0.00 | Education Expenses | AN | |
| 12/01/2005 | 2,608.33 | 0.00 | | 2,608.33 | Education Expenses | AN | |
| 01/01/2006 | 2,608.33 | 0.00 | | 2,608.33 | Education Expenses | AN | |
| 02/01/2006 | 2,608.33 | 0.00 | | 2,608.33 | Education Expenses | AN | |

Only payments due are sent to the school.

| Messages |
|---|
| No Messages |

## Be sure to use your statement stub when submitting payments

Questions and/or changes to your account should be sent to AMS at info@amsweb.com
Be sure to include your account number on all correspondence

top of page

(c) 1995-2005 AMS. All rights reserved.

https://secure.tuitionpay.com/cgi-bin/WebObjects/AMSInfoLink.woa/3/wo/B96GiciLc5oS2Ivuzs8mKNK54x1/0.4.1.5.20.3.7    11/29/2005

454

Page 3 of 3

Contract Information

View our privacy policy, and terms of use

455

**Student Contract Information for Miss N█████ P G█████ 2006 - 2006 Plan No 800902508**

View Online Enrollment

skip down the page to: ACCOUNT DETAIL

| | |
|---|---|
| School Name | Buxton School |
| Bill Payer | Mr. Manuel R Gomez |
| Account # | 900186757 |
| Original Contract Amount | 32,500.00 |
| Previous Contract Amount | 32,500.00 |
| Current Contract Amount | 31,500.00 |
| Total Paid to AMS | 23,675.01 |
| Total Disbursed to the School | 23,675.01 |
| Enrollment Fees | 55.00 |
| Account Status | Active |
| Life Insurance | In Force |

456

## Account Summary

### Contract Amounts

| Contract Total | Term | Balance Due | Paid to AMS | Currently Due | Disbursed to School | Next Due Date | Fees Assessed | Paid | Amount to AMS | Amount to School |
|---|---|---|---|---|---|---|---|---|---|---|
| 31,500.00 | AN | 7,824.99 | 23,675.01 | 2,608.33 | 23,675.01 | 12/01/2005 | 0.00 | 0.00 | 0.00 | 0.00 |

### Account Detail

top of page

| Due Date | Invoice Amount | Amount Paid | Last Payment Received | Open Balance | Type | Term | Disbursed |
|---|---|---|---|---|---|---|---|
| 03/01/2005 | 2,708.37 | 2,708.37 | 03/08/2005 | 0.00 | Education Expenses | AN | 2,708.37 |
| 04/01/2005 | 2,708.33 | 2,708.33 | 03/29/2005 | 0.00 | Education Expenses | AN | 2,708.37 |
| 05/01/2005 | 2,608.33 | 2,608.33 | 04/29/2005 | 0.00 | Education Expenses | AN | 2,708.33 |
| 06/01/2005 | 2,608.33 | 2,608.33 | 05/31/2005 | 0.00 | Education Expenses | AN | 2,608.33 |
| 07/01/2005 | 2,608.33 | 2,608.33 | 07/01/2005 | 0.00 | Education Expenses | AN | 2,608.33 |
| 08/01/2005 | 2,608.33 | 2,608.33 | 07/27/2005 | 0.00 | Education Expenses | AN | 2,608.33 |
| 09/01/2005 | 2,608.33 | 2,608.33 | 08/29/2005 | 0.00 | Education Expenses | AN | 2,608.33 |
| 10/01/2005 | 2,608.33 | 2,608.33 | 09/22/2005 | 0.00 | Education Expenses | AN | 2,608.33 |
| 11/01/2005 | 2,608.33 | 2,608.33 | 10/27/2005 | 0.00 | Education Expenses | AN | 2,608.33 |
| 12/01/2005 | 2,608.33 | 0.00 | | 2,608.33 | Education Expenses | AN | 2,608.33 |
| 01/01/2006 | 2,608.33 | 0.00 | | 2,608.33 | Education Expenses | AN | |

nr

T7256

1

GOVERNMENT OF THE DISTRICT OF COLUMBIA

DEPARTMENT OF PUBLIC SCHOOLS

OFFICE OF STUDENT HEARINGS

- - - - - - - - - - - - - x
                          :
In the Matter of:         :
                          :
N███████ G██████          :
                          :
- - - - - - - - - - - - - x

Washington, D.C.

Wednesday, September 14, 2005

The above-entitled matter came on for

hearing, pursuant to notice.

BEFORE:

FRED WOODS, Hearing Officer

APPEARANCES:

On Behalf of the Student/Parent:

D. SAVIT, ESQ.

On Behalf of D.C. Public Schools:

L. RIVERA, ESQ.

[TRANSCRIPT PREPARED FROM A TAPE RECORDING.]

458

nr

2

459

1    P R O C E E D I N G S

2    HEARING OFFICER WOODS:  Good afternoon.

3  It is Wednesday, September 14, 2005.  My name is

4  Fred Woods.  I am the independent Hearing Officer

5  convening the due process hearing for N▆▆▆▆

6  G▆▆▆.   I have N▆▆▆▆ birth date as July 21,

7  1987.

8         This hearing is being convened in

9  accordance with the Individuals with Disabilities

10  Education Act and the Federal and District of

11  Columbia laws and regulations that implement the

12  Act.

13         The purpose for this hearing is to

14  determine whether the District of Columbia Public

15  Schools, who is represented here today by their

16  attorney advisor, Ms. Lenore Rivera, had complied

17  with those rules.

18         My role as the Hearing Officer is to

19  receive the testimony and review the documents that

20  the parties will submit and provide in support of

21  their respective case and, based on that

22  information and the law, reach a decision with

nr

3

1  regard to the issues presented for resolution.

2       That decision will be placed in the form

3  of a written order and provided to the parties

4  within ten days of this hearing date through their

5  attorney.

6       For the parents, I think it is Manuel

7  Gomez; is that correct?

8       MR. GOMEZ:  Yes; that is right.

9       HEARING OFFICER WOODS:  And Ms. Sylvia

10 Correa.

11      MS. CORREA:  Yes.

12      HEARING OFFICER WOODS:  Welcome to you

13 both.  This information is primarily for you.  This

14 hearing is considered a closed hearing, meaning

15 noone else would be invited into this room, unless

16 they were a witness or party to this case.

17      If, however, you two decide you want it to

18 be an open hearing, meaning anyone is welcome to

19 come in and sit and observe, you can just advise of

20 that and I won't necessarily invite people in, but

21 if they happen to drop in, we will allow them to

22 stay.  But unless you suggest it be an open

nr

4

1  hearing, we will keep it closed.

2        The hearing is, however, being audio

3  recorded and it would be helpful, therefore, if

4  each of you would be in front of a microphone so we

5  could make sure we pick up your voice when you are

6  speaking.

7        Before further explaining how the hearing

8  will go, what I will do is allow everyone present

9  to introduce themselves and then visit with the

10  lawyers to see where we are with regard to this

11  case.

12        Ms. Savit?

13        MS. SAVIT:  I am Diana Savit.  I am

14  N█████████ attorney, also representing the parents

15  today, Sylvia Correa and Manuel Gomez, N███████

16  parents, and [off microphone].

17        HEARING OFFICER WOODS:  So that the

18  recorder can get used to their voices, I am going

19  to allow them to also introduce themselves.

20        MS. CORREA:  Yes.  Hello.  I am Sylvia

21  Correa.  I am N███████ G███████ mother.

22        MR. GOMEZ:  Manuel Gomez.  I am N███████

nr

5

1 father.

2        MS. ROBBINS:  Carol Robbins, her

3 psychologist.

4        MS. RIVERA:  DCPS court liaison attorney

5 advisor, Lenore Rivera.

6        HEARING OFFICER WOODS:  Okay.  Welcome to

7 you all, and always a special welcome to the

8 parents here.

9        Let me ask Ms. Savit if the parents have

10 been advised of their due process rights.

11        MS. SAVIT:  Yes, they have.

12        HEARING OFFICER WOODS:  And would you

13 waive formal reading of those rights here?

14        MS. SAVIT:  Yes.

15        HEARING OFFICER WOODS:  And what I will do

16 at this point is acknowledge and admit the

17 documents that the attorneys want to rely on in

18 this case, before asking them about the nature of

19 the case itself.  These are referred to as five-day

20 disclosures.

21        I have received from Ms. Savit a

22 disclosure letter dated September 6, 2005, and it

nr

6

1  lists, I count, five witnesses; is that right?

2          MS. SAVIT:  Correct.  We actually

3  designated William Bennett or a designated

4  representative of the Buxton School, and Mr.

5  Bennett has actually designated two teachers.  So

6  there might be six all together.

7          HEARING OFFICER WOODS:  Okay.

8          MS. SAVIT:  There was no one person who

9  could give all of the information we need.

10          HEARING OFFICER WOODS:  Okay.  I will keep

11  it at five.  If there are two designated, unless

12  there is objection, those two could be the

13  stand-in.  So five witnesses that were disclosed

14  and 34 exhibits, pre-marked, labeled and tabbed,

15  NG-1 through 34.

16          Ms. Rivera, are you in receipt of that

17  disclosure?

18          MS. RIVERA:  Yes, we are.

19          HEARING OFFICER WOODS:  Any objection to

20  it?

21          MS. RIVERA:  We object to the entire

22  disclosure, along with the witnesses.

463

nr

1          HEARING OFFICER WOODS: Okay. Let me hear

2     your objection, then.

3          MS. RIVERA: Our objection, Hearing

4     Officer, relates to the fact that under the rules,

5     the parents were to provide DCPS written notice of

6     a unilateral placement ten days before they removed

7     a student from DCPS and placed them in a private

8     school.

9          If you will notice, in the disclosure,

10    there is absolutely no ten-day written notice

11    anywhere. So DCPS was not on notice that this

12    student was moving to Massachusetts or whatever

13    school she was in.

14         So I would object to any disclosure

15    statement after her withdrawal date of 10/1/03,

16    because they are irrelevant.

17         It doesn't--I mean, we are talking about

18    reimbursement and the witnesses that would speak to

19    this student's reimbursement. It is on the record.

20    DCPS has withdrawn on 10/1/03, which I have

21    admitted into evidence, and there is no ten-day

22    written notice, as required under the IDEA, under

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1  Section 300.403(ii).

2       There is no ten-day written notice to us

3  that tells us that the parents had wanted to

4  unilaterally place this child because they weren't

5  receiving special education services.

6       In addition, there is one document I will

7  allow.  The parents made no request from us--I

8  mean, to us for special education services.  They

9  did, in fact, make a request a year later for 504

10 accommodations, but it was not a request for

11 special education services.

12      That is their document NG-14, which is

13 dated December 16, 2004.  That is well past the

14 IDEA's requirement of a ten-day notice informing us

15 that this student is unilaterally placed for IDEA

16 reasons.  And 504 and IDEA are two different

17 requests.

18      DCPS was never on notice that this child

19 wanted--or these parents wanted special education

20 services, and so they are barred now from coming

21 back two years later requesting reimbursement for a

22 kid we had no idea was in a private school

nr                                                                    9

1    somewhere.

2              HEARING OFFICER WOODS:  What was the

3    exhibit you just referred to?

4              MS. RIVERA:  Ours or theirs?  Their

5    exhibit is NG-14, consent for evaluation, which you

6    will clearly see is a request for 504, not for

7    special education services.

8              The school system had no notice regarding

9    this student's request for special education, and

10   especially no written notice as prescribed by the

11   law.  It is clearly written in the IDEA that they

12   are to provide us the ten-day unilateral letter.

13   It is not anywhere in the disclosure.

14             They did not provide that to us.  We had

15   no notice they were removing this student to a

16   private school for two years because they weren't

17   receiving special education services, when, in

18   fact, they didn't request special education

19   services.  They requested 504 services almost a

20   year later, a year after she had already been in

21   private school.

22             Where is the 504 on that form?

nr

10

1          MS. RIVERA:  Right here where it says,

2    "Wilson failed to recognize the potential presence

3    of a disability and neither initiated the special

4    education evaluation process nor responded to the

5    request by Mr. Gomez and Ms. Correa."

6          HEARING OFFICER WOODS:  NG-14?

7          MS. RIVERA:  Yes.  That is NG-14.

8          HEARING OFFICER WOODS:  My NG-14 is a

9    consent to evaluate.

10          MS. RIVERA:  That is not mine.

11          MS. SAVIT:  What are you reading as your

12    NG-14?

13          MS. RIVERA:  This letter right here to--

14          MS. SAVIT:  What is the date?

15          MS. RIVERA:  December 16, 2004.

16          MS. SAVIT:  That is NG-13.  The tabs may

17    be out of order.

18          MS. RIVERA:  All right.  Well, then,

19    NG-13.

20          HEARING OFFICER WOODS:  What is it, again,

21    a letter?

22          MS. RIVERA:  A letter--oh, it is a letter

1   to Wilson.

2          HEARING OFFICER WOODS:  Go ahead.  I

3   wasn't following your point, because I was looking

4   for what you were talking about.  Now that I am

5   there, now you can tell me what your point was.

6          MS. RIVERA:  Yes.  So here are our points.

7   Number one, there was no ten-day unilateral letter,

8   as prescribed under the IDEA, which notifies the

9   school system that the parent is seeking self-help

10  and, therefore, allows the school system ten days

11  to come in and try to resolve the issue.

12          We had no idea this kid was going to a

13  school in Massachusetts or any other school.  The

14  parents didn't--and it requires, under the IDEA,

15  written notice.  That is nowhere in the disclosure.

16          Number two, part of records are the

17  withdrawal.  She was withdrawn from Wilson,

18  according to our master student school records, on

19  10/1/03.

20          So with that withdrawal, she is no longer

21  a DCPS student, no longer entitled to special

22  education or 504.  This kid is withdrawn.  We have

nr

12

1   no idea where she is going.

2           All we knew is the parent sought

3   self-help, the kid is withdrawn.

4           Number three, they made a request for

5   accommodations under NG-13, not for special

6   education services.  As I was talking to counsel,

7   they admitted they never made a request for special

8   education services.  So if they never made a

9   request, we wouldn't know to evaluate.

10          Apparently, she had a lot of issues.  She

11  was in our schools.  She was in hospitalization for

12  different reasons.  But as you will find in their

13  disclosure, it was later discovered that she wasn't

14  --she is not--she is ineligible for special

15  education services.

16          Number four, they came to us--it is '05

17  right now, almost '06.  They come to us

18  three--almost two and a half years later requesting

19  reimbursement for a kid that withdrew in '03,

20  10/1/03.

21          And, number four, apparently they went to

22  the Care Center in '05.  We still don't have them

nr

13

1    as--we still don't have residency verification on

2    them and as you will notice in the disclosure,

3    there is no evidence of residency verification.

4           A letter goes out every year telling

5    parents that they have to verify residency,

6    immunization records, and et cetera. It goes out

7    every year. Parents are put on notice. It is also

8    in the D.C. Code.

9           This kid still has not registered. So

10   they weren't to the Care Center. The Care Center

11   apparently did evaluations for them and determined

12   these child ineligible for special ed.

13          So, again, they must be seeking 504,

14   because they could not possibly be seeking special

15   education, because two and a half, three years

16   later, you request special education services, does

17   not give you the right to seek reimbursement from

18   us two years when the kid wasn't registered, and

19   you never provided us a ten-day unilateral letter.

20          We had no notice of this kid until they

21   popped up at the Care Center requesting evaluations

22   in '05. They are pretty much barred under this reg

470

nr

1    from seeking reimbursement from us right now.

2         So I would object to anybody testifying as

3    to what happened in between, from 10/01/03 up until

4    the Care Center, whenever they went to the Care

5    Center to request evaluations.

6         HEARING OFFICER WOODS:  Okay.  Your

7    response to what you are hearing here?

8         MS. SAVIT:  Well, the short answer is the

9    parents did not send a ten-day letter in 2003.

10   That is correct.  The parents were never given

11   notice of their rights under the IDEA and under 20

12   USC 1412, the requirement to give a ten-day notice

13   is excused if the parents are never notified of

14   their rights and obligations.  The parents can

15   testify to that.

16        This gets into what happened here and I

17   will take a few minutes to tell you what happened

18   here.

19        HEARING OFFICER WOODS:  In this case?

20        MS. SAVIT:  Yes.

21        HEARING OFFICER WOODS:  Let me just deal

22   with the--at this point, I thought the motion was

nr

15

1   not to admit the exhibits, but you did get into the

2   evidence.   Why not admit her exhibits?

3        MS. RIVERA:   Because her exhibits relate

4   to reimbursement for the '03-04, the time that she

5   was away in private school, and, clearly, the Code

6   bars her from that.

7        She just stated that they weren't given

8   their rights.   They weren't given their rights

9   because they didn't request special education

10  services.   We don't just give out the due process

11  rights to people who don't request special

12  education services.

13       The school wasn't on notice that this

14  kid--that they wanted special education services.

15  So, therefore, they wouldn't have given them any

16  rights regarding that.

17       HEARING OFFICER WOODS:   So you are

18  objecting to the exhibits because there is--are you

19  saying that the hearing--are you attacking the

20  hearing request?   I'm not sure.

21       MS. RIVERA:   I am attacking the hearing

22  request.   I am attacking their witnesses.

nr

1         HEARING OFFICER WOODS:  At this point, I

2   was trying to determine whether their exhibits

3   should be admitted.

4         MS. RIVERA:  No, no.  And I argue that the

5   exhibits should not be admitted because they don't

6   go to the relevant issue of this--of us having to

7   reimburse them for the two years that she was in

8   private school.

9         HEARING OFFICER WOODS:  And those two

10  years are?

11        MS. RIVERA:  What, '03-04.  These

12  documents are absolutely irrelevant.

13        HEARING OFFICER WOODS:  And what other

14  year?  You said two years.

15        MS. RIVERA:  Well, '03-04, and I guess

16  this year, '05.  All these document speak to--

17        HEARING OFFICER WOODS:  You mean this

18  current school year or the past year?

19        MS. RIVERA:  They are asking for, I think,

20  the current school year, as well.

21        MS. SAVIT:  Let me clarify what we are

22  asking for, what this is all about, because it has

nr

17

1   gotten a little muddy.

2          HEARING OFFICER WOODS:   Okay.

3          MS. SAVIT:   We are asking retroactively

4   for reimbursement for the 2003-04 school year, the

5   2004-05 school year, and for prospective placement.

6   We are challenging both the funding and eligibility

7   and failure to provide services from the fall 2003

8   forward.

9          The narrow issue that is raised by the

10  objection to our exhibits is does the failure to

11  provide the ten-day notice disqualify the student

12  from receiving reimbursement for tuition already

13  incurred.

14         As I started to say, yes, it is correct

15  that the ten-day notice was not given.  The ten-day

16  notice wasn't given because they were not given

17  notice of their rights.  They were not given notice

18  of their rights because DCPS doesn't give notice of

19  rights until a parent makes a request for special

20  education, and the parent didn't make a request for

21  special education because the parents had no idea

22  that they needed to initiate that.

nr

1        N███████ had a very difficult tenth grade.

2    She skipped a lot of classes.  She failed almost

3    every course she has taken.  She ultimately was

4    hospitalized in the spring of 2003 with depression.

5    It was a suicide attempt or there was behavior that

6    could have killed her, to be more narrow.

7        The school system was placed on notice,

8    through communications both from N███████ parents

9    and from her therapists, two different

10    communications from the therapist, that she had

11    recently been diagnosed with attention deficit

12    hyperactivity disorder and clinical depression.

13        Her therapist, Dr. Robbins, who is here,

14    did write letters asking for a 504 plan.  And she

15    is not a lawyer, she is not an employee of the

16    school system.  She asked for what she knew about,

17    but she squarely placed them on notice of disabling

18    conditions that would have warranted consideration

19    for services under the IDEA, as well as under 504.

20        By the way, there was no effective

21    response even to the request for 504

22    accommodations.

nr

19

1          MS. RIVERA:  She wasn't a student at that
2  time.

3          MS. SAVIT:  Excuse me.  I didn't--

4          MS. RIVERA:  She wasn't a student.

5          MS. SAVIT:  --interrupt you.

6          MS. RIVERA:  She wasn't a student, is all.

7          MS. SAVIT:  The request, initial request,
8  was made in the spring of 2003, when she was
9  enrolled in the tenth grade in Wilson High School.

10         There was a meeting, purportedly attended
11  by her teachers, and no effective plan, no plan at
12  all was developed.

13         At that point, DCPS, with its own Child
14  Find obligation, should have recognized that this
15  was a student who was eligible for services under
16  the IDEA, and, in fact, if we get that far, you
17  will hear that at the eligibility meeting last
18  spring, the DCPS representatives admitted to Ms.
19  Correa and Mr. Gomez that there should have been
20  follow-up in 2003, based on the available
21  information.

22         What happened was DCPS did not initiate

nr

20

1  assessments.  They didn't suggest to the parents

2  that they needed to initiate assessments.  They

3  didn't tell them about their rights.  They did not

4  recognize the presence of IDEA issues.

5       So, of course, the parents didn't give the

6  ten-day notice.  They didn't know to give it.

7       All they knew was that they had a child

8  who was failing school, who was cutting classes,

9  who was severely depressed, whose depression was at

10  least partially due to the fact that she was

11  performing so poorly in school and knew she had

12  nowhere to turn, and they put her in private

13  school, because she could not return to the

14  environment in which she found herself.

15       Now, what has been placed in front of you

16  as evidence that she was withdrawn is not

17  withdrawal papers.  It is a computer-generated

18  record that says that in October of 2003, she was

19  withdrawn.

20       MS. RIVERA:  I object, Hearing Officer.

21       HEARING OFFICER WOODS:  Hold on.  Let her

22  finish.

nr

21

1      MS. RIVERA:  How is she going to tell DCPS

2   what documents--I object to that.

3      HEARING OFFICER WOODS:  But she has it.

4   She can say what she characterizes it as.

5      MS. RIVERA:  She can characterize it as to

6   whatever she wants to, but I am the school system.

7   I will tell you that is the master.  I can tell you

8   what the record is.  She can't tell us what the

9   record is.  I am the school system.

10     HEARING OFFICER WOODS:  But you can come

11  back after she finishes and say that was incorrect

12  and here is your representation.

13     MS. SAVIT:  I want to note for the record

14  that I sat silently as a number of inaccuracies

15  came out from the--

16     MS. RIVERA:  I don't care.

17     MS. SAVIT:  --District of Columbia Public

18  Schools and I would expect the same courtesy and

19  get an opportunity to correct, and I will ask the

20  Hearing Officer to hold the hearing in abeyance, if

21  people can't behave.

22     MS. RIVERA:  That is his decision, not

nr

22

1   mine and yours.

2            HEARING OFFICER WOODS:  I don't know what

3   is going on, but I think Ms. Savit did sit

4   patiently and quietly, even if she disagreed with

5   what was being said, and this is her opportunity to

6   speak.  You can certainly--

7            MS. RIVERA:  It is just the whole--it is a

8   farce, Hearing Officer, and, I'm sorry, I can't.  I

9   mean, two years later, I am just upset about it.

10           HEARING OFFICER WOODS:  Okay.  But we

11  still have to conduct the hearing so that the

12  parents can get their case before the Hearing

13  Officer, to see what conclusion he would reach.

14           Ms. Savit?

15           MS. SAVIT:  If you would like, Ms. Correa

16  will testify that she did go in over the summer to

17  register N███████.  She attempted to do so.  The

18  person that she met with was not responsive.

19           She never notified DCPS that N██████ was

20  being withdrawn.  N██████ did not return in the

21  fall.  She was never withdrawn by her parents.

22  DCPS wrote in its record that she was withdrawn.

nr

23

1    She has never been voluntarily withdrawn

2   and our position is that if she was withdrawn, it

3   was coerced by the non-responsiveness to what was

4   clearly an emergency situation in the spring of

5   2003.

6    As I said, DCPS had an obligation, its own

7   Child Find obligation, to recognize N██████ as

8   potentially needing special education and they also

9   failed to respond in any meaningful way to the

10   request for accommodations under Section 504,

11   including recognizing that this might be beyond

12   Section 504.

13    Therefore, yes, as I said, it is correct

14   that a ten day notice was not given.  The parents

15   were prevented from giving it by the

16   non-responsiveness of the school system, which, in

17   the first instance, failed in its own obligation

18   and, therefore, the parents should not be bound by

19   that.

20    HEARING OFFICER WOODS:  What was the point

21   Ms. Rivera made that Natalia is not eligible for

22   special?

nr

24

1      MS. SAVIT:  There was some testing done by

2   the District of Columbia Public Schools.  Ms.

3   Correa went to Wilson High School and registered

4   N███████ in November of 2004.

5         She tried at that time to request special

6   education and she was told that she could not do

7   that.

8         MS. RIVERA:  Hearing Officer, I object to

9   that, unless it is in this record, because there is

10   nothing in the record that says that, Hearing

11   Officer.

12         HEARING OFFICER WOODS:  We have a live

13   witness here.

14         MS. RIVERA:  I don't care.  You are not a

15   witness to what happened.  You are the attorney.

16         HEARING OFFICER WOODS:  She is just giving

17   me the proffer, though.

18         MS. RIVERA:  All right.  Well, I

19   still--because she is putting it in the Hearing

20   Officer's mind that they requested it, and it is

21   nowhere in these documents.

22         MS. SAVIT:  I would ask that I not be

nr

25

1  interrupted.

2          MS. RIVERA:  I can note an objection.  I

3  objected.

4          HEARING OFFICER WOODS:  If there is

5  objection--

6          MS. SAVIT:  Objection is a different

7  story.

8          MS. RIVERA:  Which I did.

9          HEARING OFFICER WOODS:  Which she did.

10  She objected.

11          MS. SAVIT:  She did then eventually go to

12  the care center in December of 2004.

13          HEARING OFFICER WOODS:  Let's start with

14  that.  In November of 2004.

15          MS. SAVIT:  She went to Wilson to

16  re-register N███████.

17          HEARING OFFICER WOODS:  Who is she?

18          MS. SAVIT:  Ms. Correa.

19          HEARING OFFICER WOODS:  Okay.

20          MS. SAVIT:  And to request special

21  education.

22          HEARING OFFICER WOODS:  Okay.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

26

1    MS. SAVIT: About a month later, she went

2    to the care center and requested special education.

3    DCPS then did some evaluations and they concluded,

4    based on their evaluations, that because N███████,

5    who is a student of superior ability, was

6    performing at an acceptable level now, she either

7    is not disabled or her disability is not affecting

8    her ability to be educated.

9        Our position on that is that the reason

10   that N██████ is now performing well is that she is

11   receiving the programming that she needs and that

12   were she to be placed in regular education without

13   supports, she would quickly revert to the situation

14   that we had in the tenth grade, when she was

15   skipping school and endangering herself and failing

16   almost all her classes.

17       And, therefore, we challenge the finding

18   of ineligibility. It is certainly not conceded.

19       That is the response on that.

20       HEARING OFFICER WOODS: And is that part

21   of this request that you challenged?

22       MS. SAVIT: Yes. Oh, yes.

nr

27

1      HEARING OFFICER WOODS:  I see.  Is that in

2  the hearing request?

3      MS. RIVERA:  They just state the child is

4  removed, the eligibility, which we object to,

5  because it provides me absolutely no notice as to

6  what part of the eligibility determination--was

7  there something wrong with the evaluations, et

8  cetera, which means I can't properly dismiss, if I

9  don't know specifically what they challenge.

10     So we object to that part of the hearing

11 request.  It is entirely too general.

12     HEARING OFFICER WOODS:  Okay.  You wanted

13 to--were you done, Ms. Savit?

14     MS. SAVIT:  I am done at this point.

15     HEARING OFFICER WOODS:  Okay.

16     MS. RIVERA:  Several points, Hearing

17 Officer.  Number one, again, there were no requests

18 made for special education services and at least

19 until they admit, until sometime in '04, when they

20 re-registered her, which means this student, again,

21 was withdrawn and the reason why she was withdrawn

22 is because she was skipping school and no

nr

28

1   attendance.

2        That doesn't necessarily mean special

3   education.  N⬛⬛⬛ appeared--as they said, she was

4   quite bright.  She was on track.  Her grades were

5   very good up until a point and with her skipping

6   school, that just meant the student wasn't present.

7        So her decline in grades could have been

8   from skipping class, not necessarily special, which

9   meant if that is what the parents thought, they

10  should have made the request.  They did not.

11       Because there is a requirement, because we

12  get per pupil, student, student funds from the

13  government, that when a student doesn't attend for

14  a certain amount of days, the student is

15  automatically withdrawn.

16       This student--the parents had apparently

17  enrolled her in a private school.  So with her not

18  attending DCPS, attending school, they, of course,

19  withdrew her.  We don't just keep students on the

20  record, because we get a certain amount of funds

21  for those students.

22       So she was withdrawn 10/1/03.  The parents

nr

1    had plenty of time, if they didn't know their

2    rights or et cetera, and, again, they didn't get

3    rights, because we had no idea they were requesting

4    special education services--requesting special

5    education services.

6            It still is almost a year before they let

7    us know that they unilaterally placed this child in

8    a private school.  You don't get to place your

9    child in a private school and ask for reimbursement

10   two years later, talking about, oh, well, we

11   thought she--we didn't--we didn't disenroll her; we

12   just thought because she wasn't going, that you all

13   would have, you know, you all just would have kept

14   her on the--on the--on the--on the register--on the

15   register.

16           We don't--I mean, the kid was withdrawn.

17   She was not attending.  We had to withdraw her.  So

18   whether the parents did it or not, if you know she

19   is attending another school someplace else and then

20   don't let us know, of course, she is withdrawn.

21           The mother doesn't go and re-register her,

22   and I am curious as to how the mother knew to go

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

30

1    re-register her, if she didn't know to withdraw

2    her.

3            The mother goes and re-registers her

4    sometime in '04, which is still almost a year

5    later.  You don't let the school system know

6    anything.  You request a 504, not--not special ed.

7            In addition, once she was--once they

8    dropped her from the roll on 10/1/03, we no longer

9    had any obligation.

10           So whatever records they sent or whatever

11   records they sent from the--whatever request the

12   psychologist made or sent over, as far as our

13   master student record showed, this student was

14   withdrawn.  So there was no place for us to--what

15   were we going to do with the records?  What were we

16   going to do with the request?

17           This student is not here, not available

18   for us to evaluate, for us to even look at.  We

19   have no idea where this student is.

20           So they could have made all the requests

21   they wanted.  With this student being made

22   unavailable by the parent, we couldn't do--we

1   couldn't have done anything.

2           HEARING OFFICER WOODS:  Were there any

3   requests--

4           MS. SAVIT:  I want to respond on that.

5   The request to which she is referring from Dr.

6   Robbins both predated the end of N███████ tenth

7   grade, she was still a student.  You will see them.

8   They are in the record.  They are Exhibits NG-10

9   and NG-11.  N██████ was still enrolled.

10          HEARING OFFICER WOODS:  And those records

11  reflect?

12          MS. SAVIT:  That whatever they did--

13          HEARING OFFICER WOODS:  Are they requests

14  for--

15          MS. SAVIT:  They are notice of her

16  disabling conditions, request that she be

17  accommodated, and specific request for a 504.

18  They--

19          MS. RIVERA:  Not special ed.

20          MS. SAVIT:  I cannot--

21          MS. RIVERA:  I mean, this is the whole

22  issue, Hearing Officer.

nr

1          MS. SAVIT:  --I keep getting interrupted.

2          MS. RIVERA:  This is the whole thing.  It

3    is not special ed.  It is 504.  Totally different.

4          MS. SAVIT:  If we are--if our presentation

5    is going to continue to get interrupted, I am going

6    to have to ask you to suspend the hearing.

7          HEARING OFFICER WOODS:  Okay.

8          MS. SAVIT:  I think we are entitled to

9    present our case.

10          HEARING OFFICER WOODS:  You are.  If you

11    would--again, I am not really one who likes to

12    admonish, but if we could allow each person to

13    finish, that would be helpful.

14          MS. RIVERA:  Okay.  Just one other

15    question.  She said NG-10.  I am trying to review

16    the document that she spoke of.

17          MS. SAVIT:  There is a--

18          HEARING OFFICER WOODS:  What--go ahead.

19          MS. SAVIT:  To answer that question, there

20    was a May 4, 2003 letter from Dr. Robbins and a

21    June 3, 2003 letter, and those are consecutive

22    exhibits.

nr

33

1          MS. RIVERA:  Again, I would like to note

2     the objection on this particular exhibit and that

3     it is not a request--it is a not a request for

4     special ed.

5          And the other one, it requests

6     specifically 504.

7          MS. SAVIT:  There are two consecutive

8     exhibits, May 4 and June 3, and they are not

9     post-October 1, whatever significance that date may

10    have.  They are--they both came in while N████

11    was still in school.

12         So whatever value they have, it is

13    absolutely not correct that they were meaningless

14    notices because she had already been withdrawn.

15    She was still in school.

16         HEARING OFFICER WOODS:  Okay.  So if I

17    understand correctly, when was the ineligibility

18    determination?

19         MS. SAVIT:  The ineligibility

20    determination was in May of 2005.

21         HEARING OFFICER WOODS:  Okay.  Now, how do

22    we go backwards then?  I am just trying to follow

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

34

1   this.  Let's say that all of what you said, up in

2   May, in the letters, in Robbins' letters, but they

3   have now evaluated, why do we go back to that?

4           MS. SAVIT:  I am not completely following

5   you.

6           HEARING OFFICER WOODS:  What you are

7   claiming is they should have found her and

8   determined her eligibility.  Well, they now have

9   determined her ineligible.

10          I am trying to figure out how do I now go

11  back to those dates.

12          MS. SAVIT:  Well, they found her--and we

13  are separately challenging the finding of

14  ineligibility.

15          HEARING OFFICER WOODS:  So that brings us

16  to '05.

17          MS. SAVIT:  Right.  So there is a separate

18  issue as to whether she is currently eligible.

19          HEARING OFFICER WOODS:  Okay.

20          MS. SAVIT:  But we maintain that the

21  eligibility began no later than the spring of 2003,

22  because of all the issues of which they were well

nr

35

1  aware.

2       HEARING OFFICER WOODS:  Okay.  So now it

3  is a little bit more focused.  Then your real claim

4  is on the determination of being found ineligible

5  in May of '05 and I take it that if I were to find

6  that she is, in fact, eligible, I should even, I

7  guess, if I am understanding you, say that that

8  should have been made back in '03.

9       MS. SAVIT:  Well, there is actually--well,

10 we maintain that there has been a continuing status

11 of eligibility from 2003 forward.  But there is a

12 separate--you could break it down, though, because

13 the basis on which she was found ineligible in 2005

14 was that she was not making adequate academic

15 progress.

16      Our argument on that is that the reason

17 she is making academic progress is because she is

18 finally in an appropriate program, but even if you

19 were to accept current ineligibility, our fallback

20 position would be that there is still an

21 entitlement to reimbursement because it was the

22 parents who did the work of letting her reach the

nr

36

1   point where she is now making good progress.

2          So it would be--we have a primary

3   argument, which is that it is 2003 forward, but a

4   secondary argument that they are at least obligated

5   for the period of time when essentially the parents

6   did their work for them.

7          HEARING OFFICER WOODS:  You know I am

8   confused, but here is the part I am clear on; that

9   is, the challenge to the ineligibility is this

10  year.

11         MS. SAVIT:  Beginning in 2005, correct.

12         HEARING OFFICER WOODS:  Okay.  And I think

13  what I am being asked is forget about where she is

14  now, you have got to look at where she was to

15  determine whether she should have been eligible in

16  2003.

17         How do I do that, though, with where she

18  is now?

19         MS. SAVIT:  Well, I mean, you will have

20  evidence to show where she was in 2003 and how her

21  needs have been met through what the parents have

22  been able to provide for her, but where she is now,

493

nr

37

1  as well.

2           I mean, that is why Dr. Robbins is here.

3           HEARING OFFICER WOODS:  I see.

4      MS. SAVIT:  For you to hear where she is

5  now and why she is doing well now and what would

6  happen if the supports were eliminated.

7           HEARING OFFICER WOODS:  Was she ever

8  determined eligible by the school that she is

9  attending?

10      MS. SAVIT:  They don't make that

11  determination.  They just provide a program.

12          HEARING OFFICER WOODS:  Is it special ed?

13      MS. SAVIT:  It is not special ed

14  certified.

15          HEARING OFFICER WOODS:  How do we get that

16  under the IDEA?

17      MS. SAVIT:  Under Carter, it doesn't have

18  to be.  If you find that the school system did not

19  provide, then any appropriate program that the

20  parents find for can be endorsed.

21          HEARING OFFICER WOODS:  But you are saying

22  the program was not special ed, though.

494

nr

1          MS. SAVIT:   Well, it is not special ed

2    certified.   Special education is, very simply and

3    fundamentally, education that is individually

4    tailored to the unique needs of the student.

5          What you will hear is that what N▮▮▮▮

6    needs is a highly structured program, small

7    classes, teachers who will work with her to get her

8    over the problems that she has academically due to

9    her attention deficit hyperactivity disorder, that

10   she needs a situation in which she can build trust

11   relationships with her teachers and that she feels

12   comfortable going to them, and that in a milieu

13   such as that, she can make appropriate academic

14   progress, because cognitively she has tremendous

15   gifts.

16          So what you will hear is evidence that the

17   schools she has attended have met precisely those

18   needs.   They have afforded that atmosphere in which

19   she can succeed and that they are, for N▮▮▮▮,

20   special education placements, without regard for

21   whether they are certified.

22          And under the Carter case, the Supreme

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

39

1    Court decision about ten--I believe it was 11 years

2    ago.  In any event, once there has been a default

3    by the school system in its obligations, which is,

4    obviously, an issue at this hearing, the parents

5    are not to be faulted for finding the school that

6    may not meet the certification requirements.

7          HEARING OFFICER WOODS:  That is not my

8    question, though.  My question, are you suggesting

9    that an ineligible student for special ed will get

10   tuition reimbursement under the IDEA, under Carter?

11         MS. SAVIT:  Not if she is ineligible.  We

12   are saying she is eligible.  She should be

13   eligible. They found her ineligible.  We are

14   challenging that.  We think they were wrong.

15         HEARING OFFICER WOODS:  But you are also

16   saying the school that she is not is not providing

17   her services as a special ed student.

18         MS. SAVIT:  Well, they don't call her a

19   special ed student.  They are providing the program

20   she needs.  They are providing exactly what is

21   recommended for her.

22         HEARING OFFICER WOODS:  Is that school

nr

1  going to be in this case?

2          MS. SAVIT:  Yes.  We have a witness.

3          HEARING OFFICER WOODS:  Is that where we

4  are at then in terms of the case?  That they are

5  challenging the ineligibility decision of DCPS and,

6  based on that, seeking tuition reimbursement, I

7  think, for '03-04, '04-05, and seeking--

8          MS. SAVIT:  Prospective placement.

9          HEARING OFFICER WOODS:  Placement for this

10  year.

11          MS. RIVERA:  I mean, that is how the

12  Hearing Officer sees it.

13          HEARING OFFICER WOODS:  That is how it has

14  been expressed to me.  I am asking you.  Is that

15  how it has been expressed?  Are you objecting to

16  the way she has--

17          MS. RIVERA:  What I am objecting to is, I

18  guess, their--her--the--let me--there is a section

19  in the IDEA that talks about notice.  It is 300

20  something.

21          My issue regarding the eligibility

22  determination is that she has just been challenging

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

41

1   whether N█████ is current eligible for special

2   education.  She doesn't provide the school system

3   with enough notice as to the basis for this

4   challenge.  It is very broad, very--I don't know

5   what specifically they are challenging, which means

6   I wouldn't have notice as to what experts to bring

7   in that were at the meeting for them to challenge.

8           Now she is saying the basis for the

9   challenge was the academic progress, but they are

10  very general and broad here.  So I would need more,

11  I guess, definition as to what she is claiming,

12  what they are saying their problem is with our

13  ineligibility notice.

14          It doesn't provide me any information

15  regarding that.

16          MS. SAVIT:  Can I suggest you just read

17  the due process request?

18          HEARING OFFICER WOODS:  I have it here.

19  Why don't you tell us?  What is it?  The basis for

20  it.

21          MS. SAVIT:  We characterize that the

22  ineligibility decision as having been made because

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1  she made progress since leaving DCPS in private

2  placements and that they also declined to convene a

3  request to--the meeting we had requested that

4  originally they said would be available.

5      If you go down to "describe facts relevant

6  to the problem," it says she is a student of above

7  average intelligence and potential, is capable of

8  high achievement, when the needs incident to her

9  disability are met.  She requires small classes and

10 individualized attention, among other

11 accommodations.

12     DCPS failed to meet these needs and,

13 consequently, she was removed from the system.  The

14 only reason she is currently achieving reasonable

15 academic progress is that she is in an appropriate

16 placement.

17     That is a direct challenge to their

18 ineligibility determination.  That was the argument

19 at the--

20     HEARING OFFICER WOODS:  I guess the

21 eligibility is based on evaluations, disability

22 classification.  That is what a challenge to

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

43

1  ineligibility.  Are you saying that the psycho-ed

2  is wrong?

3      MS. SAVIT:  I understand what you are

4  saying.  You are trying to make us make a challenge

5  that we are not making.

6      HEARING OFFICER WOODS:  What are you

7  making?

8      MS. SAVIT:  We are making a challenge to

9  their conclusion.  They tested her.  They got

10  reports from her current school.  They said she has

11  got good potential and she is achieving that

12  potential now and, therefore, she is not eligible,

13  because we find no academic impact from any

14  disability she may have, and we disagree with that

15  because they failed to consider the fact that she

16  has been in an appropriate program since leaving

17  DCPS.

18      That is the issue.  That she is doing well

19  now is not at issue.  That she was tested and found

20  to be doing well now is not at issue.  She is doing

21  much better now.

22      I am not challenging tests, those