nr

11

1     Q    Was that the end of your involvement at

2   that time?

3     A    The parent made a comment that there was

4   some information from Wilson High School.  I went

5   to Wilson High School, because I wanted to make

6   sure that--I had additional information from the

7   parent.

8          When I went to Wilson, there a report

9   card from tenth grade and that was what was in the

10  record, nothing beyond that.

11    Q    What subsequent requests, if any, were

12  made after the team made a determination of

13  ineligibility?

14    A    The parent attorney asked that we

15  reconvene the IEP meeting--I mean, the MDT meeting.

16  She felt that we didn't consider all information.

17  My response was we considered the information that

18  was provided.

19    Q    Was subsequent information provided to

20  you, as the case manager, after the MDT meeting?

21    A    No; it was not.

22    Q    Now, in your capacity as the social

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

12

1   worker, did you look at any--did you address any of

2   the emotional issues that were raised?

3       A    The emotional issues that were raised were

4   in the report that the parent had provided.

5       Q    Okay.

6       A    Based on that information--

7       Q    What was the report the parent provided?

8   Do you remember what that report was?

9       A    It was a report from a psychologist,

10  clinical psychologist who had evaluated the

11  student.

12      Q    You said there was an evaluation that the

13  parent gave you.  Do you remember what type of

14  evaluation that was?

15      A    It was a clinical psychological

16  evaluation.  It talked about her emotionality in

17  the past, talked about her academic capacity.

18      Q    Okay.  I want to show you what has been

19  marked in the record as NG-21.  Is this the

20  evaluation that you are referring to?

21      A    No.  It was an outside evaluation that the

22  parent provided.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

13

nr

1    Q    Okay.  Let me refer you to what has been

2  marked as NG-4.  Is this the evaluation that the

3  student has provided?

4    A    Yes.

5    Q    And what is the date of that evaluation?

6    A    It says the testing date was January 17 to

7  January 21, January 30, 2003.

8    Q    Now, based on your responsibilities in

9  this case, what--was this evaluation--would you

10  consider this evaluation current?

11    A    It was current, but we received the case

12  in 2004.

13    Q    Okay.

14    A    So relatively current.

15    Q    What issues did the parent raise in her

16  referral?

17    A    She mentioned that there was

18  distractability in school, student not able to

19  follow directions.

20    Q    And was that--was the--were those issues

21  related to a past date or current date?

22    A    I think--well, how do I answer that

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

14

1    question?  The information that we receive on

2    referral is considered current at that time,

3    what--how the student is performing at that time.

4        Q    Okay.  You are saying it was

5    distractability and?

6        A    And inability to follow directions in

7    school.

8        Q    And what type of information did you

9    receive from Buxton?

10       A    It did not support the referring

11   information.

12       Q    Can you tell me what--do you remember what

13   information you received?

14       A    I received a school report from fall of

15   2004 and fall of 2005 from Buxton.

16       Q    Okay.  Let me show you what has been

17   marked as NG-27--sorry--28 and 29.  Can you look at

18   this and, first, identify it for the record and

19   then tell me did you receive--are these the

20   documents you received from Buxton?

21       A    This is addressed to Manuel Gomez and

22   Sylvia Correa and it is directed to them.  Here are

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1    the fall reports from N███████ teacher.

2        Q    Is this the information that you had with

3    you when you went to the meeting?

4        A    Mm-hmm.

5        Q    Okay.

6        A    Yes, it is.  I'm sorry.

7

8        Q    Okay.  And then you indicated what

9    was--how did that information relate to--how

10   consistent was that information with the referral

11   made by the parent?

12       A    Apparently, this child had improved.  It

13   is a very glowing report.  She is a high energy

14   child.  She is intellectually mature.  She enjoys

15   the class.  She certainly is a great pick for the

16   school--

17            MS. SAVIT:  Objection.  This witness is

18   just reading from the report.

19            THE WITNESS:  I am not reading.  I was not

20   reading.

21            MS. SAVIT:  Her eyes were on the page.

22            HEARING OFFICER SMITH:  Why don't you

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                        16

1   close it?

2            THE WITNESS:  Okay.

3            MS. HARRIS-LINDSEY:  Okay.  No problem.

4   No problem.

5            THE WITNESS:  I am not reading.  I am just

6   remembering what they said.

7            HEARING OFFICER SMITH:  Just close the

8   report.

9            THE WITNESS:  She showed me the report and

10  so I looked at it to identify it.

11           BY MS. HARRIS-LINDSEY:

12      Q    Okay.  Go ahead.

13      A    Okay.  I will start again.  N██████--each

14  teacher mentioned that she was a good student,

15  intellectually mature student, a very bright

16  student.  She enjoyed her work.  She was not afraid

17  to speak up if she disagreed with what another

18  student had said in the classroom.  She was a

19  leader in the classroom and that she certainly had

20  the capability to function, you know, at a high

21  level and, in fact, was doing so.

22           This was from each--this was from

 1  2004-2005.

 2      Q    Okay.  Now, I want to take you to the

 3  meeting, the MDT meeting.  Did you attend that

 4  meeting?

 5      A    Yes, I did.

 6      Q    Do you recall--

 7      A    Yes.

 8      Q    --it?

 9      A    I do.

10      Q    What information regarding the

11  distractability was presented to the team or did

12  the team have before it at that meeting?

13      A    We did not receive that information.

14      Q    You said there was no information on

15  distractability.

16      A    No; there was not.

17      Q    To the extent you recall, who attended

18  that meeting?

19      A    The parents, the attorney, my team

20  members, Linda Flynn and Dr. White-Jennings, and

21  myself.

22      Q    Okay.  And what information were you given

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

18

1    about additional evaluations in existence when you

2    were presented--when you came to the meeting or

3    when the meeting convened?

4         A    The mother mentioned that she had some

5    medical information, which she gave to me at the

6    table.   It was new information.

7         Q    Let me show you something.   Let me show

8    you what has been marked as DCPS-22.   You indicated

9    that you are responsible for holding MDT, TAT, IEP

10   meetings.

11        A    Yes.

12        Q    Is this your handwriting?

13        A    Yes, it is.

14        Q    And tell me what document this is.

15        A    This is the multi-disciplinary team

16   eligibility meeting notes.

17        Q    And what does this reflect?

18        A    It reflects the conversation that we had

19   around the table during the MDT meeting.

20        Q    Okay.   Now, you indicated that it was at

21   the meeting that additional documentation was

22   provided to the team.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

19

1      A    Yes.   From the mother.

2      Q    And prior to that information being given

3  to you, that medical documentation, had you

4  requested that information before?

5      A    I had.   The mother sent me information

6  from 2003 from Children's Hospital and I asked her

7  to provide me with current medical information.   I

8  received information that she provided the day of

9  the meeting.   That was--I think I am recalling that

10 that was 2003 information, again.

11         Again, it wasn't current information,

12 where the child was functioning.

13     Q    Okay.   Ultimately, what was the team's

14 determination at that meeting?

15     A    We determined at that meeting that she did

16 not meet the criteria for special education.

17     Q    Okay.   Now, did the team discuss--what

18 period of time did the team discuss N▓▓▓▓▓▓▓

19 performance?   What period?   Were you talking

20 current or did you all discuss the prior 2003

21 period?

22     A    We didn't discuss 2003.   We discussed

nr

1  current information, the current school year

2  information.

3      Q     And based on the information you had from

4  the 2005, 2004-2005 period of time, what was the

5  team's determination, again?

6      A     That N█████ G█████ did not meet the

7  criteria for special education.

8      Q     Okay.  Now, did you--did you--did the team

9  --did the team talk about the Buxton program?

10     A     Yes, we did.

11     Q     And what--can you recount that discussion,

12 please?

13     A     That the regular education program, small

14 classes, small student population, private school,

15 that she was doing quite well there.  Her grades

16 were A-plus and A and Bs.  Maybe not even a B, but

17 I remember A-plus, because we did discuss her

18 A-plus.

19            So the parents indicated that she was

20 doing quite well there.  She seemed to have found

21 her calling at that school.

22     Q     Okay.  What services, if any, was the

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1   student receiving, additional services to education

2   was the student receiving?

3        A    Buxton did not send me any information

4   concerning any related services.

5        Q    What did the parent--what kind of

6   information--what information did the parent

7   provide regarding any additional services N███████

8   was receiving?

9        A    They did not.

10       Q    Now, I want to talk to you about when you

11  indicated you went back to Wilson, the parent

12  referred you to Wilson.

13       A    Yes.

14       Q    Now, what was the purpose of that referral

15  back to Wilson?

16       A    The parent mentioned that they had

17  requested services while the student was attending

18  Wilson High School.

19       Q    Okay.

20       A    The parent indicated that she had written

21  a letter to someone, I am not--I don't recall who

22  the letter was written to, asking that her daughter

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                              22

1   receive some service.

2          So I went to Wilson looking for that

3   information.   There was none indicated in the

4   school record.

5      Q   Now, prior to that meeting, what type

6   of--what was the nature--what was just the tone or

7   tenor of your interaction with N▮▮▮▮▮▮ parents?

8      A   It was cordial, very cooperative.   I feel

9   that the mother worked very hard to get information

10  from the school, because I had mentioned to her I

11  had written to the school, I had not heard from

12  them, and time was running out.

13         And we talked about that a couple of times

14  and she said, "I will make sure that you get the

15  information."

16     Q   Okay.

17     A   When I asked her about medical

18  information, she sent me medical information, and I

19  would call her back and write her back and say, "We

20  need current information."   So she was always very

21  cooperative.

22     Q   Now, the time frame, the time line for

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.   20003-2802
(202) 546-6666

nr

1  actually--from the referral to the--what were--what

2  impediments, if any, were there to convening this

3  meeting in May?

4      A    Well, lack of information, because, again,

5  we could not do a classroom observation without any

6  information from the school.  I informed the parent

7  of this.  The only information we had at the time

8  was from the 2003 clinical psychologist and I was

9  encouraging the parent that without school

10  information, we are not able to really hold an MDT

11  that would be meaningful.

12      Q    Now, do you recall or did the--was the

13  team receptive to the information provided by--

14          MS. SAVIT:  Objection.  That is the

15  witness' conclusion.

16          THE WITNESS:  Well, I--

17          HEARING OFFICER SMITH:  Why don't you just

18  rephrase?

19          MS. HARRIS-LINDSEY:  Excuse me?

20          HEARING OFFICER SMITH:  Why don't you just

21  rephrase the question?

22          MS. HARRIS-LINDSEY:  Sure.  Sure.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1        BY MS. HARRIS-LINDSEY:

2        Q    How was the--would you describe the tenor

3    of the meeting?  How would you describe the meeting

4    that took place as far as the tone of the meeting?

5    The MDT meeting.  Excuse me.

6        A    The tone.  There may have--there were some

7    differences of opinion.  There were statements made

8    that we should have considered information from

9    2003, Wilson High School, and there was a feeling

10   that without that information, that we were, DCPS

11   was not making an appropriate determination of what

12   the student's needs were.

13       Q    Was the meeting contentious?

14       A    I think there was some tension in the

15   meeting.

16       Q    Now, when did the team learn of Wilson's

17   part or Wilson Senior High School's part in the

18   referral?

19            MS. SAVIT:  Objection.  There is no

20   evidence that the team ever learned of that.

21            MS. HARRIS-LINDSEY:  I said when.  That is

22   why I asked.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1          MS. SAVIT:  That assumes they knew about

2   it.

3          MS. HARRIS-LINDSEY:  I said when, if ever,

4   how that--when--

5          HEARING OFFICER SMITH:  You can answer the

6   question.

7          THE WITNESS:  The parent brought it up in

8   the MDT meeting.  They asked me was I aware of

9   their request for services at Wilson High School,

10  and I was not aware of it.

11         BY MS. HARRIS-LINDSEY:

12    Q    Now, based on the team's--what

13  determination was made of ineligibility?  Were

14  there any other--any requests made

15  additional--other than --outside of the one request

16  that you identified to reconvene the meeting later,

17  were there any other requests made by the parent or

18  attorney?

19    A    No.

20         MS. HARRIS-LINDSEY:  I have nothing

21  further for Everett.

22         HEARING OFFICER SMITH:  Cross.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

26

1                    CROSS-EXAMINATION

2          BY MS. SAVIT:

3     Q    Ms. Everett, you would agree with me,

4  would you not, that the purpose of providing

5  special education to a disabled student is to allow

6  that student to make appropriate progress in

7  education, notwithstanding the student's

8  disability; isn't that correct?

9     A    I didn't understand your question.

10    Q    Okay.  Tell me what you don't understand,

11 so I can help you.

12    A    Can you just repeat it?

13    Q    Well, wouldn't you agree with me that the

14 purpose of providing special education is to allow

15 a disabled student to make appropriate educational

16 progress, notwithstanding the disability?

17    A    Yes.

18    Q    And if a disabled student is receiving

19 appropriate special education, one would expect

20 that that student would make progress; isn't that

21 correct?

22    A    Yes.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1       Q    And if you have a student whose disability

2   is not a cognitive impairment, but another type of

3   disability, once that student receives the

4   appropriate programming, that student should be

5   performing to the level of that student's cognitive

6   ability; isn't that correct?

7       A    That is correct.

8       Q    And if that student's cognitive ability is

9   very high, once you ameliorate the disability, you

10  would expect very good performance; is that

11  correct?

12      A    Yes.

13      Q    Now, there is no claim here, isn't it

14  correct, that N██████ G█████ has a cognitive

15  problem?  N██████ is not claimed to be, for

16  example, mentally regarded, correct?

17      A    No; she is not.

18      Q    Everyone agrees N██████ is quite bright.

19      A    Yes.

20      Q    Isn't that correct?  So whatever

21  disability she has, it has nothing to do with her

22  ability to appropriately access a regular education

nr                                                                    28

1    curriculum once the disability is addressed; isn't

2    that correct?

3        A    Yes.

4        Q    So if N██████ is disabled--I am going to

5    ask you to allow for that at the moment--and she is

6    now receiving an appropriate program, one would not

7    be surprised that she is doing quite well

8    academically; isn't that correct?

9        A    That is correct.

10       Q    But that doesn't mean that she doesn't

11   have a disability by itself; isn't that correct?

12       A    That is correct.

13       Q    In fact, let's take it into a somewhat

14   easier realm.  If you have a student who is blind,

15   that student, obviously, if you present that

16   student with a written textbook, that student can't

17   read the textbook, right?

18       A    That is right.

19       Q    And so the school would have to provide a

20   reader or books in braille or books on tape or

21   something like that in order for the student to

22   access the material, correct?

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                      29

1          A    If that is what the student has been

2    identified as needing.

3          Q    Right.  I am asking you to assume that

4    that is--

5          A    Okay.

6          Q    The student cannot ready visually.

7          A    Okay.

8          Q    And so the student needs something to

9    overcome that.  And assuming you provide for that

10   blind student, say, arbitrarily, a reader who reads

11   the material and then the student proceeds to get

12   As in all her subjects because she can now access

13   the material, does that mean the student isn't

14   blind anymore?

15         A    No; it does not.

16         Q    But the student is doing well, right?

17         A    Yes.

18         Q    Because the student's disability has been

19   addressed and ameliorated, correct?

20         A    Correct.

21         Q    The student is still disabled and if you

22   took away those supports, the student would again

719

1   be back to the situation where she could not be

2   educated effectively; isn't that correct?

3       A    Correct.

4       Q    When you went to that MDT meeting, if I

5   understand you correctly, you had not, at that

6   point, reviewed the Wilson High School record,

7   correct?

8       A    I had not.  My understanding is that--no.

9   I had not reviewed it.

10      Q    Wouldn't you agree that it is important,

11  when you are dealing with a student who is alleged

12  to be disabled, to see how that student has been

13  performing in an academic setting?

14      A    Yes.

15      Q    Wouldn't you say that looking at how that

16  student performed when the student was in a DCPS

17  school is important?

18      A    Overall, yes; it is important.

19      Q    But you did not have the Wilson record

20  prior to the MDT meeting, correct?

21      A    No, I didn't.

22      Q    And if I understand you correctly, and

nr                                                              31

1    correct me if I am wrong, after the meeting, you

2    did go to Wilson and you looked at N▆▆▆▆▆▆ last

3    report card and you looked for some evidence that

4    her parents had requested services.

5         A    Yes, I did.

6         Q    But you did not otherwise look at her

7    records to see how she had been performing in

8    school while she was attending a DCPS school; is

9    that correct?

10        A    That is not correct.

11        Q    Well, then, what else did you look at?

12   Because it is the only--

13        A    I looked at the--I looked at the report

14   card and that report card in terms of her grades,

15   what had impacted her grades, and it appeared that

16   attendance had impacted the grades.  This is just

17   from looking at the record.

18        Q    So you didn't speak to any teacher at the

19   school; is that correct?

20        A    I spoke with the special ed coordinator.

21        Q    Okay.  But N▆▆▆▆▆ wasn't in special

22   education at Wilson, correct?

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1      A    They referred me to that person to get the

2   records for me.

3      Q    My question.  Was N▓▓▓▓▓ in special

4   education when she was in Wilson?

5      A    There was no indication that she was.

6      Q    Do you have any reason to believe that the

7   special education coordinator knew anything about

8   N▓▓▓▓▓?

9      A    I didn't know anything about the special

10  coordinator, what her role was, until I arrived at

11  Wilson.  I called her prior to going and let her

12  know that in an MDT meeting, there was a statement

13  made that services were requested for services, and

14  that would come under the special ed coordinator.

15      So when I went there, she pulled out the

16  record and she showed me what was there.

17     Q    But my question is do you have any reason

18  to believe that the special education coordinator

19  knew anything about N▓▓▓▓▓ G▓▓▓▓, other than that

20  she had her record that day for you to review?

21     A    Right.  I didn't.

22     Q    And you said you indicated that your

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1    review of the report card told you that attendance

2    had had an impact on N███████ performance.

3        A    It appeared that way.

4        Q    Okay.  What efforts, if any, did you make

5    to find out what had prompted the attendance

6    problem?

7        A    This was a record from 2003 and we are in

8    2005.  That would not be current information.

9        Q    Well, how are you going to evaluate the

10   student's current performance in a different

11   setting if you don't know how she was performing in

12   the general education setting, to which you were

13   effectively recommending that she return?

14       A    How am I going to evaluate that?

15       Q    Yes.

16       A    I can only evaluate what I see.  There was

17   no indication that a request was made for any

18   specialized services.  All I saw was the report

19   card in general education.  The student had some

20   good grades in some classes and other classes the

21   grades were not good.

22       Q    Okay.  But, again, my question, you made a

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1    determination, as you have said many times now,

2    based on current information, based essentially on

3    the report that she was doing very well with Buxton

4    School.

5        A    Yes.  Right.

6        Q    And Buxton School is a very different

7    environment from Woodrow Wilson Senior High School;

8    isn't that right?

9        A    Yes.

10        Q    Well, how do you determine, based solely

11    on current information, that there isn't something

12    about Buxton that is contributing to this as

13    opposed to the fact that N██████ is not disabled,

14    which was your conclusion?

15        A    What are you asking me?

16        Q    Well, let me--let me go back to the

17    example I gave you before, which is, I think, a

18    little bit easier.

19        A    About the blind student?

20        Q    Exactly.  Now, if you take away that blind

21    student's reader and that student begins to fail

22    again, what conclusion do you draw?

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1        A    That his accommodations were taken away.

2        Q    And that he needs them, right, in order to

3    succeed?

4        A    Right.

5        Q    So how do you determine the reasons why

6    N███████ is doing well in 2005 and assume that it is

7    because she is not disabled if you don't know how

8    she was doing in the general education environment?

9        A    The report card that I looked at, she was

10   having some good grades in general education and

11   not so good grades in general education.  Buxton

12   says she has good grades in every class in general

13   education.

14       Q    In a different milieu, right?

15       A    Yes; it is different.

16       Q    Right.  And, in fact, you recall, do you

17   not, that at the MDT meeting, there was discussion

18   about the concept of milieu therapy, correct?

19       A    Yes.

20       Q    And there was discussion about the fact

21   that N███████ was doing well at Buxton because she

22   was getting the small class sizes, the

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1    individualized attention, and the direct

2    involvement of teachers that she needed to address

3    her emotional problems and her attention deficit

4    hyperactivity disorder; isn't that correct?

5        A    Yes.

6        Q    But by finding her ineligible, you were

7    effectively saying she could return to Wilson and

8    return to the general education environment there,

9    correct?

10        A    Correct.

11        Q    And how large is Woodrow Wilson Senior

12    High School?

13        A    It has several hundred students.

14        Q    How large is a typical class at Wilson?

15        A    I don't know if there is a typical class

16    at Wilson, because at any high school, classes are

17    different sizes based on the subject and the

18    students' level of abilities and the students'

19    interest.

20        Q    Most classes have 20 or more students,

21    don't they?

22        A    I cannot say that for sure.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1       Q    You don't know what environment you are

2    sending N██████ back to, do you?

3       A    I can describe Wilson.

4       Q    Well, you can't tell me how many students

5    they have in a class.

6       A    But, you know, classes are different size

7    based on the subject area, based on grade level,

8    based on academic ability.  I am not sure there is

9    a typical size classroom at Wilson.

10      Q    Okay.  But what were you sending N██████

11   G█████ back to, if her parents had accepted the

12   determination that she was not eligible and had

13   returned her to Wilson High School?

14      A    When she left Wilson, she was general

15   education.  At Buxton, she is in general education.

16   So she would come back to Wilson in general

17   education.

18      Q    Are you telling me that special education

19   consists exclusively of an altered curriculum?

20      A    You didn't ask me if special education

21   consisted of an altered curriculum.

22      Q    I am asking you if that is what you are

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1   saying and if it is not, it is not.

2       A    Special education does make accommodations

3   for students based on their disability.

4       Q    And a special education program, depending

5   on the individual student's needs, would, in fact,

6   consist of a regular curriculum, an unaltered

7   curriculum, because the student is intellectually

8   capable of handling an unaltered curriculum,

9   coupled with other modifications, such as small

10  class size, or counseling, or possibly speech

11  therapy, or any of the above, correct?

12      A    Mm-hmm.

13      Q    So the fact that a student is receiving a

14  general curriculum does not necessarily mean that

15  the student is not receiving special education;

16  isn't that correct?

17      A    That is correct.

18      Q    Now, you said you saw no evidence in the

19  Wilson record that the parents had ever requested

20  services.

21      A    No; I did not.

22      Q    What were you looking for?

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1      A    The parent had said there was a letter

2  sent to someone at Wilson.  I was looking for that

3  letter, looking for a discussion with whomever it

4  was she was talking to at Wilson, what the outcome

5  of those communications would have been.  That was

6  not in the record.

7      Q    Okay.  Well, would you turn to exhibit--

8          MS. SAVIT:  And, Ms. Harris-Lindsey, would

9  you be good enough to give her the Exhibit NG-1,

10  which has been admitted as the cumulative file for

11  N██████ G█████ maintained by Wilson High School?

12          THE WITNESS:  Okay.

13

14          BY MS. SAVIT:

15      Q    And can you tell me if that is what you

16  saw?

17      A    No.  I saw a report card.

18      Q    Then let me direct your attention

19  to--let's just go through this.

20      A    Okay.

21      Q    The first page is the student master

22  record, correct?

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

40

1      A    Mm-hmm.

2      Q    And the second page is another page of the

3  student master record, correct?

4      A    Okay.

5      Q    And the third page is a fax transmittal

6  form, correct?

7      A    Yes.

8      Q    From Chesapeake Psychological Services.

9      A    Uh-huh.

10     Q    Right?

11     A    I see it.

12     Q    And I think the next page somehow got to

13  be blank.

14     A    Mm-hmm.

15     Q    And then the next page is a June 3, 2003

16  letter from Carol Ann Robbins, Ph.D., at Chesapeake

17  Psychological Services.

18     A    Mm-hmm.

19     Q    To Ms. Gaines, and she talks about her

20  client, N██████ G████, who is in treatment for

21  newly diagnosed depression and ADHD, and it

22  contains certain recommendations about what the

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1    school might do for her.

2        Did you see that?

3    A    I only saw the report card.

4    Q    So you didn't see that.  You didn't see

5    the next page, which is another copy of the same

6    fax transmittal form.

7    A    Okay.

8    Q    And you didn't see the next page, which

9    has some additional writing on it, including "I

10   approve."

11   A    Is that the St. James School?

12   Q    No.

13   A    That is the next page.  Oh.  This one

14   here?

15   Q    Yes.

16   A    Okay.

17   Q    There is another copy of Dr. Robbins'

18   letter.

19   A    I see that.

20   Q    With I believe it is N███████ student ID

21   handwritten on it.

22   A    Okay.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

42

1    Q    You never saw that either.

2    A    No.

3    Q    Okay.  Go with me a couple more pages past

4  the St. James and the student report.  Actually, go

5  quite a bit of the way.

6    A    Okay.

7    Q    Would you turn to Exhibit NG-6?  They are

8  all tabbed on the side.

9    A    Okay.  It says--is it Ms. Moten?

10    Q    Ms. Moten.

11    A    Okay.

12    Q    It is an April 23 letter from N▮▮▮▮▮▮

13  parents, correct?

14    A    Mm-hmm.

15    Q    You didn't see that in the file either.

16    A    I only saw the report card.

17    Q    What was in the file that was shown to you

18  other than the report card?

19    A    I only saw the report card.

20    Q    That is all they brought to you.

21    A    That is the file she gave me.  That is

22  what I saw.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1      Q    And you personally--

2      A    And I made a copy of it.

3      Q    And you personally did not go to see if

4   there were any other documents.  You accepted what

5   the special educator showed you.

6      A    I felt like the school gave me her folder.

7   I had no reason to believe that they didn't give me

8   everything or there was another folder, because I

9   made contact with her.  I went up to the school.  I

10  explained why I was calling.  The parent said that

11  she had tried to get services.

12          I wanted to see what information.  I went

13  there and that is what they gave me.

14     Q    Well, separate and apart from the request

15  for special education services, wouldn't a folder

16  normally have more than just the report card?

17     A    I have no idea what Wilson's folders would

18  have.  They gave it to me.  I had no reason to

19  think that they were hiding or withholding

20  anything.  Again, I called ahead of time, saying

21  what I was looking for, and that is what they gave

22  me.

nr                                                                    44

1        Q    Now, you indicated that you had asked for

2   current medical information.

3        A    That is correct.

4        Q    Now, if you would be good enough

5   to--Exhibit NG-23.

6        A    Okay.

7        Q    And that is an April 25 letter to you,

8   correct?

9        A    That is correct.

10       Q    And the attachments to that letter are an

11  April 12, 2005 summary of medications.

12       A    That is correct.

13       Q    Correct?

14       A    That is correct.

15       Q    And an April 18, 2005 letter from

16  N██████ psychiatrist.

17       A    That is correct.

18       Q    And I understand that you say that you

19  never received the mailed copy of that letter,

20  correct?

21       A    I did not.

22       Q    However, aren't those the documents that

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1  were handed to you by Ms. Correa at the MDT

2  meeting?

3      A    I indicated that those were the documents

4  handed to me at the MDT meeting.

5      Q    Okay.  But if I recall your testimony, you

6  said you were given 2003 documents and nothing

7  current.

8      A    Okay.

9      Q    Was your testimony correct?

10     A    This information relates to her treatment

11  back in--wait a minute--April 18.

12          It relates to her treatment between May

13  2003 and November 2003.

14          The one that is dated April 12, the last

15  session with this doctor was December 15, 2004.

16          So she had ended her session prior to

17  coming to the care center asking for services.

18

19     Q    But that wasn't 2003 information, was it?

20     A    This one is 2004 information.

21     Q    Right.  And, in fact, 2004 fell

22  with--December 2004 fell within the school year

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1   that you were considering; isn't that correct?

2       A    Yes, it is.

3       Q    Because you were, at that time,

4   considering her performance in 2004-2005.

5       A    Right.

6       Q    Correct?

7       A    Mm-hmm.

8       Q    If you would turn with me to Exhibit 22,

9   the second page of that exhibit.

10      A    Okay.

11      Q    That page lists the current information

12  that you said was available to you, which were two

13  D.C. Public Schools reports and Buxton School

14  reports, correct?

15      A    That is correct.

16      Q    And that is the information on which you

17  relied in making the eligibility determination,

18  correct?

19      A    That is correct.

20      Q    And if something is not there, it was not

21  considered, correct?

22      A    That is correct.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                          47

1        Q    Now, do you recall saying at the meeting

2   that if N████████ parents had requested services in

3   2003 while N██████ was still at Wilson, that there

4   should have been a response at that point, based on

5   what the parents were telling you about N███████████--

6        A    Yes.  I agree to that.  Yes.

7        Q    That, in fact, what the parents told you

8   was going on at that time was that N██████ was

9   severely depressed and she was skipping school,

10  that there had been a suicide attempt, that her

11  grades were plummeting, that her--

12            MS. HARRIS-LINDSEY:  Hold on.  You have to

13  respond with a "yes."

14            THE WITNESS:  Oh, I'm sorry.

15            MS. HARRIS-LINDSEY:  So it will pick up.

16            We don't want Ms. Savit's to be the only

17  voice that is heard on the tape.

18            THE WITNESS:  Okay.

19            BY MS. SAVIT:

20       Q    And that her grades were plummeting.

21       A    Yes.

22       Q    That, in fact, she had been threatened

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

48

1  with removal from a special program she was in, the

2  international program, because of poor grades.

3      A   Yes.

4      Q   That she was involved with inappropriate

5  and controlled substances, including alcohol abuse.

6      A   Yes.

7      Q   And had DCPS investigated that, it was

8  your opinion, was it not, that DCPS would, in fact,

9  have evaluated her and probably found her

10 eligible--

11     A   Yes.

12     Q   --for special education?

13     A   Yes.

14     Q   In 2003.

15     A   Yes.

16     Q   Your decision in 2005 was based on your

17 conclusion that whatever problems N▮▮▮▮▮ had in

18 2003, the Buxton reports indicated that they were

19 not current problems; is that correct?

20     A   That is correct.

21     Q   And that was without regard to the change

22 in setting for N▮▮▮▮ from Wilson to Buxton,

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                    49

1    correct?

2        A    That was in regards to N██████ functioning

3    in a 2004-2005 school year as not having the

4    problems that the parents indicated was going on in

5    2003.

6        Q    And that was based on how she was

7    functioning at Buxton.

8        A    That is the only information we had about

9    her school performance.

10       Q    Right.  And with whatever Buxton was

11   providing for her.

12       A    Yes.

13            MS. SAVIT:  No further questions.

14            THE WITNESS:  Okay.

15            HEARING OFFICER SMITH:  Redirect?

16            MS. HARRIS-LINDSEY:  Yes.  Just a couple

17   questions.

18                  REDIRECT EXAMINATION

19            BY MS. HARRIS-LINDSEY:

20       Q    Now, throughout this process leading up to

21   the MDT meeting, what additional services did the

22   parents tell you N██████ was receiving, outside

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1   of--at Buxton or outside of Buxton?

2          MS. SAVIT:  Object to the premise of the

3   question.  Of course, we have had the benefit of

4   hearing from Ms. Correa already, calling anything

5   that is provided at Buxton additional services

6   probably artificially divide the program into

7   pieces that are not appropriate.

8          MS. HARRIS-LINDSEY:  How about this, if I

9   say what services?  Actually, I am referring to--

10         BY MS. HARRIS-LINDSEY:

11     Q   Let me refer you just--strike that

12   question.  I am going to refer you back to the

13   document that you just referred to by counsel.  Go

14   to page two.

15     A   Okay.

16         MS. SAVIT:  Which one are you talking

17   about?

18         MS. HARRIS-LINDSEY:  Exhibit 23, NG-23,

19   page two.

20         THE WITNESS:  Page two.

21         BY MS. HARRIS-LINDSEY:

22     Q   Referring you to the actual April 12

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1   summary of medications prescribed.  You indicated

2   that the first time you saw this was on the meeting

3   date.

4        A    Yes.

5        Q    And the entry of December 2004, at the

6   bottom of the page.  At the bottom of the page,

7   referring to--

8        A    Yes.

9        Q    --December 2004.

10       A    I'm sorry.  Yes.  I'm sorry.

11            MS. HARRIS-LINDSEY:  So the basis of my

12   question refers to this document, that counsel

13   brought to light about counseling services.

14            BY MS. HARRIS-LINDSEY:

15       Q    Prior to that meeting, prior to receiving

16   this, were you aware that N▬▬ had been

17   receiving or was receiving services?

18       A    No, I wasn't.

19       Q    Counseling services.

20       A    I was not.

21       Q    And so the first time you learned of any

22   counseling service was this letter.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1       A    Yes.

2       Q    And in your 17 years of experience with

3  DCPS, when have you found a student eligible for

4  special education based on their performance two

5  years prior?

6       MS. SAVIT:   Objection.   The determination

7  of whether a student is eligible for special

8  education is individualized and it is inappropriate

9  to ask that question.

10      HEARING OFFICER SMITH:   She can testify

11 about her experience.   You can answer the question.

12      THE WITNESS:   We determine eligibility

13 based on one year of student's performance, and

14 that would be in the current school year, how are

15 you functioning now in your current school year,

16 what information brings to bear on how you are

17 functioning in the current school year.

18      BY MS. HARRIS-LINDSEY:

19      Q    Now, based on--you indicated--you said on

20 cross that had the information that the parent was

21 telling you about in 2003 gone to the table at that

22 time, the student probably would have been found

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1  eligible.

2      A    Probably would have been, based on what

3  the parent said.

4      Q    Based on what the parent was telling you.

5      A    Right.

6      Q    What impact does what the parent is

7  telling you have on the present decision?

8      A    It was just historical information.

9      Q    And you indicated that based on the Buxton

10 report, which encompasses the 2004 and five school

11 year, the report that you recall, indicated that

12 there was there was--they were reports--

13         MS. SAVIT:  Objection; leading.

14         MS. HARRIS-LINDSEY:  That was her

15 testimony on direct and now I am asking another

16 way.

17         HEARING OFFICER SMITH:  It is okay.

18         BY MS. HARRIS-LINDSEY:

19     Q    What information can you reiterate or

20 restate the information provided by Buxton of

21 N█████ performance at the time that you, that

22 the team went to the table?

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

54

1          MS. SAVIT:  Objection.  She is going to

2     restate testimony that has already been stated.

3          MS. HARRIS-LINDSEY:  I am asking her to

4     restate it in light of the--in light of the

5     evidence that was pointed to or highlighted in the

6     two--on cross.

7          HEARING OFFICER SMITH:  As to how she

8     viewed the information?

9          MS. HARRIS-LINDSEY:  Well, how--this

10    information--well, strike it.  It is not even worth

11    it.  I can deal with it another way.

12         Thank you.  I have nothing further for Ms.

13    Everett.

14         MS. SAVIT:  Based on the admissions in Ms.

15    Everett's testimony, I would like to move, at this

16    point, for judgment on the first issue in this

17    case.

18         We presented two issues.  One was that

19    DCPS defaulted in its initial Child Find obligation

20    in 2003 by failing to recognize N██████

21    disability and to provide appropriate programming

22    and services, and the second issue was whether

744

nr

55

1    N█████ continues to be disabled and in need of

2    services.

3         And I think Ms. Everett's testimony,

4    obviously, there is still a dispute as to the

5    second issue, but we have an admission that there

6    was a default in the Child Find obligation

7    initially; that given the information that was

8    available in 2003, DCPS should have responded and

9    probably would have found N█████ eligible for

10   special education, and I would, therefore, ask for

11   judgment on that issue.

12        MS. HARRIS-LINDSEY:  I would object to

13   that and strongly object.  I think Ms. Everett's

14   testimony was based on what the parent told her.

15   Her representation is--she didn't indicate that

16   based on documents that she had seen.  It was based

17   on a conversation, a verbal--an oral--a

18   conversation she was having with the parent at the

19   meeting.

20        Based on what she was hearing, she said

21   she would have, this is one member of the team.  So

22   I would object to the broad sweeping determination

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                          56

1    that DCPS defaulted, because I think based on the

2    record and what is in the record and the testimony

3    presented so far, I don't believe that a Child Find

4    violation can be found.

5              HEARING OFFICER SMITH:  I am going to deny

6    the motion.  I think the witness' has testified

7    from her own--given her own opinions, not the team

8    decisions.  So I think I need to hear what--look at

9    the record of what the team would have concluded.

10             So I am going to deny the motion.

11             MS. HARRIS-LINDSEY:  Okay.  We are going

12   to call Denise White-Jennings.

13   Whereupon,

14   DENISE WHITE-JENNINGS

15   was called as a witness and, having been first duly

16   sworn, was examined and testified as follows:

17                     DIRECT EXAMINATION

18             BY MS. HARRIS-LINDSEY:

19        Q    Ms. Jennings, if you could, the same as

20   Ms. Everett, give your name, who you are employed

21   by, in what capacity, how long, and what your

22   duties and responsibilities are?

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                      57

1       A    I am Denise White-Jennings, school

2   psychologist.  I am employed by the District of

3   Columbia Public Schools.  I have been employed by

4   the school system since 1986.  I perform

5   evaluations.  At times, I have also provided direct

6   services to students, but primarily I do

7   evaluations to determine if students are eligible

8   for special education services.

9       Q    Now, are you familiar with the student in

10  this case, N██████ G████?

11      A    I am.  Yes.  I am familiar with her.

12  Though I have never met her, I am familiar with

13  her.

14      Q    Okay.  Can you tell us, how did you become

15  familiar with, I guess, the case of N██████ G████?

16      A    Okay.  Once the case was received by the

17  care center, Ms. Everett referred the case to me to

18  review the information and to participate in the

19  evaluation process.

20      Q    Okay.  And what was your--what part did

21  you--what was your part in the process, in the

22  referral process?

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                            58

1        A    To determine what information I thought I

2    needed to come to a decision as to whether she

3    would be eligible for services.  So I reviewed the

4    reports that were provided, the previous

5    psychological.  I reviewed the reports from

6    Children's Hospital and I made a request for

7    current information from whatever therapist was

8    currently treating N███████.

9        Q    And what information--what--in response to

10   your request for therapist information, what was

11   provided?

12       A    Nothing was provided for quite a while

13   and, in fact, when I went on and wrote my report, I

14   indicated in the report that I had not received

15   current information.

16       Q    Now, you indicated you reviewed a

17   psychological evaluation.  I want to show you what

18   has been marked as DCPS-4.  Is this the document

19   you are referring to?

20       A    Yes.

21       Q    Okay.  And based on your review of this

22   record, you indicated--and you said Children's

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1  Hospital records.

2       A    Mm-hmm.

3       Q    Let me refer you to NG-8.  Are these the

4  documents you are referring to?

5       A    Yes.

6       Q    Okay.  Based on these two documents--

7       A    I think that is the one.

8       Q    There are a number of pages in this.  Go

9  ahead and take a moment to look through that.

10      A    Yes.

11      Q    Okay.  So based on those two documents,

12  you developed your own report.

13      A    Right.

14      Q    Okay.

15      A    Well, I also--before reviewing those, I

16  also requested information from the school and I

17  gave the school a rating scale.  Since I was not

18  going to be able to go to the school to see her, I

19  asked the school to complete a behavior rating

20  scale and, obviously, I asked the mother to

21  complete the behavior rating scale.

22      Q    Did Buxton complete the behavior rating

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr
60

1   scale?

2       A    Yes, they did.

3       Q    And did Ms. Correa also complete it?

4       A    Yes, she did.

5       Q    And so let me refer to NG-18.   Is

6   this--sorry.   Bear with me.   NG-22.   Would this be

7   your evaluation.

8       A    Yes, that is.

9       Q    Can you--

10          MS. SAVIT:   Excuse me.   Is it 22 or 21?

11          MS. HARRIS-LINDSEY:   Twenty-one.   I

12   apologize.   NG-21, clinical psychological

13   consultation.

14          BY MS. HARRIS-LINDSEY:

15      Q    Now, what determinations or

16   recommendations--what was the result--what was the

17   result of your report--of your evaluations and

18   assessments of what you had before you?

19      A    Well, I mean, I reviewed all the documents

20   and it appeared that N████ had been having some

21   emotional and behavioral problems in terms of

22   missing school, had been diagnosed with depression,

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666