1  accommodations can be implemented in a regular

2  education setting?

3      A    Yes, I know that.

4      Q    And it doesn't mean that the student needs

5  special education.

6      A    No.  I understand that.

7      Q    Or specialized instruction.

8      A    Right.

9          MS. HARRIS-LINDSEY:  Okay.  I think I may

10  be done.  Just give me one second, let me make

11  sure, because I could use a note-taker myself.

12          [Pause.]

13          BY MS. HARRIS-LINDSEY:

14      Q    Just for clarification, you indicated that

15  --you said Buxton allows for non-traditional means

16  of learning.  What do you mean by that?  Because I

17  don't really understand.

18      A    Well, students with ADHD and learning

19  issues tend to respond best sometimes to several

20  modalities at once rather than just the teacher

21  lecture and the student writing notes or them

22  reading something and getting information from

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1    that.              Sometimes they are given other

2    ways to show their knowledge, for example, being

3    allowed to give a presentation in lieu of a paper,

4    or being allowed to do it auditorily versus in

5    writing, or doing more kinesthetic activities, more

6    hands-on opportunities for learning rather than,

7    again, the traditional book learning in a classic

8    setting.

9            So they tend to teach to more modalities.

10   So that if you have a child who is better auditory

11   or kinesthetically, then they have opportunities to

12   learn that way, as well.

13       Q    And that is the way Buxton--

14       A    It tends to be built into that kind of an

15   academic setting, because it is more--they have

16   more freedom to do that kind of teaching.

17       Q    Is it because of the size?

18       A    Because of the size.  I am not saying it

19   can't be done in a public school setting, because

20   [unintelligible] public school teachers who do do

21   those things.

22       Q    Okay.  But certainly size would--

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1        A    That is like the [unintelligible],

2   especially to a child who tends to be sort of shy

3   and withdrawn and not comfortable exposing

4   themselves, not knowing something or having lost

5   their place or other issues.MS. HARRIS-LINDSEY:

6   Okay.  Nothing further.  Thank you very much.

7            HEARING OFFICER SMITH:  Redirect.

8            MS. SAVIT:  Yes, please.

9                    REDIRECT EXAMINATION

10           BY MS. SAVIT:

11       Q    You indicated on cross-examination that

12  you think that Buxton is working on N███████

13  clinical issues while she is there.  Can you

14  explain specifically what you are relying on when

15  you say that?

16       A    Okay.  Relying on her report and my

17  looking at some of the reports from the school,

18  that being part of that community and being known

19  by the teachers and the students so well really

20  provided her with a sense of safety and a sense of

21  sort of loyalty, accountability, commitment,

22  understanding so that she was more emotionally safe

nr                                                                    164

1   to express any need she had to get her concerns and

2   academic [unintelligible] addressed and to feel

3   that she was also contributing to a small community

4   where she had her role and she was respected for

5   that role and she could feel competent and develop

6   self-esteem as a result of that.

7          And her relationships are more in-depth

8   with the teachers because it is so small, because

9   they all live together a lot of the time and the

10  teacher is more involved with the student other

11  than just in that classroom, so that she is, again,

12  better able to feel understood and safe and

13  accommodated, if you will, and sort of accountable

14  to the community as a whole.

15         There is more structure built into that,

16  more support.

17     Q    Does this type of support and work with

18  N██████ have to be administered by someone with a

19  professional degree in therapy?

20     A    No.  Although I know she had someone like

21  that, also.  So I think it is a combination of the

22  sort of--it creates almost a therapeutic milieu

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1   without it being deemed such, because of the

2   community feeling and the rapport and the chance to

3   really develop a good relationship with the

4   teachers individually.

5        Q    Your training, obviously, is in

6   psychology, correct?  You don't have any legal

7   background, correct?

8        A    No, none.

9        Q    Do you have any understanding of the

10   difference between special education law and

11   Section 504?

12        A    I have some understanding, yes.

13        Q    Did you have it at the time you wrote the

14   letter in 2003?

15        A    Not as clearly as I do now and--oh, wait.

16   Do you want to follow-up with that?

17

18        Q    Yes.   What I--let me follow-up.   When you

19   specifically requested Section 504 accommodations,

20   were you intending to suggest that N▮▮▮▮▮ was not

21   eligible for special education?

22        A    No.

nr

166

1      Q    And can you elaborate on that?

2      A    Yes.    Often, Section 504 accommodations

3   are easier to get more quickly and it was the end

4   of the school year and I was trying to get

5   something in place for her.  And it wasn't clear,

6   because she had not been specifically diagnosed

7   with a learning disability, I knew she wouldn't

8   qualify on that grounds, and depression, it wasn't

9   clear at that time whether it would remit through

10  medication or treatment or whether it was going to

11  be a chronic disabling condition that would need to

12  be addressed through special education, and that

13  would be the other way she could qualify.

14          So it was more expediency and knowing that

15  it is possible that that would be sufficient if she

16  got sufficient medication and therapeutic treatment

17  for the depression piece of it, that she, because

18  of her intelligence, may be able to do well

19  academically, which is the 504 type of

20  accommodations.

21          MS. SAVIT:  Nothing further.

22          HEARING OFFICER SMITH:  Thank you, Doc.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                    167

 1  ‖ Next?

 2  ‖          MS. SAVIT:  As you know, you heard

 3  ‖ extensively from Ms. Correa when we were last here

 4  ‖ and I won't repeat anything, but I do have a few

 5  ‖ questions for her.

 6  ‖          HEARING OFFICER SMITH:  Sure.  You are

 7  ‖ still under oath.

 8  ‖ Whereupon,

 9  ‖ SYLVIA CORREA

10  ‖ was called as a witness and, having been previously

11  ‖ duly sworn, was further examined and testified as

12  ‖ follows:

13  ‖                   DIRECT EXAMINATION

14  ‖          BY MS. SAVIT:

15  ‖     Q    Was N███████ on medication on January 28,

16  ‖ 2005?

17  ‖     A    N███████ has been on medication since 2003.

18  ‖ Yes.

19  ‖     Q    And what medications was she on in January

20  ‖ 2005?

21  ‖     A    Specifically, Adderall.  She takes

22  ‖ Adderall every day.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                              168

1        Q    And for what purpose did she take it?

2        A    The Adderall allows her to focus much

3   better.  She can sit still for longer periods of

4   time.  She is much--some of the things I have

5   noticed is that she will not be quite as quick to

6   make decisions about things.  Like she is able to

7   sit down and talk to you.

8            A lot of the times, when she is not, she

9   would be what she herself called hyper, she was

10  hyper, she was always sort of kinetic, almost.

11           So--and, in fact, at one point, sometime

12  at the beginning, when she started taking Adderall,

13  she would take it just when she went to school.  I

14  think she would take it Monday through Friday.

15           And in the discussion with Dr. Robbins,

16  Dr. Robbins thought that perhaps that N███████

17  should be taking Adderall every day rather than

18  just when she was in the school setting.

19           So by 2005, N███████ was taking Adderall

20  every single day of the year, 24/7, and she was

21  [unintelligible].  And it is to this day.

22       Q    Let me take you back to the

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1    multi-disciplinary team meeting in May of 2005.

2    Were you ever told at that meeting that the reason

3    that the DCPS team members believed N████████ was

4    ineligible was because of a lack of information

5    about her medical condition?

6         A    [Unintelligible.]

7         Q    What was the reason that was given to you

8    at that meeting?

9         A    That she was stubborn.  She was doing very

10   well.  Look at her grades [unintelligible], that

11   she was really smart, in fact, which, by the way,

12   was not as expressly known at that stage.

13   [Unintelligible.]

14        Q    Were you asked to provide additional

15   information prior to the team making a decision?

16        A    I was asked to provide medical

17   information.  It was sent to them and I assumed

18   that that was sufficient, because I never heard

19   anything else.

20             MS. SAVIT:  I have nothing further.

21                  CROSS-EXAMINATION

22             BY MS. HARRIS-LINDSEY:

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                  170

1       Q    I think just the one question is when

2   did--and I think we have--sorry, I'm not sure.

3   When did N▇▇▇▇▇--when in 2003 did N▇▇▇▇ start

4   taking Adderall?

5       A    She started taking Adderall after she went

6   into--after she went--when she was hospitalized.

7   She came out of the hospital and what they had

8   given her was a medication for the depression.  She

9   was still severely depressed, although she wasn't

10  suicidal, and my understanding, although I

11  don't--what I was told was that she needed to be on

12  this medication, on the medication for her

13  depression for a while.

14          Apparently, she wasn't able to take both

15  at the same time.  So she started taking--so

16  N▇▇▇▇▇ started taking--she was on the

17  antidepressant the whole summer and then she

18  started taking the ADD around August.

19      Q    August, okay.  Okay.

20          MS. HARRIS-LINDSEY:  Thank you.

21          HEARING OFFICER SMITH:  Is that it?

22          MS. HARRIS-LINDSEY:  Yes.

nr

1        HEARING OFFICER SMITH:  Any other

2  witnesses or are you ready for closing?

3        MS. SAVIT:  I would just, of course,

4  formally, note for the record that at the Hearing

5  Officer's recommendation, we did submit affidavits

6  from both the St. James School and the Buxton

7  School, explaining their programs and how they are

8  working with N███████, and I know that the exhibits

9  have already been accepted, but specifically I

10  would ask that those be accepted as if they were

11  the testimony of those witnesses.

12        HEARING OFFICER SMITH:  Yes.  They have

13  already been marked 35, 36.

14        MS. SAVIT:  They are 35, 36, and 37.

15        HEARING OFFICER SMITH:  And 37, as part of

16  the record.

17        MS. SAVIT:  Because there are warm bodies

18  here, I always worry that people will ignore the

19  fact that that is the same as testimony.

20        HEARING OFFICER SMITH:  Yes.  Okay.  You

21  want to take five minutes and then do closing?

22        MS. HARRIS-LINDSEY:  Okay.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                          172

1              HEARING OFFICER SMITH:  Off the record.

2              [Recess.]

3              HEARING OFFICER SMITH:  We are back on the

4    record.  Again, this is the matter of N██████

5    G█████, and the parties are prepared, I gather, to

6    do their closing arguments.  Ms. Harris-Lindsey?

7              MS. HARRIS-LINDSEY:  DCPS' position is

8    based on the evidence that is in front of the

9    Hearing Officer, we believe that we have met our

10   burden of proof in that DCPS has not denied N██████

11   FAPE, based on all of the evidence in the record,

12   the evaluations, the testimony of the present, the

13   current MDT team that most recently met on N██████.

14             The student does not meet the criteria for

15   specialized instruction--excuse me--for IDEA

16   services.  In the Code, the definition of a child

17   with a disability, under 300.7(a)(2) is if it is

18   determined, through the appropriate evaluation,

19   that a child has one of the disabilities identified

20   in the prior section, but only needs a related

21   service, not special education, the student is not

22   a child with a disability under this part.

1          What we have found about this case is that

2    N██████--I think Ms. White-Jennings indicated that

3    her recommendation is N██████ would benefit

4    from--she recommended continued counseling.

5          The related service part is--counseling

6    would fall under the definition of related service

7    under 300.24.  However, special education involves

8    instruction.  It doesn't speak to classroom

9    setting.  That is an accommodation.

10         So what this case boils down to is special

11   education versus under IDEA or accommodation under

12   504.   If the student doesn't meet with the

13   qualifications under IDEA, they are not entitled to

14   a FAPE.  FAPE is specifically required as the

15   student who qualifies as a student with a

16   disability under IDEA.

17         The 504 accommodations, and the

18   accommodations actually deal with are the related

19   services or the adjustment to the setting to

20   accommodate the student's disability, for example,

21   I think the example was a student who is blind, who

22   is given the braille.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1       The student not necessarily--may not--that

2  may not necessarily mean the instruction is

3  changed.  It is the access to the information in

4  the setting that is provided.

5       Whatever the--the evidence--now, if there

6  was the--it came out, I wasn't sure how--where it

7  came through in the actual hearing request, but

8  there was an allegation of Child Find.

9       What the evidence showed was that the

10  school, Wilson, in 2003, was presented with an

11  evaluation, a psychological evaluation from Dr.

12  Cargo and--well, the evaluation was done in

13  January.  The testing dates were January.  So the

14  evaluation would have been provided to the school

15  sometime, maybe sometime in February.

16       Intervening in that period of time was a

17  hospitalization.  I believe they indicated that

18  N██████ was hospitalized for a period of time and

19  the notes, NG-6, indicates that the parents had

20  sent notice to the school in April that N██████ was

21  hospitalized.

22       The e-mail train that follows indicates

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1    that the school did convene a 504 conference.  NG-9

2    starts in May, goes to the end of May, when they

3    are talking about N███████ was hospitalized and had

4    missed a lot of work.

5          She was still in the hospital in April, on

6    April 25.  However, move to the e-mails that are

7    dated in May.  There are specific references to

8    attending a 504 conference, and those references

9    are not simply DCPS references, but reference the

10   parent, also, specifically the e-mail dated May 12,

11   2004--excuse me--2003, where Ms. Correa starts

12   by--in her reference to or e-mail to Ms. Morten,

13   and we were disappointed in not seeing you at the

14   504 conference.

15          So the indication that N███████

16   hospitalization and the impact that what she was

17   going through at that time was totally disregarded

18   by the school is not accurate.

19          Now, while that is not necessarily--I see

20   that that is not necessarily correct, but I see the

21   allegation that DCPS failed to discuss or consider

22   comp ed.  It deals with present--present claim and

865

1  says despite DCPS' admissions that it did not

2  comply with IDEA in 2003.

3        Again, going back to 2003, it is clear

4  that the school moved on it.  And if you look

5  at--if you consider time-wise, because you can't

6  look at this case as though you are unaware of

7  where we are in the school year.

8        May 12 tells you that you are almost

9  a--you are a month before the end of the school

10 year, but what we also see is the last e-mails that

11 was provided is that--a few of the last e-mails,

12 the communication with Ms. Morten, the math

13 teacher, is that she had been waiting, based on Ms.

14 Correa's e-mail, to hear from N██████ to work with

15 her on making up the work.

16        I think all the indicators were that the

17 parents wanted and Dr. Robbins wanted the school to

18 allow N██████ the opportunity to--in a stress-free

19 environment, to be able to make up that work, so

20 that she could complete the 10th grade and move on

21 to the 11th grade.

22        But what you find is that as of June 20,

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                        177

1   N�letter has still been absent, missing work that

2   was assigned.

3          So it is not--the 2003 school year is not

4   cut and dry.  Child Find is where the

5   school--first, Child Find is still, again, an IDEA

6   function and the student has not been found

7   eligible.  And Ms. Everett's statement, and she was

8   honest about it, she said based on the information

9   the parent gave her.  She did not--she said she

10  hadn't looked at any evaluations or had the

11  documents that we have before us today.

12         But she said based on what the parent was

13  telling her, she may have been found--she probably

14  may have been found eligible, probably, or maybe

15  have been found eligible, but that is a statement

16  of one person.  So that, in and of itself, is not

17  an admission that there was a failure to comply

18  with IDEA or that N▒▒▒▒▒ would have been found

19  eligible for special education services.

20         The other allegation that DCPS unduly

21  prolonged the assessment and eligibility process.

22  The parent presented to the school with the same

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1    evaluation that it presented in January '03, in

2    December, December 27, '04.

3            Now, the time line, you look--consider the

4    time line, school is not in session, but the

5    document was received and the process began, and

6    the first contact with N██████, personally with

7    N██████ was in January, when she was home, with Ms.

8    Flynn, the school psychologist. She met with

9    N██████.

10           So the process began and based on what she

11   had in front of her, and IDEA is clear, the team

12   has to consider what they have. You can't

13   speculate on what you could have had. You work

14   with what you have. You go to the table with

15   everything you have and you make a decision based

16   on that.

17           Ms. Everett was clear. She said the delay

18   in the meeting was continuing the request for

19   information and she said she tried to get

20   information from Buxton herself, but Ms.

21   Correa--she had to go through Ms. Correa, to get

22   Ms. Correa to get that information, and she

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

nr                                                                      179

1   helped--she did get it for her, but it wasn't early

2   in the process.

3          That information came close to the day of

4   the MDT meeting.   The meeting took place in May.

5   And based on what the team had, the team is very

6   clear in their notes what they had.

7          They had I think they indicated the

8   Children's Hospital report of 2003, which they did

9   not consider to be recent medical records.   And

10  based on what we have heard today, clearly, there

11  is more medical evidence than this team was given

12  privy--was provided--that was provided.

13         Dr. Robbins indicated that she continues

14  to meet with N███████, has met with her six times,

15  just in brief.   I don't want to misstate what she

16  said.   She said she had met with her at least six

17  times since June and had been her--had been her

18  provider, had been working with her since 2003.

19  None of that information was provided to the team

20  at that May meeting.

21         So the--and Ms. Everett indicated we

22  wanted current information, because that is what we

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1   are bound by.  The law says look at the current

2   information.  How do you--as this child presents to

3   you today, does this child meet the criteria of

4   requiring special education, which is the

5   instruction provided in a way that she can

6   understand it; not the setting, the instruction and

7   related services.

8           So I believe that the evidence is clear

9   that based on what the team had, even if you take

10  into consideration 2003, because that is not--that

11  is relevant, I think that one of the witnesses

12  said, for historical purposes, but that is not

13  relevant for how this child, how this student needs

14  to be instructed today.

15          The other allegation is DCPS disregarded

16  relevant information.  I don't believe that based

17  on the testimony provided by DCPS witnesses, that

18  there was an allegation that D.C. disregarded

19  anything.  I think what D.C. did was work--the

20  team, what this team did was worked with what they

21  had and, based on what they had, made a

22  determination of ineligibility.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1           And I don't think any testimony of the MDT

2    team members was--has been controverted.  They had

3    what they had and they went forward.

4           And when the request was made to reconvene

5    again and the response was we don't have anything

6    new.  What you do have new is Dr. Robbins'

7    psychological evaluation that the team still

8    doesn't--the team still doesn't have it.  I have

9    it, but the team doesn't have it.

10          So the team had not been presented with

11   anything post May '05 that would warrant coming

12   back and re-looking at this situation--looking at

13   this student.

14          The allegation that there is a failure to

15   conduct a proper psycho-educational evaluation, Ms.

16   Flynn's evaluation actually was not--wasn't

17   disputed.  She said I had what I had.  I did not

18   have her academic records.  I did what I was

19   supposed to do, contacted Ms. Everett and said can

20   you get me more information.

21          Ms. Everett has already said I had--Buxton

22   was non-responsive to me, I had to get it from the

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

182

1  mother.

2       So based on how the complaint is set out,

3  the four prongs that are alleged to be a violation

4  of IDEA, I believe DCPS has met its burden.

5       But there is more here, because what is

6  being asked is that we fund this student from 2003

7  to present in a non-special education setting,

8  regular education school, two of them.

9       Now, the law is clear on reimbursement for

10 private school.  The parent has to make notice,

11 give the school notice of their dissatisfaction and

12 in writing and request that DCPS fund.

13      Now, that evidence is absent in this case.

14 The only way DCPS became aware that these parents

15 wanted DCPS to pay was by filing this due process

16 hearing request, and I do not believe that that is

17 the notice that DCPS has to be provided.

18      Under the '97 regs, which is what we still

19 have to operate by til the new ones are

20 implemented, it speaks under IDEA and it is

21 parents' obligation, one of the three obligations

22 the parent has under the IDEA of '97 regs, and that

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1  is placement of children by parents if FAPE is an

2  issue, and indicated that if a parent wants

3  reimbursement for the private school, and I believe

4  it is 403, 300.403(c), that the parent has the

5  obligation to put the school on notice in writing

6  of their dissatisfaction that the team--excuse me,

7  sorry--that the--at least ten days prior to

8  removing the child from the public school, the

9  parents have to give written notice to the public

10 agency that they want DCPS to fund the private

11 school, because DCPS has denied them or has not

12 provided FAPE.

13        That notice never--that notice has never

14 been provided.  Even after the May 2005 meeting,

15 that notice was never provided.  So there is a

16 limitation to the parents' request for

17 reimbursement in this case.

18        I think the trouble I have with this case

19 is it seems the issue, the true issue, the true

20 substance of this case is two years old, what

21 happened in 2003.  The team that presented today

22 had no choice but to take the--you still have to

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                184

1   take the student as they present today, not take

2   the student as she presented in 2003, because you

3   can't go back and provide special education

4   services for 2003.  You provide what you provide

5   for the student now.

6           And there is a question as to whether this

7   student would have still been provided special

8   education services, because she didn't remain at

9   the school long enough for there to be any other

10  services provided under a 504 claim.  We don't know

11  what that meeting--I think Ms. Correa's testimony

12  about the 504 plan, the first--first, her

13  testimony, she said that there was no 504 meeting,

14  but the IE--but the reference to the 504 conference

15  actually comes from her own e-mail.

16          And he indicated that--she indicated that

17  the meeting was convened by Ms. Hanson, that they

18  were all in attendance, the English teacher,

19  Spanish teacher, Mr. Sonovit [ph], private tutor,

20  to discuss the student's problems, identify what

21  the student needed to pass classes and homework.

22          They talked about extra time to complete

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1  missed homework.  Now, Ms. Correa doesn't say--she

2  said it didn't--didn't refer to it as 504, but that

3  is controverted.  That is contradicted by the

4  e-mail in May.  And she said didn't come out of the

5  meeting with a plan, yet the e-mails with Ms.

6  Morten indicated that in order for N██████ to be

7  able to make up or be able to address her missed

8  services, she was supposed to come to Ms. Morten

9  and she was going to work with her, and she

10 indicated she would work with her after school and

11 that she had made herself available, but N██████

12 had not made herself available to her.

13       So there is--it is not--as I said, it is

14 not cut and dry.  Initially, it seemed that maybe

15 Wilson may have dropped the ball, but that clearly

16 is not the case.  The student still has to make

17 themselves available.

18       If a student makes themselves available

19 and DCPS fails, then the argument has more

20 validity.  But where a student fails to make

21 themself available and the school makes themself

22 available, then the violation--there can't be a

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

186

1  violation found against the school.

2          So I would ask the Hearing Officer, based

3  on what has been presented today, and it has been a

4  lot, but I think it is not as convoluted as I

5  initially thought it was, because what it comes

6  down to us whether N▬▬▬ is--whether she

7  requires--whether she meets the standard of a child

8  with a disability under IDEA and whether DCPS

9  failed to find that she requires--failed to find

10 that she was properly a student or whether DCPS

11 properly found that she was ineligible, the student

12 does not require--the student does not receive

13 specialized instruction, doesn't receive

14 special--does not receive special education.

15         She just attends a small school and has

16 the benefit of a small class setting.  And the

17 things that Dr. Robbins said, she indicated,

18 unprompted, that she is not saying that these

19 things can't be provided in the public school.  She

20 just thought it was not likely, because of the

21 size--because of the size.

22             When the class is smaller, the teacher has

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                    187

1  more--is better able or can use more--use a variety

2  of means to teach the students.

3         So I would ask the Hearing Officer to

4  actually find that DCPS actually has met its

5  burden, based on what they had in front of them,

6  and see--and you--and the record is very telling,

7  when you look--when you look back to 2003.

8         This team was not part of the 2003

9  process, but the record is clear that 2000--in

10 2003, Wilson did act, but based on how--based on

11 the time line, we are at the end of the school

12 year, N███████ never came back, and notice was not

13 given to DCPS that she wasn't coming back.

14        So I would ask the Hearing Officer to

15 dismiss the case and found that DCPS has not denied

16 the student FAPE.

17        MS. SAVIT:  Well, the thing that jumps out

18 at me, to start, is that this is now boiling down

19 to an argument about whether N██████ needed

20 services under 504 or under IDEA.

21        We seem not to be fighting over the fact

22 that N██████ had disabilities that required

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1  accommodations, and the question is to what extent

2  and under what law.

3      The problem with that, from DCPS'

4  perspective, is that there are references to a 504

5  meeting, but what happened was not a 504 meeting

6  and it did not yield a 504 plan.

7      Dr. Robbins was very clear about what

8  N██████ needed and is putting aside, for the

9  moment, whether that was something that could have

10 adequately be met under Section 504 or whether it

11 required the greater intervention of the IDEA; the

12 reality is that nothing of that nature was proposed

13 for N██████.

14     Ms. Correa testified, and noone has come

15 forward to contradict her, that at the meeting that

16 we are calling a 504 meeting, all that happened is

17 there was a discussion about how N██████ could

18 finish the school year, some tolerance for her on

19 the amount of work that she had to do, some

20 considerations of how she was going to pass all her

21 10th grade classes.

22     There was no discussion about what was

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

189

1  going to happen for her going forward,

2  notwithstanding the ample notice of severe

3  problems; not only Dr. Robbins' two letters, that

4  identified both depression and attention deficit

5  hyperactivity disorder as N███████ problems, but

6  also multiple communications, both e-mails and

7  letters, from N███████ parents.

8           For example, the letter from both Mr.

9  Gomez and Ms. Correa, Exhibit 6, April 23, "Our

10  daughter was hospitalized in the adolescent

11  psychiatric unit in Children's Hospital yesterday.

12  She has been very depressed for many months now,

13  but keeping it to herself far too effectively.

14  There is a certified teacher on the unit and there

15  is some school work being done, but we need help

16  from the school system."  That is in April.

17           We then have a letter a few days later, to

18  Dr. Tarason, the principal of Wilson Senior High

19  School, from Mr. Gomez, "My daughter is a 10th

20  grader.  She has been at Children's Hospital for

21  this past week.  We expect her to be released.  We

22  would like to prepare a 504 plan to support her

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

190

1  upon her return to school. You will be getting a

2  letter from Dr. Robbins to summarize the issues

3  that prompt this request."

4         Then we have the series of e-mails,

5  beginning with one on April 25, "Our daughter is in

6  hospital. We would like to gather her materials

7  and help her do her work."

8         The e-mails continue on about getting

9  N████████ work done. It is correct that it was a

10  focus, at that point, on getting N██████ work

11  done and getting her through the year, but there

12  was also clear notice of her precipitating

13  conditions, depression and ADHD.

14         And at that point, it was DCPS'

15  responsibility to look at N██████, to not merely

16  respond to the parents' immediate concern with

17  finishing the year, but to look at this child, look

18  at her record, both the issues she was presenting

19  and her school record that year, and say does this

20  child require special education.

21         One of DCPS' favorite defenses in these

22  cases is that nobody told us special education was

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

nr

191

1  required, and that defense has been decisively

2  rejected by the courts in this jurisdiction, most

3  recently in the case of Brannum v. District of

4  Columbia, which is reported at 2005 US Lexus 22994,

5  in which the United States Court of Appeals for the

6  District of Columbia Circuit has squarely placed on

7  DCPS' shoulders the responsibility to consider

8  whether a child may be disabled and in need of

9  special education when information comes to the

10  school system's attention that the child may have a

11  disability.

12      I submit to you when you get letters,

13  multiple letters, multiple e-mails, notifying you

14  that a child has been hospitalized for suicidal

15  depression, that she is depressed, that she has

16  attention deficit hyperactivity disorder, that a

17  non-lawyer has talked about a 504 plan, and you

18  can't hold a non-lawyer to a lawyer standard of

19  differentiating between the two statutes, that you

20  look at the child's record and see this child is

21  failing her classes, is doing extremely poorly,

22  that you are on notice that something may be going

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

192

1    on, and they should, at minimum, have started the

2    evaluation process.

3            So she should have been evaluated as

4    potentially in need of special education.  She

5    certainly should have had more than a meeting to

6    talk about how are we going to get her through the

7    rest of this school year.

8            You heard from Dr. Robbins that standard

9    accommodations for ADHD are things like small

10    classes and individualized help and reminders.

11    There was no plan put in place to give her those

12    things.

13            She needed a safe place, a place she could

14    feel secure.  She was cutting classes because she

15    couldn't handle.  She was overwhelmed by what was

16    going on for her in school, and there was no

17    consideration whatsoever given to what is going on

18    with this child, we know she has got some issues,

19    let's find out what is going on and let's see if

20    she is disabled and then if she is, what help she

21    needs.

22            So they didn't even meet their 504

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1   obligations.  I submit to you that what they should

2   have done was thoroughly evaluated her under the

3   Individuals with Disabilities Education Act in

4   2003, at which time, we are confident, based on the

5   information, that she would have been found

6   disabled and in need of special education.

7          They left Mr. Gomez and Ms. Correa with no

8   choice other than to remove N██████ from school,

9   because nothing was proposed going forward for

10  N███████.  She was going to repeat the 10th grade

11  pattern at Wilson had she remained there and since

12  she had already attempted suicide and she was

13  involved in very risky behavior, there was only the

14  probability that that was going to continue to

15  occur.

16         So they put her in the kind of environment

17  that she needed.

18         Now, addressing specifically the claim

19  that the ten-day notice was not given.  If you look

20  at the IDEA itself, specifically, Section

21  1412(a)(10)(3), the requirement that notice be

22  given ten business days prior to removing a child

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

194

 1  from the public school system applies only when the

 2  parents know that they have a legal obligation to

 3  give that notice.

 4       If the parents have not received notice,

 5  pursuant to Section 1415, of this requirement, it

 6  is excused.  Now, there is no evidence in the

 7  record that in May or June of 2003, when N███████

 8  parents, on a regular basis, were approaching the

 9  school system and saying "our daughter has

10  problems, help us," that anyone ever notified them

11  of the existence of the IDEA and they never

12  received the procedural rights brochure.

13       They had no idea what they obligations

14  were.  IDEA was totally off their radar screen.

15       If DCPS chooses not to recognize a

16  potential IDEA student and not to give the parents

17  notice of their procedural rights, it waives its

18  right to complain about the lack of a ten-day

19  notice.  So that issue is a non-issue.

20       To the extent that there is a claim that

21  the notice should have been given at the

22  eligibility meeting, the requirement is to give

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr
                                                                    195

1   notice prior to removal from the school system, if

2   the parents know that they are obligated to give

3   that notice.

4           There is no continuing obligation.  But in

5   any event, it was very clear at the MDT meeting

6   that N██████ was staying at Buxton and you don't

7   have to give the written notice if, at the most

8   recent IEP meeting, of which there was none, the

9   parents tell the school system that they are

10  removing the child.

11          DCPS never had an IEP meeting, because

12  they didn't find eligibility.  But at the

13  eligibility meeting, there was no question what was

14  going to happen with N██████, that her parents were

15  unhappy with DCPS' decision and that she was going

16  to remain at Buxton, where she was doing well.

17          So that is, in our view, a complete

18  non-issue.  But the reality is that the school

19  system did not recognize its obligation.  It did

20  not propose any kind of plan for N██████, either

21  under 504 or under IDEA.  They left them with no

22  choice, and they properly removed her to an

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1   environment in which she was able to make

2   educational progress.

3           I would also call to your attention

4   another case, Nesbitt v. District of Columbia,

5   which is at 2003 U.S. District Lexus 26306, in

6   which the judge held, in that case, that merely

7   receiving notice that a student had attention

8   deficit hyperactivity disorder was sufficient

9   notice to DCPS to activate its obligations under

10  the IDEA:

11          In that particular case, the parent came

12  to DCPS requesting special education services,

13  asked for an evaluation for ADHD, was told by DCPS,

14  "We don't do that," and so the child was taken

15  elsewhere and, ultimately, following fairly

16  extensive litigation, the court held that that, in

17  and of itself, was sufficient to activate the Child

18  Find requirement obligation of DCPS to evaluate the

19  student for potential need for special education.

20          Now, in the Nesbitt case, the parent

21  suspected that the child had ADHD and requested an

22  evaluation.   In N██████ case, we have letters

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr
197

1  from Dr. Robbins saying she has been diagnosed with

2  major depression and with ADHD.

3        So N████████ was at least one step beyond

4  Nesbitt and there was no question at that point

5  that DCPS should have considered N████████ IDEA

6  eligibility and they certainly should have

7  considered her need for accommodations, which did

8  not happen.

9        All they reacted to was the specific

10 request to get her through that school year.

11       It is completely absurd to lay the burden

12 on N██████ that she, quote-unquote, didn't make

13 herself available.  She was a depressed student,

14 who had recently attempted suicide, whose method of

15 dealing with her problems was to avoid school, and,

16 particularly, to avoid the courses in which she was

17 doing most poorly.

18       So to say that somehow DCPS is excused

19 from addressing her needs because she didn't come

20 to teachers is to punish her for having a

21 disability, and that is certainly not what this law

22 is all about.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1       So in 2003, they did not respond to the

2  request and we would submit that that is conclusive

3  right there, that everything that has happened

4  since then is traceable to the fact that the family

5  was left with no choice and did the best they could

6  to find an appropriate placement for N███████.

7       We heard last time we were here

8  extensively from Ms. Correa about the search, that

9  they looked for schools.  They did not initially

10 want to send N███████ to a boarding school and the

11 reason they chose St. James is because it was very

12 close to the District of Columbia.  They wanted to

13 keep her close.

14      But they only realized that N███████ could

15 not return to Wilson at the start of the summer and

16 they didn't know where to look.  They applied to a

17 number of day schools.  None of them would accept

18 N███████.  Most of them would not even entertain the

19 application, because they were full.

20      So they were forced to cast a wider net

21 and they ultimately found St. James, which still

22 had an opening.  And as you will see when you

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr
                                                                    199

1   review the affidavit of Sandra Pollack, who

2   participated in the admissions decision, she will

3   say that based on what she knows about N▉▉▉▉,

4   what was going on with her in 10th grade, what they

5   saw the year that she was there, it was a logical

6   next step for her and it met her needs.

7           N▉▉▉▉ switched to Buxton in the fall of

8   2004, because that was even better for her. It is

9   a smaller school. It provides even more

10  individualized attention for her and she is doing

11  much better there now.

12          Which leads us to the question of what do

13  you look at when the school system comes to the

14  assessment process very late in the day, when it

15  already starts to evaluate a student for

16  disabilities and for special education, after the

17  student, through the help of her parents and other

18  involved people, has already started to find her

19  own niche, which should have been provided by the

20  school system.

21          What happened when N▉▉▉▉ was evaluated

22  in 2005 was she was on medication. She had spent a

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1  year and a half in an appropriate setting, one

2  where she got small classes, heavy involvement by

3  the faculty, a safe environment, a place where she

4  was comfortable asking questions and letting them

5  know if she was having problems, a place where she

6  was monitored, and where any inappropriate

7  behaviors were caught quickly, where any problems

8  she was having were caught quickly and were

9  addressed, where she bought into the system, she

10  felt herself to be part of a community.

11        Well, of course, when she gets what she

12  needs, she is going to do better.  And although it

13  is correct that when you assess a child's

14  continuing need or initial need for special

15  education, you do look under the law for present

16  levels of performance.  You have to look at how the

17  student gets to those present levels of

18  performance.

19        If the student's present levels are low,

20  you look at why are they low and you remove the

21  obstacles, and if the student is performing well,

22  you look at why is the student performing well and

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1  what would happen if we change this.

2          Even DCPS' own witnesses acknowledged that

3  one of the reasons that N█████ is doing well is

4  that she is in the right environment.  I wrote

5  down, Ms. White-Jennings said her change of

6  environment, although still in a regular education

7  setting, is the reason why she is doing well.

8          I asked Ms. Everett about milieu therapy

9  and she agreed that that was what was going on for

10 N███████.  So you cannot say that a student is not

11 disabled if the student is performing well with

12 support and then propose to take away those

13 supports without considering what would happen in

14 the absence of those supports.

15         I kept harping during my cross-examination

16 on the much easier to understand phenomenon of a

17 student who is physically disabled.  If you have a

18 student who can't see, you can't give that student

19 written textbooks and expect that student to do

20 well.

21         But when you give that student a reader or

22 textbooks in braille or books on tape or whatever

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

202

1  works for that student and the student then

2  proceeds to go on and get As, you don't say, "Oh,

3  you must not be blind anymore."  You recognize that

4  the student is now performing to her potential

5  because she has the appropriate supports, and the

6  same is true of N█████.

7        She is doing well now at Buxton because

8  she is very bright and because Buxton provides the

9  environment in which she can succeed.  There is no

10 evidence, and I don't even hear a suggestion that

11 she should return to Wilson and simply go back into

12 the mainstream, in large classes, without supports.

13       But if she were to do that, we would be

14 back where we were.  She is not cured.  She still

15 needs help.  She still has setbacks and she needs

16 the support that she is getting.

17       We have conflicting testimony about

18 exactly the basis on which DCPS reached the

19 determination in 2005 that N██████ was not

20 disabled, and today DCPS comes in and says that,

21 "Well, we didn't have any medical information.  We

22 didn't know enough about N██████."

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

203

1          Ms. Correa has testified that there were

2    no requests for additional information and you look

3    at exactly what is said in the MDT notes, which are

4    our Exhibit 22, it is clearly why.  The team

5    members were completely focused on N████████

6    current good performance at Buxton and nothing was

7    going to persuade them that she continued to

8    require special education.

9          You see it in the notes.  You see it in

10   the assessments.  There is nothing in the notes

11   that indicates additional medical information would

12   have made a difference.

13          The emphasis is on current information.

14   She is doing well.  Therefore, she cannot be

15   disabled.  No recognition that she is doing well

16   because her parents provided what DCPS did not, and

17   that is the crux of the issue.

18          Where would N███████ be without the

19   parent-provided supports?  She probably wouldn't

20   even be in school now, but she certainly would not

21   be compiling the good record that she did.

22          As far as the legal requirements, IDEA

nr                                                        204

1   define a child with a disability as a child with a

2   number of impairments, including serious emotional

3   disturbance and health impairments, and then

4   further on in the regulations, other health

5   impairments are specifically defined to include

6   attention deficit hyperactivity disorder.

7            So to argue that N███████ is not disabled

8   within the meaning of IDEA is basically to ignore

9   the law and the regulations.

10           As far as emotional disturbance is

11  concerned, it is defined as follows:  the term

12  "emotional disturbance" means a condition

13  exhibiting one or more of the following

14  characteristics over a long period of time and to a

15  marked degree that adversely affects a child's

16  educational performance; an inability to learn that

17  cannot be explained by intellectual sensory or

18  health factors; an inability to build or maintain

19  satisfactory interpersonal relationships with peers

20  and teachers; inappropriate types of behaviors or

21  feelings under normal circumstances; a general

22  pervasive mood of unhappiness or depression; a

nr

1   tendency to develop physical symptoms of fears

2   associated with personal or school problems.

3        Now, N██████, when she was in Wilson, had

4   an inability to learn that cannot be explained by

5   intellectual sensory or health factors.   DCPS

6   testified that N██████, with her superior

7   intellect, should do very well in school.

8        Take a look at the report card she

9   compiled in 10th grade, her last year in DCPS.   She

10  has one A, maybe one or two Bs, and then Cs, Ds and

11  Fs, and this is not what you would expect to see of

12  N██████.

13       DCPS can't tell you why N██████ compiled

14  that record and noted the absences, which Dr.

15  Robbins has explained as being a function of

16  N██████ frustration with school, because her

17  attention deficit hyperactivity disorder wasn't

18  being accommodated.

19       But more globally, Dr. Robbins said she

20  was unable to access the curriculum in the

21  mainstream setting without supports, because she

22  knew she was bright, she couldn't understand why

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1  she wasn't working well, why she wasn't doing well.

2  She was afraid to ask for help.

3      She became so frustrated that she came to

4  the conclusion that she would rather die than

5  continue to go to school and she attempted suicide,

6  which is definitely an inappropriate type of

7  behavior, another definition of emotional

8  disturbance.

9      And all of these things contributed to her

10  inability to make appropriate progress in the

11  educational curriculum that was offered to her at

12  Wilson and nothing has been offered by DCPS to this

13  day to address these problems.

14      So I submit that she both meets the

15  definition of emotional disturbance and, certainly,

16  there is no dispute she has been diagnosed as ADHD,

17  she meets the definition of other health

18  impairment.

19      So then the question becomes what does she

20  need.   Well, fortunately for everyone, Natalia is

21  very bright.   So she does not need curricular

22  modifications.   You can give her the same

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

1    curriculum that a non-disabled student gets in a

2    high school class and she can handle it, under the

3    right conditions.

4        We have heard at length from Dr. Robbins

5    what those conditions are; a small class size, the

6    individualized attention, the feeling of a sense of

7    community, the elimination of fear, of poor

8    performance, of monitoring, reminding to get her

9    work in, some tolerance if she can't meet

10   deadlines, ways to help her do that, and that is

11   exactly what she has gotten at the two schools she

12   has attended since she left DCPS.

13       Now, the argument appears to be made that

14   because N█████ doesn't require a curricular

15   modification, she doesn't require special

16   education.  But if you look at the regulations,

17   specifically, Section 300.26, it says specially

18   designed instruction means adapting, as

19   appropriate, to the needs of the eligible child; a

20   content methodology or delivery of instruction.

21       In other words, you can modify content,

22   that certainly is appropriate for the right

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                        208

1    disabled child, but you don't have to modify

2    content.  Those three factors are listed in the

3    disjunctive of an "or."  You don't have to have all

4    three, and the delivery of instruction includes

5    what N██████ is getting, small classes and

6    everything else that we have discussed.

7             Because the purpose of developing a

8    special education program under the IDEA is to

9    address the unique needs of the child that are

10   caused by the child's disability and to assure

11   access of the child to the general curriculum.

12            The goal of special education is for a

13   child to do exactly what N█████ is doing, which is

14   to complete the regular course of study, not a

15   dumped down course of study.

16            So what she is getting is exactly

17   appropriate for her, and it is, indeed, special

18   education for N██████.  Now, it might not be

19   special education for some other student, but for

20   N██████, it is.

21            Finally, on the issue of what information

22   the school must consider, certainly, the school

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr

209

1  must consider current information, but it must also

2  consider input from the child's parents and any

3  other relevant information.

4          And in this unique situation, which was

5  created by DCPS' failure to deal directly with

6  N███████ issues in 2003, you have to look at the

7  historical background, because N██████ cannot be

8  charged with the fact that DCPS came to this

9  evaluation procedure a year and a half late.

10          They would have seen a very different

11  child and a very different level of performance had

12  they begun the evaluation process in 2003.  They

13  didn't recognize her problems.  They didn't do it.

14  And now they are trying to take advantage of the

15  fact that N███████ parents jumped in and provided

16  what they did not.

17          But, again, one cannot divorce N████████

18  current performance from how she gets to that

19  current performance and from being in the right

20  setting.  One has to look at what would happen if

21  the supports were eliminated, and there is

22  absolutely no evidence that if the supports were

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

nr                                                                    210

1   eliminated for her, that she would, in fact,

2   succeed.

3          Now, with respect to delays, certainly,

4   there are certain inefficiencies in attempting to

5   assess a child who is not present locally, but that

6   is not what Mr. Gomez and Ms. Correa are

7   complaining about, when we talk about DCPS unduly

8   protracting the process.

9          First, there is the complete failure in

10  2003 to recognize N██████ needs, and that

11  certainly has nothing to do with inability to get

12  information from schools that N█████ had not yet

13  attended.

14         But more important, there was a delay of

15  at least one month, it was actually more like five

16  weeks, because Ms. Correa went to Wilson High

17  School in an attempt to start the process in

18  November of 2004.  She was allowed to register

19  N██████, but then she was told that she could not

20  make a request for special education services

21  because she wasn't a teacher.

22         And it was not until approximately five

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666