# United States District Court
## for the District of Columbia

**N.G.**, *et al.*,

    **Plaintiffs**

  **v.**

**CLIFFORD B. JANEY, Superintendent, District of Columbia Public Schools,** *et al.*,

    **Defendants**

**Civil Action No. 06-00312 (EGS)**

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs N.G., Manuel Gomez ("Gomez") and Sylvia Correa ("Correa") (collectively, "plaintiffs"), through counsel, respectfully move the Court, pursuant to Fed. R. Civ. P. 56 and LCvR 7(h), to enter summary judgment in their favor on all issues presented by their complaint. The grounds for this motion are that all facts material to this case are undisputed, and that plaintiffs are entitled to judgment in their favor as a matter of law. Specifically, plaintiffs contend as follows:

1. N.G. was at all times relevant to this case a disabled student within the meaning of either the Rehabilitation Act of 1973, 29 U.S.C. §794 *et seq.* ("the Rehabilitation Act"), or the Individuals with Disabilities Education Act, 20 U.S.C. §1400 *et seq.* ("IDEA"). Defendants' agency, the District of Columbia Public Schools ("DCPS") was sufficiently aware of N.G.'s disabling conditions to trigger their obligation to consider her eligibility for a free appropriate public education under both statutes.

2. Despite notice, in 2003 DCPS failed to evaluate N.G. to determine whether she was disabled, identify her disabilities, find her eligible for either Rehabilitation Act accommodations or special education pursuant to IDEA, or to develop a program appropriate to her individualized needs.

3.      As a result of DCPS's inaction, Gomez and Correa were forced to find alternatives to DCPS schools for N.G., at their own expense, for which they are now entitled to be reimbursed.

4.      In late 2004, Gomez and Correa learned of N.G.'s IDEA rights, which were not disclosed to them by DCPS while she was enrolled in its schools, and requested special education on her behalf.  DCPS then erroneously determined that N.G. was ineligible for special education, and completely failed to consider whether she qualified for accommodations under the Rehabilitation Act.  N.G. therefore remained in the appropriate private placements that her parents had found for her until she completed high school, rather than return to a potentially harmful school environment.

5.      DCPS prevailed at a due process hearing held to consider these issues.  The hearing officer's ruling was wrong as a matter of law and should be reversed by this Court because, *inter alia,* the hearing officer:

    a.      found facts not supported by the evidence;

    b.      disregarded undisputed evidence of record;

    c.      improperly placed upon Gomez and Correa the burden of identifying N.G.'s need for special education beyond the obligation–which they met–of bringing to DCPS's attention sufficient information to allow the process of considering N.G.'s potential disability to go forward;

    d.      erred as a matter of law in finding that Gomez and Correa should have notified DCPS of their concerns about N.G.'s education before withdrawing her, when DCPS did not satisfy the condition precedent of providing Gomez with notice of the procedures mandated by IDEA;

    e.      erred as a matter of law in placing upon Gomez and Correa the burden of gathering for DCPS information it is legally required to assemble on its own in assessing a student's eligibility for special education; and

    f.      erred in finding that the schools which N.G. attended following her withdrawal from DCPS were not appropriate special education or Rehabilitation Act placements

when the undisputed evidence of record demonstrates that those schools met N.G.'s individual educational needs.

Based upon the foregoing, plaintiffs move the Court to enter summary judgment in their behalf.  The appropriate relief is either entry of judgment in their favor on the ultimate issues, or a remand to the hearing officer to reconsider his decision with appropriate guidance from this Court.

In support of this motion, plaintiffs respectfully refer the Court to the accompanying statement of material facts not in dispute, supporting memorandum of points and authorities, exhibits and the administrative record previously filed by defendants.

/s/    *Diana M. Savit*
_____

Diana M. Savit #244970
**SAVIT & SZYMKOWICZ, LLP**
7315 Wisconsin Avenue
Suite 601N
Bethesda, Maryland 20815
(301) 951-9191
Attorneys for plaintiffs

## Certificate of Service

I hereby certify that, this 29th day of June, 2007, I electronically filed the foregoing plaintiffs' motion for summary judgment, together with memorandum of points and authorities in support thereof, statement of undisputed material facts, exhibits and proposed order, and thereby served all counsel of record.

/s/    *Diana M. Savit*
_____

Diana M. Savit

3

# United States District Court
# for the District of Columbia

| |
|---|
| N. G., *et al.*, |
| **Plaintiffs** |
| v. |
| CLIFFORD B. JANEY, Superintendent, District of Columbia Public Schools, *et al.*, |
| **Defendants** |

Civil Action No. 06-00312 (EGS)

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to LCvR 7(h), plaintiffs submit the following statement of material facts as to which they contend in good faith there are no material issues to be litigated.

1.    At all times pertinent to this litigation, plaintiff N.G. resided in the District of Columbia at the address listed in the caption of the complaint.  (Complaint, ¶3; answer, ¶3)

2.    At all times pertinent to this litigation, plaintiffs Sylvia Correa ("Correa") and Manuel Gomez ("Gomez"), N.G.'s parents, were adult residents of the District of Columbia who lived at the address listed in the caption of the complaint.  (Complaint, ¶4; answer, ¶4)

3.    Defendant District of Columbia is a municipal corporation which, through its Board of Education, receives federal funds and therefore is subject to the provisions of the Rehabilitation Act of 1973, 29 U.S.C. §794 *et seq.* ("the Rehabilitation Act") and the Individuals with Disabilities Education Act, 20 U.S.C. §1400 *et seq.* ("IDEA"). (Complaint, ¶5; answer, ¶5)

4.      Defendant Clifford B. Janey was, at all times relevant to this action, the Superintendent of the District of Columbia Public Schools ("DCPS").  As such, he was charged with supervising DCPS's operations and functioning, including its compliance with the IDEA, the Rehabilitation Act and all other governing laws.

5.      N.G. entered DCPS in pre-kindergarten, enrolling in Lafayette Elementary School ("Lafayette"), where she experienced no difficulties.  (R. 615-616)[1]

6.      N.G. continued on to Alice Deal Junior High School, where at first she experienced some minor behavioral difficulties, but generally continued the good academic performance she had begun at Lafayette.  (R. 616-617)

7.      In N.G.'s eighth grade year, her parents began to notice more serious problems: N.G. said she did not like school and that her teachers did not like her.  (R. 617)

8.      Also in N.G.'s eighth grade year at Deal, she got into trouble seriously enough to warrant moving her to another school, Hardy Middle School, to complete the school year: N.G. was extremely late to Spanish class on one occasion, danced during class with another student and, together with another girl, put pencil shavings into a teacher's water glass.  (R. 618, 622)

9.      Gomez and Correa did not understand, while the seventh and eighth grade problems were happening, that they might be harbingers of more serious issues.  (R. 618)

---

[1]   References to the administrative record filed June 9, 2006 are designated "R. ___."

10.     N.G. returned to Deal for ninth grade.  By that time, N.G. was telling her parents that everyone hated her, including the principal, and said she believed herself "stupid."  (R. 618-619, 622-623)

11.     Correa went to see the school counselor at Deal and spoke with some of N.G.'s teachers during  her ninth grade year, for guidance.  (R. 619)

12.     In March or April of N.G.'s ninth grade year, she ingested a bottle of aspirin and was rushed to the hospital to have her stomach pumped.  She remained at Georgetown University Hospital in the pediatric mental health unit for five days.  (R. 619-620)

13.     N.G. missed a total of approximately two weeks of school due to the aspirin ingestion.  (R. 620)

14.     Gomez and Correa notified DCPS of the reason for N.G.'s absence.  (R. 620)

15.     Following the aspirin ingestion, N.G. and her parents commenced family therapy.  (R. 620)

16.      Other than missing school due to the aspirin ingestion, N.G.'s primary manifestation of unusual behavior was that she was reluctant to go to school and appeared sad.  Nevertheless, she went to school, participated in the ninth grade play, sang at graduation and had friends at Deal.  (R. 621, 623)

17.     N.G. entered DCPS's Woodrow Wilson Senior High School ("Wilson") in 10th grade, the 2002-03 school year.  (Complaint, ¶¶7-8; answer, ¶¶7-8; R. 623)

18.    Gomez and Correa thought N.G.'s 10th grade year began "fine."  (R. 624-625)

19.    Correa went to meetings with N.G.'s teachers at Wilson in late October or early November 2002, at the end of the first advisory period, expecting to hear good things about N.G.'s progress.  (R. 623-624)

20.    Correa received N.G.'s report card at the first advisory meeting, and was completely surprised by N.G.'s grades: 1 F, 1 D-, 1 D, 1 C-, and 3 Cs.  The report card also showed an erratic pattern of absences: N.G. was reported as having missed 10 sessions in one class and 20 in another.  (R. 92, 624-625)

21.    N.G.'s poor report card was completely unexpected; she had always presented as "very smart" and tested well.  She had even managed to obtain good grades in 9th grade, despite her hospital stay and diagnosis of clinical depression.  (R. 625)

22.    Correa immediately asked N.G.'s teachers for help, saying she was committed to N.G.'s regular school attendance and that all needed to work together to stop her from cutting classes.  (R. 626-627)

23.    Although all of N.G.'s teachers were responsive when she spoke with them at the advisory meeting, they did not follow through to call Gomez or Correa when N.G. missed class, although she continued to do so and suffered further deterioration in her grades as the school year continued. (R. 92, 627-628)

24.    As the school year progressed, there were occasions on which Wilson staff contacted Gomez and/or Correa about N.G.'s  poor performance or responded to inquiries from Gomez or

4

Correa about efforts to improve her attentiveness and to help her make up missed assignments.  (R. 206-209, 225)

25.    In a letter dated January 8, 2003, DCPS warned Ms. Correa and Mr. Gomez that Natalia was at risk for removal from a special program in which she was enrolled unless she pulled her grades up.  At that point, her grade point average was 1.4, approximately equivalent to a D+. (Complaint, ¶ 9; answer, ¶9; R. 206)

26.    In January 2003, on a friend's advice, Gomez and Correa had N.G. tested by Dr. Alexandra P. Cargo, a clinical psychologist with Wake • Kendall • Springer • Isenman • Schweickert • Weintraub and Associates PLLC, educational and psychological consultants.  (R. 210-224; 628-630)

27.    Dr. Cargo's report, which Gomez and Correa received in February 2003, did not formally diagnose N.G. with a disabling condition, but found weaknesses in her organizational and attending skills, restlessness, inefficiencies in her perceptual organization, a tendency toward distractibility, lack of attention to details and deadlines, some trouble with word retrieval, weaknesses in math fluency and problem solving, poor coping resources, emotional lability, chronic irritability and mild anxiety.  Dr. Cargo noted N.G.'s "avoidant style," difficulty in admitting her own distress, appearance of aloofness and tendency to oversimplify.  (R. 210-224)

28.    Dr. Cargo made the following recommendations to improve N.G.'s school performance and overall functioning:

a.        Individual tutoring

b.     Consultation with a psychiatrist for a possible medication trial to reduce Natalia's emotional lability, chronic mild depression, anxiety and tendency to pick her skin

c.     Family therapy

d.     Participation in an extracurricular activity

e.     Regular physical exercise

f.     Consultation with a college advisor during N.G.'s 11th grade.

(R. 220-221)

29.     Correa gave Jeffrey A. Schultz, who was in charge of the international studies program in which N.G. participated at Wilson, a copy of Dr. Cargo's report. She also gave copies of the report to some of N.G.'s teachers, her counselor, the principal and the vice principal. (R. 630-632)

30.     Wilson did not adjust N.G.'s program in response to Dr. Cargo's report. (R. 632)

31.     Following up on suggestions in Dr. Cargo's report that N.G. might have attention deficit hyperactivity disorder ("ADHD"), Correa sought out an expert on ADHD, eventually connecting with Dr. Carol Robbins. (R. 341-346, 632-633, 807)

32.     N.G. began to see Dr. Robbins in late February or March, 2003. Dr. Robbins almost immediately diagnosed N.G. with ADHD and major depression. (R. 338, 633, 812)

33.     Both ADHD and depression affect social skills and social interactions. Students with ADHD tend to be impulsive and to have difficulty managing their reactions. They are hyper-reactive, emotional and to seek stimulation, sometimes through risk-taking behavior. They may feel that they do not fit in socially because they feel different from others. Persons

with depression do not always care about themselves or about being safe, and can make poor decisions about their own safety.  (R. 820-821)

34.  The effects of ADHD and depression, as described above, can prevent a person with these disabilities from achieving her intellectual potential.  (R. 821)

35.  Students with ADHD tend to do better academically in small classes and with more individualized attention because they get off track, become distracted and get lost.  They do not always hear directions or key into things, and need more direction and support than most students to keep up.  (R. 813-814)

36.  Dr. Robbins noted, in evaluating N.G., that she was having trouble keeping up with her workload at school.  This problem was exacerbated by N.G.'s high intellect, as she was in advanced classes in which she carried a heavy workload.  (R. 813)

37.  Students like N.G. benefit from smaller classes, having note-takers or other assistance in copying material from the board or from a lecture, being given the opportunity to leave the classroom when they become overwhelmed in order to retreat to a safe environment to speak with someone for reassurance, reduced workloads and accommodating teachers who understand their challenges and work with them to make their work manageable.  (R. 338, 815, 822)

38.  Without a designated "safe place" at Wilson, N.G. was leaving the school entirely when she felt overwhelmed, consequently missing classes.  (R. 822-823)

39. N.G. entered into therapy with Dr. Robbins in 2003. At the start of N.G.'s treatment, Dr. Robbins also recommended that N.G. see a psychiatrist for medication therapy. (R. 634)

40. When N.G. began her therapy, Dr. Robbins learned from her that she was struggling academically because she found her classes large and frustrating, struggled to keep up with her work, felt stupid and acted out in frustration. This exacerbated her depression. N.G. would sometimes become too emotionally overwrought to remain in class; she would panic and leave the classroom. (R. 338)

41. In April 2003, Dr. Robbins realized during a therapy session that N.G. was very depressed and evidenced suicidal intent. She recommended immediate psychiatric hospitalization. (R. 338, 636-637, 811, 816)

42. N.G. was hospitalized the next day at Children's Hospital, where she remained from April 22, 2003 until May 1, 2003. (R. 232-234, 637)

43. On April 23, 2003 and April 26, 2003, Mr. Gomez informed various staff members at Wilson of N.G.'s hospitalization and that she was suffering from depression. He asked Wilson to prepare a "504 plan" to help her when she returned to school. (Complaint, ¶¶14-15; answer, ¶¶14-15; R. 226-227)

44. Correa hand-delivered letters about N.G.'s situation to her teachers and to the principal. (Complaint, ¶14; answer, ¶14; R. 638)

45. Gomez also communicated with N.G.'s reachers about her schoolwork and her need to know that her teachers were supporting her. (Complaint, ¶14; answer, ¶14; R. 240-242)

46.     On May 4, 2003, Dr. Robbins wrote to Wilson's principal, Dr. Tarason, informing him of

N.G.'s diagnoses of ADHD and major depression.  She provided N.G.'s treatment history

and the various ways in which N.G.'s conditions affected her, including inattention,

distractibility, impulsivity, disorganization, inefficiency, poor time management, inconsistent

follow-through, procrastination, poor working memory, low frustration tolerance, and low

self-esteem.  Dr. Robbins expressed her hope that the school would make appropriate

accommodations for N.G., specifically stating that

> She would benefit greatly from some standard educational
> accommodations (a 504 Plan), such as being seated near the front of
> the classroom, being provided organizational assistance, being
> reminded to hand in homework assignments, being provided
> academic assistance/tutoring when needed, and being given extended
> time on tests.  Please encourage her teachers to work with her to make
> appropriate modifications to her academic requirements, such that she
> will be able to make up work from both prior to and during her
> current psychiatric hospitalization.  She is a very capable and
> intelligent young woman, who, with the right supports, will be able
> to succeed academically and reach her intellectual potential.  As a
> result of her current fragile emotional state, she may well also need
> to make use of a crisis counselor, or have a safe place to go if she
> becomes overwhelmed or upset during the school day.

(Complaint, ¶¶14-15; answer, ¶¶14-15; R. 250)

47.     Dr. Robbins also urged the principal to contact her for additional information "in order for

her to qualify for the necessary accommodations."  (R. 251)

48.     In Dr. Robbins's opinion, had N.G. been offered the recommended modifications, she could

have handled the standard academic curriculum.  (R. 823-824)

49.     The school environment N.G. needed to succeed was not available to her in Wilson.  (R. 824)

50.     No one from DCPS suggested in 2003 that N.G. should be tested to determine whether she was disabled.  (R. 641)

51.     No one from DCPS notified Ms. Correa or Mr. Gomez about the rights of a student with disabilities.  (R. 641)

52.     In May, Ms. Correa and Mr. Gomez attended what everyone called a "504 meeting."  N.G.'s parents thought the purpose of the meeting was to discuss how to help and support N.G.  Ms. Correa thought the Americans with Disabilities Act was involved.  (R. 642)

53.     In addition to N.G.'s parents, the school counselor, N.G.'s English teacher, N.G.'s Spanish teacher, another teacher and N.G.'s private tutor attended the meeting.  (R. 642-643)

54.     The meeting focused on getting N.G. through the rest of the school year, primarily on having her complete her assignments, perhaps with extensions of the deadlines for handing them in. There was no discussion of allowing N.G. extended time on tests, nor of any of the other accommodations Dr. Robbins had suggested in her May 4, 2003 letter.  (R. 643-644)

55.     No one at the meeting discussed developing a 504 plan, nor did anyone talk about N.G.'s possible eligibility for services under IDEA.  No one suggested that N.G. be evaluated to determine whether she was disabled.  (R. 644)

56.     Following the meeting, Ms. Correa asked the school counselor to help N.G. withdraw from math.  The counselor directed her to the vice principal.  Eventually, following a June 3, 2003 letter from Dr. Robbins which again notified Wilson that N.G. had been diagnosed with ADHD and depression, N.G. was allowed to drop her math class.  (R. 88)

10

57. No one from DCPS contacted Dr. Robbins in response to either of her letters concerning N.G. She was not invited to attend the May 2003 meeting. (R. 339, 836)

58. N.G. ended the school year with low or failing grades in the fourth advisory, but received credit for all of her courses other than math. (R. 92)

59. Over the summer, Ms. Correa and Mr. Gomez began to investigate private schools for N.G. They were unaware of any public school options for her other than a return to Wilson. (R. 647-648)

60. On August 8, 2003, Ms. Correa went to Wilson to register N.G. for the 2003-04 school year. She saw the school counselor, Ms. Hansen, and approached her to discuss how they could protect N.G. against a repetition of the problems of the prior year. She asked specifically about one-to-one assistance. (R. 649)

61. Ms. Correa also asked Ms. Hansen to meet with her before school started. Ms. Hansen refused and said she would not be available until the third week of school, at the earliest. (R. 649-650)

62. At that point, Ms. Correa and Mr. Gomez decided that N.G. could not return to Wilson and that they needed to find another school for her. (R. 650)

63. It is Dr. Robbins's opinion that N.G. needed academic and emotional supports upon her return to school in fall 2003, and that Wilson was not appropriate for her at that point because the school had not prepared any accommodations for her. (R. 339)

11

64.  The search for an alternative school for N.G. eventually led Ms. Correa and Mr. Gomez to the Saint James School ("Saint James") in Saint James, Maryland.  (R. 650-652)

65.  Saint James is a small, college preparatory boarding school.  Although it is not certified as a special education school, it is structured, provides small classes (an average of 12 students per class) and a high degree of student-teacher interaction, and a great deal of supervision of its students.  (R. 353-379)

66.  Saint James has in the past enrolled other students with ADHD and has accommodated them via small classes, structure, attentive teaching, coaching and dormitory supervision.  (R. 359)

67.  Saint James admitted N.G. with knowledge of her ADHD diagnosis, believing its size, small structure and ability to provide accommodations made the school a good place for her.  (R. 359)

68.  N.G.'s admission was conditioned upon her repeating the 10th grade, due to her poor academic performance the prior year.  (R. 359, 654-655)

69.  Dr. Robbins supported N.G.'s move to Saint James, believing it could meet her emotional and academic needs.  (R. 339)

70.  In particular, Dr. Robbins approved of Saint James's attentiveness and willingness to accommodate N.G., including providing structure and oversight that she needed.  Saint James provided a contained environment, rules that she had to follow and structure that helped her study.  She received assistance in organizing her study schedule, as well as smaller classes and relationships with her teachers which made her feel comfortable in asking

for help if she needed it and in requesting the supports and accommodations that she needed. (R. 825)

71. Saint James calls itself a "textbook example" of the environment Dr. Robbins recommended for N.G: a highly structured environment that offers small classes, extended time, teachers who will work with her to help her catch up when her disabilities cause her to fall behind, and an environment that will allow her to build trust with her teachers and that will provide a safe place for her to go when she feels overwhelmed. (R. 360)

72. N.G. received psychological support while at Saint James with a therapist who came to the school one day each week. She also continued to see her psychiatrist at home, for medication therapy, and saw Dr. Robbins when she came home. (R. 679)

73. N.G. enrolled in Saint James for the 2003-04 school year, taking the school's standard 10th grade curriculum. She earned academic credit for all subjects, earning average- to above-average grades. (R. 360)

74. Based on what it knows of N.G., Saint James does not believe that she would not have succeeded had she remained in a large public high school, without accommodations. (R. 361)

75. Ms. Correa observed improvement in N.G. during her time at Saint James. N.G. was excited about learning again, she started to believe in herself, and her grades improved. (R. 655)

76.     Despite the improvement, Saint James was not the best fit for N.G. as its orientation was too religious for her, the school was not sufficiently diverse, and she found that it had too many rules.  (R. 657-658)

77.     Ms. Correa and Mr. Gomez searched for a different school for N.G. for the 2004-05 school year and found The Buxton School ("Buxton") in Williamstown, Massachusetts.  (R. 658)

78.     N.G. enrolled in Buxton for 11th grade.  (R. 659)

79.     Dr. Robbins supported the move to Buxton, opining that N.G. had been traumatized by her experiences at Wilson and could not have succeeded there academically or emotionally had she returned to Wilson at the start of the 2004-05 school year.

80.     Dr. Robbins also approved of Buxton because it was even smaller than Saint James and was more responsive to the individual differences in the way people learn.  Buxton gave N.G. freedom to take control of things she enjoyed doing, such as planning a school trip to Puerto Rico, which allowed her to show her abilities and skills.  Dr. Robbins found Buxton to be a cohesive community which nurtured N.G. emotionally and augmented her academic achievement.  (R. 825-826)

81.     While at Buxton, N.G. received counseling services with a therapist who works with the school but is not on its staff.  (R. 675)

82.     Buxton is a college preparatory school which enrolls 90 students in the 9th through 12th grades.  Almost all students board at the school.  The environment affords a lot of personal contact with adults to foment self-esteem, trust and basic growth.  (R. 381)

14

83. Students who come to Buxton may not be doing well in large, impersonal environments but have the potential for success in a community that affords personal rights along with imposing personal responsibility. (R. 381)

84. The Buxton program is structured; each student has obligations and a sense of responsibility. Staff monitor students closely and students have many opportunities to interact with staff. Most faculty live on campus. (R. 380-434)

85. N.G., who has good intellectual potential but who lacked self-esteem at enrollment, was distractible but capable of being refocused, required personal involvement, and needed an intellectually stimulating environment where she would not get lost and was appreciated as an individual. She was appropriately placed at Buxton for these reasons. (R. 384-386, 436-437)

86. N.G. did well academically at Buxton. She passed all courses and earned full credit for the 11th grade there. (R. 385. 436-437)

87. At the time of the administrative due process hearing, N.G. was a 12th grade student at Buxton and was making appropriate academic progress. (R. 385, 436-437)

88. Buxton provided the type of setting that Dr. Robbins recommended for N.G: small classes, extended time, teachers who worked with her to catch up when she fell behind, and an environment that allowed her to build trust with her teachers and that provided a safe place for her to go when she felt overwhelmed. (R. 438-439)

89. N.G. had some emotional difficulties while at Buxton, but also grew in this area. Over time, staff saw her increase her self-confidence and self-discipline, become more accepting of routines, take her work seriously, assume leadership positions, and attend class regularly. (R. 385, 437)

90. Buxton staff were able to address N.G.'s ADHD by, among other things, refocusing her when she drifted off in class. (R. 437)

91. The staff at Buxton believed that N.G. was appropriately placed at Buxton and would not have succeeded in a large public high school where, they believed, she would have felt lost and defeated. (R. 386-387)

92. Dr. Robbins saw N.G. several times after she enrolled in Buxton, beginning in June 2005. (R. 827)

93. Dr. Robbins noted that following her stays at Saint James and Buxton, N.G. felt better about herself in light of her academic successes, and was more mature and self-confident. She was less guarded than in 2003 and more willing to take responsibility for her actions and to change her behavior when necessary. (R. 828-829)

94. N.G. was still struggling at the time of the administrative due process hearing, and continued to need small classes, the opportunity to develop rapport with her teachers, to know that her teachers believed in her and that she would be given help if she asked for it. She also needed an environment that would teach in different modalities as she needed it, and give her structure, support, reminders and oversight. (R. 829)

95.   DCPS has funded at least one other special education student, Laura Swearingen Steadwell, at Buxton, for the 1997-98, 1998-99, and 1999-00 school years.  Laura Swearingen Steadwell remained at Buxton, funded by DCPS, until she completed high school and graduated. (Exhibit 1, June 28, 2007 affidavit of Louis R. Steadwell)

96.   Ms. Correa observed improvement in N.G. following her move to Buxton.  She received good grades, did well on her SATs, "perked up" in terms of wanting to learn, and was excited about classes.  (R. 659)

97.   Ms. Correa noted that Buxton's small size permitted constant interaction between students and teachers, and that the teachers seemed to know the students very well.  She also believed that Buxton's small class size allowed N.G. the attention she needed, and that the environment denied her the option of not going to class.  (R. 659-661)

98.   Despite N.G.'s progress at Saint James and Buxton, as of the date of the due process hearing, she was still experiencing problems, continuing to see her therapist, and remained on medication.  (R. 662-663)

99.   Ms. Correa returned to Wilson in November 2004 to ask for special education services for N.G.  She eventually re-registered N.G. and filled out forms that led to a series of evaluations to determine whether N.G. was disabled.  (R. 257- 270, 664-666)

100.  DCPS representatives met with Ms. Correa on December 27, 2004.  Ms. Correa agreed to provide available evaluations to DCPS's multidisciplinary team ("MDT").  The MDT, in turn, was to review the evaluations and determine whether further assessments were needed. (R. 271)

101.    DCPS subsequently performed a comprehensive psychoeducational evaluation, which

included testing of N.G., and a clinical psychological consultation, which consisted entirely

of a record review and completion of forms by N.G.'s parents and teachers. (R. 272-287,

293-296)

102.    The psychoeducational evaluation, dated January 28, 2005, found N.G. to have very superior

intellectual and cognitive abilities, without severe discrepancy between her intellectual and

academic achievement.  (R. 275-276)

103.    The clinical psychological consultation, dated May 11, 2005, concluded with the following

"diagnostic impressions":

> N[.] has a history of depression with past suicide attempts and
> hospitalization.  She has been diagnosed with Major Depressive
> Disorder and prescribed Lexapro and Keflex according to Children's
> Hospital records from her 2003 hospitalization.  No current
> psychiatric/treatment records were made available.  According to
> parent report N[.] has also been diagnosed with ADHD although
> records were not made available indicating this diagnosis.  Current
> parent and teacher rating scales are suggestive of ADHD
> symptomotology [sic] however symptoms of restlessness, inattention,
> distractibility can also be associated with depression.  N[.] is reported
> to be in ongoing psychotherapeutic treatment.  Current reports have
> been requested but have not been provided.  Diagnosis is deferred
> pending treatment/progress notes from her therapist.

(R. 295)

104.    The clinical psychologist, Denise White-Jennings, who prepared the "diagnostic

impressions" has never met N.G., met Mr. Gomez and Ms. Correa only at the MDT meeting,

did not conduct a clinical interview with N.G.'s parents, and did not diagnose N.G. (R. 747,

756-757)

18

105.   Ms. White-Jennings was aware that N.G. had been diagnosed with depressive disorder and also knew that there was at least a question as to whether N.G. also suffered from ADHD. (R. 306, 754)

106.   Ms. White-Jennings later learned that N.G. had been diagnosed with ADHD.  (R. 754)

107.   Ms. White-Jennings acknowledged in her testimony that major depressive disorder affects different students in different ways, and that for some the effects will require academic program changes or specialized environments.  For this reason, one must know how the student with this diagnosis was functioning in the general education environment in order to decide what accommodations that student might need.  (R. 758)

108.   Ms. White-Jennings acknowledged that the same is true for a student with ADHD: One must first know how that student functions in a general education environment in order to determine whether that environment needs to be modified, and to what degree.  (R. 758-759)

109.   If the modifications put in place for a disabled student achieve their desired effect and the student is able to perform well academically as a result, it does not mean that the student is not disabled.  (R. 716-720, 759)

110.   After conducting the referenced assessments, DCPS invited Mr. Gomez and Ms. Correa to a second MDT meeting, on May 16, 2005.  (R. 290, 667)

111.   Mr. Gomez and Ms. Correa were given copies of DCPS's psychoeducational evaluation and clinical psychological consultation, as well as the findings of both, for the first time at the May 16, 2005 meeting.  (R. 668)

112.    No one who knew N.G. from her time at Wilson was present at the MDT meeting, nor were her records from Wilson.  (R. 297, 668)

113.    The MDT meeting was chaired by Gloria Everett, a clinical social worker who has never met N.G.  (R. 695-697)

114.    Ms. Correa and Mr. Gomez presented medical information about N.G. at the MDT meeting, which DCPS said it had not previously seen.  (R. 297)

115.    The medical information, from Dr. Lawrence A. Brain, a child psychiatrist, indicated that N.G. had been diagnosed in 2003 with ADHD, predominantly inattentive type, and mood disorder, not otherwise specified.  (R. 306)

116.    Dr. Brain also reported that

> [d]uring the course of my seeing her for psychopharmacologic management the patient gradually showed improvement with the stabilization of her mood lability and an improved capacity to function academically because of improved attentional ability.  Her entry into St. James private school, with its manifest structure was particularly effective in helping her academic achievement.

(R. 306)

117.    Ms. Correa and Mr. Gomez also reviewed for DCPS's N.G.'s history at Wilson.  The DCPS MDT team members said that had they seen her then, they probably would have agreed that N.G. needed services.  (R. 669, 737-738)

118.   DCPS concluded at the MDT that N.G. was not eligible for special education services, based upon what it termed "current information," identified as "DCPS psycho-education report [sic], DCPS clinical psych. report [sic], Buxton school reports." (R. 298)

119.   The "Buxton school reports" upon which the MDT team relied indicated that N.G. was a good student, intellectually mature, who enjoyed her work, was not afraid to speak up in the classroom, was a leader, had the capacity to function at a high level and was in fact doing so. (R. 706)

120.   DCPS was also aware that Buxton was providing a small environment and small classes for N.G., and that this environment was different from the one in which she found herself when she attended Wilson. (R. 710, 725)

121.   DCPS looked at N.G.'s current performance at Buxton in deciding that she was not eligible for special education, and concluded that even if N.G. had had educational problems in 2003, they were not being manifested in 2005, when the MDT team met.  (R. 710, 738)

122.   Ms. White-Jennings looked at Buxton's Web site to determine whether it provides special education.  She was looking for evidence that it provides specialized instruction or therapeutic services.  (R. 767)

123.   In reviewing information about Buxton, Ms. White-Jennings saw that it has small classes. (R. 767)

124. Ms. White-Jennings defines "specialized instruction" as "presenting information in a way that is tailored to the needs of the student to meet their [sic] disability category, to provide them [sic] with a way to access the information so that they [sic] can learn." (R. 768)

125. "Special education" can, in appropriate circumstances, be delivered to a disabled student in a general education setting, using a standard curriculum, provided the student receives the accommodations that are required by her particular disabling condition.  (R. 728)

126. By finding N.G. ineligible for special education, DCPS was effectively returning N.G. to the general education program at Wilson, a high school of several education students, with no accommodations.  (R. 726)

127. DCPS did not identify the specific classes N.G. would have attended, nor any accommodations she would have received, had she returned to Wilson following the finding of ineligibility.  (R. 726-727)

128. Following the MDT meeting, Ms. Everett went to Wilson to try to find other information about N.G., and to confirm Ms. Correa's statement that she had requested services for N.G. while N.G. was still enrolled there.  (R. 711-712, 729)

129. Ms. Everett found no information about N.G. at Wilson other than her report card.  Based upon that document, she concluded that poor attendance had affected N.G.'s grades.  (R. 721, 732)

130. Ms. Everett did not try to find out what had prompted the poor attendance, because it had occurred in 2003, and she wanted only "current" information.  (R. 723)

131.   Ms. Everett never saw Dr. Robbins's letters to Wilson in 2003, informing the school of N.G.'s diagnoses and requesting accommodations for her, nor did she see the requests from N.G.'s parents for a "504 meeting." (R. 730-732)

132.   At Wilson, Ms. Everett spoke only with the school's special education coordinator, whose sole function was to provide what was represented to Ms. Everett as N.G.'s file. She did not speak with anyone who had taught N.G. (R. 721-722)

133.   On May 24, 2005, Mr. Gomez and Ms. Correa, through counsel, asked Ms. Everett to reconvene the MDT to consider N.G.'s medical evidence, since it was not discussed at the May 16th meeting. (R. 307-308)

134.   By letter dated June 1, 2005, Ms. Everett refused to reconvene the MDT meeting. (R. 309)

135.   Also in the May 24, 2005 letter, Mr. Gomez and Ms. Correa asked Ms. Everett to refer N.G.'s case to the appropriate person within DCPS to consider reimbursing N.G.'s parents for costs they incurred following DCPS's failure to respond to their 2003 request for services for N.G. (R. 307-308)

136.   Ms. Everett's June 1, 2005 letter did not address the request regarding ameliorating the effects of DCPS's 2003 inaction. (R. 309)

137.   Gomez and Correa incurred the following costs in educating N.G. after she left Wilson: $22,567.50 in tuition and fees at Saint James, $31,560 for N.G.'s first year at Buxton, and $32,555 for the second year at Buxton. (R. 442-457)

138. Mr. Gomez and Ms. Correa requested a due process hearing on June 30, 2005. (Complaint, ¶25; answer, ¶25)

139. The requested hearing took place on September 14, 2005; November 28, 2005; December 9, 2005; and January 13, 2006. On January 23, 2006, the presiding hearing officer issued a determination which held in DCPS's favor on all issues. (Complaint, ¶26 and Exhibit 1; answer, ¶26)

140. In deciding the case, the hearing officer held as follows:

    a. DCPS did not fail in its IDEA "child find" obligation to N.G. in 2003 because it did not have sufficient information to allow it to recognize that N.G. might have been disabled and eligible for special education;

    b. DCPS held a "504 meeting" under the Rehabilitation Act in 2003, and therefore adequately fulfilled its obligations to N.G. under that statute;

    c. N.G.'s parents cannot be reimbursed for private school tuition they incurred because they did not notify DCPS that they were withdrawing N.G. from public school before enrolling her in Saint James and, later, Buxton;

    d. N.G. was not entitled to compensatory education resulting from DCPS's 2003 inaction because her difficulties were attributable to absences (skipping school and hospitalization) that DCPS did not cause;

    e. N.G. was not then eligible for special education due to lack of evidence that her emotional problems and ADHD have educational impact upon her, relying upon the evidence that she has performed well academically since entering private school, and finding that there was no evidence that Wilson could not have provided the accommodations recommended by Dr. Robinson; and

f.     Because the hearing officer upheld DCPS's finding of ineligibility, he ruled that

DCPS was not prospectively responsible to provide special education for N.G.

(Complaint, Exhibit 1; R. 59-78)

/s/     *Diana M. Savit*

_____

Diana M. Savit #244970
**SAVIT & SZYMKOWICZ, LLP**
7315 Wisconsin Avenue
Suite 601N
Bethesda, Maryland 20815
(301) 951-9191
Attorneys for plaintiffs

25