# United States District Court
# for the District of Columbia

| | |
|---|---|
| N. G., *et al.*,<br><br>    **Plaintiffs**<br><br>    **v.**<br><br>CLIFFORD B. JANEY, Superintendent,<br>District of Columbia Public Schools, *et al.*,<br><br>    **Defendants** | **Civil Action No. 06-00312 (EGS)** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Both the Rehabilitation Act of 1973, 29 U.S.C. §794 *et seq.* ("Rehabilitation Act"), and the Individuals with Disabilities Education Act, 20 U.S.C. §1400 *et seq.* ("IDEA"), impose upon recipients of federal funds, like defendants District of Columbia ("the District") and Clifford B. Janey, former Superintendent of the District of Columbia Public Schools[1] (collectively, "the District" or "DCPS"), obligations to provide free appropriate public educations ("FAPE") to disabled students within their jurisdictions, and to seek out children who are potentially in need of such services. 20 U.S.C. §1412(a)(1); 34 C.F.R. §104.33(a); 20 U.S.C. §1412(a)(3)(A); 34 C.F.R. §300.125(a)(ii).

The latter is generally known as the "child find" obligation. *See, e.g., DL v. District of Columbia,* 450 F.Supp.2d 21 (D.D.C. 2006); *DL v. District of Columbia,* 450 F.Supp.2d 11 (D.D.C. 2006); *DL v. District of Columbia,* 237 F.R.D. 319 (D.D.C. 2006); *Scott v. District of Columbia,*

---

[1]

    The Court may take judicial notice that Superintendent Janey was recently removed from his position and that the Mayor of the District of Columbia has appointed an interim chancellor to serve essentially the same functions as were performed by the former superintendent. The interim chancellor should be substituted as a defendant in this action as a matter of law.

2006 U.S. Dist. LEXIS 14900 (D.D.C. 2006); *Nesbit v. District of Columbia,* 2003 U.S. Dist. LEXIS 26306 (D.D.C. 2003).

"Child find" is the shorthand term for the affirmative obligation of every public school system to identify students who might be disabled and in need of special education or accommodations for their disabilities, evaluate those students to determine whether they are indeed eligible, and then to provide a FAPE to each eligible student. As we show below, DCPS utterly failed in its child find obligations to plaintiff N.G., first in 2003, when it did not even recognize the existence of potentially disabling conditions, and again in 2005, when it failed either to gather relevant information or to properly interpret the information it had. Consequently, N.G.'s parents, Manuel Gomez ("Gomez") and Sylvia Correa ("Correa") (collectively, "plaintiffs" or "N.G.'s parents"), were forced to provide an appropriate education for N.G. on their own, at considerable expense.

The hearing officer's determination which found that DCPS had fulfilled its duties to N.G. in 2003, and which separately affirmed DCPS's 2005 finding of ineligibility for special education under IDEA, is not supported by the evidence of record, and results from misapplying the governing law to the facts. Consequently, the hearing officer's determination must be reversed, with the Court either entering judgment directly, or remanding the case for further appropriate administrative proceedings.

## ARGUMENT

In reviewing administrative decisions under IDEA, courts review the records of the administrative proceedings, may hear additional evidence at a party's request, and then decide the matter based on the preponderance of the evidence. 20 U.S.C. §1415(i)(2)(B). The reviewing court

must answer two basic questions: (1) Has DCPS complied with the procedures set forth in IDEA? and (2) Is the program DCPS developed reasonably calculated to enable the student to receive educational benefit? *Board of Education v. Rowley,* 458 U.S. 176 (1982). The district court's standard of review under IDEA is less deferential than in typical administrative review cases, although the court must give "due weight" to the administrative proceedings. *Id.; Kerkam v. McKenzie,* 862 F.2d 884 (D.C. Cir. 1984).

Applying these principles, the administrative decision under review cannot stand.

I.    **DCPS failed in 2003 to recognize N.G.'s potential need for special education and/or accommodations for her disabilities and must bear the cost of the steps her parents took to provide that which DCPS did not**

    A.    **DCPS defaulted in its "child find" obligation**

The hearing officer excused DCPS's failure to provide special education for N.G. in 2003 upon his finding that Gomez and Correa did not sufficiently place DCPS on notice of the presence of disabling conditions. He cited the following facts and made the following conclusions:

- Dr. Alexandra Cargo's January 2003 evaluation, which was provided to Woodrow Wilson Senior High School ("Wilson"), did not formally diagnose a disability;

- Dr. Carol Robbins's two letters to Wilson, which both formally notified DCPS of N.G.'s attention deficit hyperactivity disorder ("ADHD") and major depressive disorder, and requested accommodations and a "504 plan" for N.G., could be discounted because they were unaccompanied by evaluations;

- N.G. had earned above-average grades prior to the 2002-03 school year; and

- although N.G.'s grades suffered in the 2002-03 school year, this could have been due to her poor attendance which, in turn, was attributed by Dr. Cargo to skipping classes to be with friends or to get food.

3

(R. 73)

The hearing officer further criticized Dr. Robbins for not "interacting" with Wilson other than through her correspondence, and therefore found that there was insufficient evidence that Wilson had been put on notice of the possible disability-related causes of N.G.'s poor academic performance and high absence rate.  (R. 74)

In reaching his conclusions, the hearing officer ignored undisputed evidence of record and gave excessive emphasis to the Cargo report, which N.G.'s parents obtained early in the process of learning about N.G.'s disabilities and which was superseded by events in N.G.'s life and by Dr. Robbins's superior knowledge of N.G.–both of which were timely presented to DCPS.[2]  Dr. Cargo's report was written in January 2003.  In April 2003, N.G. was hospitalized for 10 days at Children's Hospital, and emerged with a diagnosis of depression, of which DCPS was immediately made aware. Dr. Robbins, furthermore, promptly followed up with notice of both the depression diagnosis and her ADHD diagnosis, and requested accommodations for N.G.

---

[2]

We believe that the Cargo report, standing alone, was sufficient to put DCPS on notice that N.G. should be evaluated for possible disabilities.  Dr. Cargo, for example, identified weaknesses in N.G.'s organizational and attending skills,  restlessness, inefficiencies in her perceptual organization, a tendency toward distractibility, lack of attention to details and deadlines, some trouble with word retrieval, weaknesses in math fluency and problem solving, poor coping resources, emotional lability, chronic irritability and mild anxiety.  She suggested that N.G. might have ADHD, although she did not render a formal diagnosis.

Dr. Cargo noted N.G.'s "avoidant style," difficulty in admitting her own distress, appearance of aloofness and tendency to oversimplify.  She also noted N.G.'s history of a suicide attempt (N.G. ingested a bottle of aspirin and had to have her stomach pumped), comments indicating a lack of self-esteem ("nobody likes me and I'm a failure"), unstable friendships and similar warning signs.  (R. 209-221)

While none of these was sufficient to prompt an immediate declaration of eligibility for special education services, a properly functioning child find program would at least have gathered more information.  In any event, by the time N.G.'s parents requested services for her, much more–and more concrete–information was available.

This was more than enough information for DCPS to begin the process of evaluating N.G. for either special education or "504" accommodations under the Rehabilitation Act. *See, e.g., Scott v. District of Columbia, supra* (parental notice that student had been diagnosed with ADHD sufficient to trigger DCPS's child find obligation and to begin process of evaluating for special education). *See also Reid v. District of Columbia,* 401 F.3[d] 516 (D.C. Cir. 2005) (DCPS cannot await parental demand before providing special instruction; school system is affirmatively charged with identifying, locating and evaluating children with disabilities).

Nor can Dr. Robbins's claimed failure to have provided a written evaluation, or to have otherwise been more aggressive with DCPS, be charged to N.G. or her parents. Dr. Robbins specifically informed Wilson in her correspondence that she was available to provide additional information in support of N.G.'s need for accommodations, but no one from Wilson contacted her, nor was she invited to the alleged "504 meeting" in May 2003. It was DCPS's responsibility, under both the Rehabilitation Act and IDEA, to seek out information about N.G. 20 U.S.C. §1414(a)(1)(A); 34 C.F.R. §301(a); 34 C.F.R. §104.35. Gomez and Correa's only obligation, once DCPS had been placed on notice of N.G.'s difficulties, was to respond with information and to cooperate in obtaining information from others. They were never given a chance to do so.

The hearing officer also held that N.G.'s in-school experience did not afford DCPS sufficient notice of the presence of a disability, noting that the decline in her academic performance could have been attributable to poor attendance and nothing more. This unjustifiably isolates one ambiguous issue–attendance–from the wealth of information available to DCPS by May 2003. First, by the time Gomez and Correa requested services, DCPS was well aware that one significant cause of N.G's spotty attendance was her 10-day psychiatric hospitalization. Indeed, the hearing officer noted that this hospitalization made N.G. "unavailable for education." If a disabling condition was causing

N.G. to miss school and this, in turn, affected her ability to be educated, DCPS was not free to write this off as attributable to "attendance problems" that were of no moment. Second, had DCPS bothered to inquire of Dr. Robbins, it would have had the benefit of the wisdom of a supremely qualified ADHD expert who would have told them that N.G.'s actions in skipping classes were symptomatic of unaccommodated ADHD.

DCPS did not make use of the information provided and available to it, and consequently failed to recognize N.G.'s special education and accommodation needs. It admitted as much in 2005, and again at the hearing, when the chair of N.G.'s multidisciplinary team acknowledged that based upon the information provided by Gomez and Correa about N.G.'s condition in 2003, she should have been evaluated for special education then and likely would have been found eligible. The hearing officer's finding regarding DCPS's fulfillment of its "child find" obligation in 2003 should therefore be overturned.

### B.    DCPS did not properly respond to the request for "504" accommodations

The hearing officer found that DCPS held a "§504" meeting in response to the request for same, essentially because everyone called the meeting a "504 meeting." There is, however, no evidence of record that DCPS complied in any respect with its obligations under the Rehabilitation Act (colloquially called "§504"). Correa's undisputed testimony was that all that was discussed at the "§504" meeting was how N.G. could pass her 10th grade courses notwithstanding her absences and her poor grades. No "504 plan" was developed, nor were accommodations discussed. DCPS did nothing before the meeting to educate itself about N.G.'s depression or ADHD, and certainly conducted no formal evaluations, as it should have done. 34 C.F.R. §104.35.

6

The hearing officer excused the failure to develop a plan for N.G. going forward because the school year was ending; he deemed it reasonable not to develop a plan that would not have been implemented until the fall. (R. 74). There is, however, no evidence of record that DCPS deferred the plan for that reason; in fact, there is no evidence of record that DCPS ever intended to develop a plan for N.G. (As noted repeatedly, it did not take even the first step toward developing a plan, which is evaluating the student.) Moreover, the **only** evidence of record shows that DCPS had no intention of picking up where it left off when school resumed for the 2003-04 school year: Correa testified that when she returned to Wilson in August 2003 to register N.G. for the fall, she asked the school counselor what could be done to improve things for N.G. going forward. At first, she received a blank stare; after pressing the point, the counselor told Correa she could meet with her several weeks after school had started. There is, therefore, no evidence upon which the hearing officer could rely to find that DCPS had acquitted–or was planning to acquit–its §504 duties to N.G.

It should be noted as well that the hearing officer's determination on this point is wholly inconsistent with his earlier conclusion that DCPS did not have sufficient notice of N.G.'s disabilities to trigger its "child find" obligation. DCPS clearly knew enough to convene a §504 meeting–at least, the hearing officer found that DCPS held such a meeting, and everyone called the meeting by that name. A §504 meeting is held to consider the needs of a disabled student. DCPS could not have held a §504 meeting if it did not at least suspect that N.G. suffered from disabling conditions that needed to be addressed in the educational context.

Either DCPS knew enough about N.G. to recognize that she had disabilities that required action by the school–hence the §504 meeting–or what Wilson called a "§504 meeting" was nothing of the sort, and the term had no meaning to DCPS. One or the other–but not both–is true.

7

Whichever it is, it demonstrates non-compliance with the law on DCPS's part, and a hearing officer's decision that cannot be sustained.

### C.    N.G. was eligible for services in 2003 under §504 and/or IDEA

Because he found that DCPS owed N.G. nothing, or else gave her what she was owed–as indicated above, the decision can be read both ways–the hearing officer did not specifically address whether N.G. was in fact disabled within the meaning of either the Rehabilitation Act or IDEA in 2003, and therefore whether she was eligible for services under either statute.  As noted, DCPS largely conceded 2003 eligibility at the due process hearing, saying that based upon the information available regarding N.G.'s ADHD and depression, she should have been found eligible and provided services.


If there is any need to go beyond that, the undisputed evidence supports this conclusion and no other.  By the end of the 2002-03 school year, N.G. had been diagnosed with major depressive disorder and ADHD.  She had missed significant amounts of school on account of both conditions and was–in the hearing officer's own words–"unavailable for education."  Her grades were plummeting; she finished the fourth school year advisory period largely with failing grades and received credit for the year only because of her somewhat stronger performance in the earlier advisory periods and because Wilson relaxed some of its requirements for her, including extending deadlines to submit work, and allowed her to drop math.  Her classroom difficulties attributable to her ADHD caused her to doubt herself, to refrain from doing her work, and to need a safe haven to which she could retreat when classes became overwhelming.  She needed help with her organizational skills, smaller classes, extended time on tests and teachers who were tuned into the needs of ADHD students.

All of these satisfied the criteria for IDEA eligibility. Under IDEA, a "child with a disability" is one who has an impairment (including serious emotional disturbance or a health impairment such as ADHD) and who, by reason thereof, requires special education and related services. 20 U.S.C. §1401(3). "Special education and related services," in turn, is "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability." 20 U.S.C. §1401(25). "Specially designed instruction" is defined as instruction that is modified in content, methodology or delivery of instruction to meet the child's unique needs that result from the disability, and to ensure the child's access to the general curriculum. 34 C.F.R. §300.26(b)(3).

Dr. Robbins's undisputed evidence was that instruction had to be delivered to N.G. in non-standard ways in order for her to access the general education curriculum. Thus, she qualified for special education. DCPS may argue that because N.G. had the intellectual ability to master the general education curriculum, and primarily required accommodations, she more properly fell within the purview of the Rehabilitation Act, not IDEA. This is a distinction without a difference, because DCPS did not recognize N.G. as disabled within the meaning of the Rehabilitation Act, and never offered her services available under that statute. As we show below, the remedies available to her are the same.

**D.    Gomez and Correa are entitled to reimbursement for the costs they incurred in providing special education and services for N.G.**

A public school system that fails to provide a FAPE for an IDEA-eligible student is liable for the costs that student and her family incur in doing the school system's work for it, including reimbursement of tuition paid to an appropriate private program. *Burlington School Committee v. Department of Education,* 471 U.S. 359 (1985). Similarly, discriminating against a disabled student by failing to provide FAPE violates the Rehabilitation Act, and gives rise to a claim for tuition

reimbursement if the discrimination forced the student and her family to buy privately the services that should have been freely available through the public schools. *Gregg B. v. Board of Education of the Lawrence School District,* 535 F.Supp. 1333 (E.D.N.Y. 1982). N.G. and her parents are therefore entitled to be reimbursed for the costs of educating her at The Saint James School ("Saint James") and The Buxton School ("Buxton"), assuming those schools provided the appropriate education that was not available from DCPS. *Burlington School Committee v. Department of Education, supra.*

The hearing officer did not specifically address the appropriateness of either Saint James or Buxton for N.G., finding it unnecessary to do so after finding her ineligible for special education. He did note, however, that both schools provided at least some of the accommodations Dr. Robbins said N.G. needed (small classes and refocusing); the evidence provided by the educators from the two schools shows that everything else N.G. needed was present, as well. In addition, Dr. Robbins testified that she supported N.G.'s placement at both schools, saying that each provided the elements of an appropriate program for N.G. Finally, the hearing officer found that N.G. responded well to both schools and that the academic and personal problems she experienced at Wilson were greatly diminished during her years at Saint James and Buxton. Indeed, it was her very success in those nurturing and supportive environments that caused first DCPS, and then the hearing officer, to conclude that N.G. was not eligible for special education!

N.G. made academic progress at both schools, earning high school credit and developing the critical personal and interpersonal skills that she lacked at the end of her last year in DCPS. The schools, therefore, contained all of the elements that would have been included in an individualized education program ("IEP") for N.G., had DCPS bothered to develop one. (*See* 20 U.S.C. §1412(a)(4): IEP must be developed, reviewed and revised for each child with a disability.)

10

At the due process hearing, DCPS objected strenuously to funding either Saint James or Buxton, as neither is formally certified as a special education school. Nevertheless, each provided what N.G. needed as a matter of course within its program. Neither the schools nor N.G. and her parents can be faulted for delivering effortlessly precisely what N.G. needed. State special education placement requirements do not apply to private parental placements. *Florence County School District Four v. Carter,* 510 U.S. 7 (1993). It is inconsistent with IDEA's goals to punish parents for finding a school that meets their child's needs better than what was available publicly. This is particularly the case here, where DCPS offered nothing except a general education program in a comprehensive high school, with no accommodations–a recipe for failure and disaster for N.G. This is compounded by the dilemma Gomez and Carter faced in 2003: they knew they had to get N.G. out of Wilson, yet they were not special education-savvy. They had never heard of IDEA, they had not been given notice of N.G.'s IDEA rights, and they had no idea that education options other than a large public school like Wilson, or some type of private school, were available. They should not be punished for doing the best they could in a desperate situation in which they received neither help nor guidance from DCPS.

Finally, the Court should note that DCPS has previously funded at least one other special education student, Laura Swearingen Steadwell, at Buxton, for three years.

### E. Gomez and Correa were not required to give DCPS advance notice of N.G.'s withdrawal

The hearing officer also faulted Gomez and Correa for their purported noncompliance with 20 U.S.C. §1412(a)(10)(C)(iii), which provides as follows:

Limitation on reimbursement. The cost of reimbursement described in clause (ii) [relating to reimbursement of private school tuition upon a finding that the public agency did not provide FAPE] may be reduced or denied–

(I) if–

(aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

(bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);

(II) if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in Section 1415(b)(3) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

(III) upon a judicial finding of unreasonableness with respect to actions taken by the parents.

On its face, this IDEA provision does not apply to N.G.'s case.  There was no IEP meeting in 2003 because no IDEA procedures were ever started.  Thus, the event that would have triggered her parents' notice obligation–an IEP meeting at which something was proposed that they rejected–never occurred.  Moreover, the hearing officer did not address at all the following applicable exceptions to the notice requirement, found immediately following at 20 U.S.C. §1412(a)(10)(C)(iv):

Exception.  Notwithstanding the notice requirement in clause (iii)(I), the cost of reimbursement

(I) shall not be reduced or denied for failure to provide such notice if–

(aa) the school prevented the parent from providing such notice;

12

        (bb) the parents had not received notice, pursuant to Section 1415 of this title, of the notice requirement in clause (iii)(I); or

        (cc) compliance with clause (iii)(I) would likely result in physical harm to the child; and

(II) may, in the discretion of a court or a hearing officer, not be reduced or denied for failure to provide such notice if–

        (aa) the parent is illiterate or cannot write in English; or

        (bb) compliance with clause (iii)(I) would likely result in serious emotional harm to the child.

The undisputed evidence is that in 2003 DCPS never gave Gomez or Correa the notice required by 20 U.S.C. §1415, which would have alerted them to their obligation to notify DCPS before they removed N.G. to a private school. There is also evidence that given N.G.'s suicidal thoughts and history of abuse of both legal and illegal substances, she was at risk of physical harm had her school placement not been changed. Finally, potential exacerbation of her depression caused by her continued unaccommodated attendance at Wilson gives both this Court and the hearing officer discretion not to deny or reduce tuition reimbursement.

The hearing officer therefore erred in finding that Gomez and Correa forfeited their right to reimbursement by not giving DCPS advance notice of N.G.'s withdrawal.

## II.   DCPS did not properly consider N.G.'s eligibility for special education in 2005

Assuming, *arguendo,* that DCPS's many failures in 2003 do not establish that N.G. was properly removed from public school at the start of the 2003-04 school year and kept in appropriate private schools thereafter, Gomez and Correa are further entitled to reimbursement for the Buxton

tuition they incurred once DCPS improperly found N.G. ineligible for special education (and also erroneously failed to consider her for §504 accommodations) in 2005.

DCPS found N.G. ineligible for two reasons. First, it said it did not have sufficient information about her disabling conditions or their impact upon her educational performance. This deficiency is entirely attributable to DCPS. DCPS knew when it convened the MDT meeting in 2005 that N.G. had been diagnosed with ADHD, yet chose not to fully inform itself about this. Instead, it asked Correa for medical information; dissatisfied with what she brought to the meeting, it declared N.G. ineligible. It also met without reviewing any information about N.G.'s experiences within its own system, although Gomez and Correa forcefully urged the relevance of that data. This violated IDEA.

An eligibility team must consider, *inter alia*, information provided by the parents. DCPS pointedly refused to do this. Had it considered N.G.'s prior history, it would have seen that the good performance N.G. was demonstrating at Buxton was directly attributable to the appropriateness of her placement there. It certainly would have recognized that returning her to the general education program at Wilson, unsupported, was contraindicated. As even DCPS acknowledged, grudgingly, at the due process hearing, the mere fact that a disabled student is doing well with support and accommodations does not mean that the student is no longer eligible for special education; it means that the system that has been devised for that student is working.

Lack of medical or other information about N.G.'s ADHD should not have resulted in a finding in ineligibility; it should have caused DCPS to table the decision until the necessary information was available. *See* 20 U.S.C. §1414(c)(1)(A) and (B) (at eligibility meeting, team must review existing data and identify what additional data, if any, are needed to determine whether child

14

has a particular category of disability).  It is only if additional data are not needed that the team may move to considering eligibility.  20 U.S.C. §1414(c)(4).

If additional data are needed to determine eligibility, it is the burden of the public agency to secure them.  34 C.F.R. §300.533(c).  DCPS and, later, the hearing officer improperly placed upon Gomez and Correa the burden of filling in the alleged gaps in DCPS's information.

It is noteworthy that the chair of the multidisciplinary team ("MDT") took it upon herself to search for additional information about N.G. after DCPS found her ineligible for special education, and then concluded her search after she found that DCPS's entire record of N.G.'s existence consisted of one report card.  The appropriate response would have been, at minimum, to inquire further, either within DCPS itself, or to ask Gomez and Correa for help in finding the missing information.

It is also noteworthy that DCPS made the point of specifically excluding from its consideration of N.G.'s eligibility information from her doctors that Gomez and Correa brought to the MDT meeting, because the team members had not seen it previously, but then faulted Gomez and Correa for the absence of this information and refused to reconvene the meeting to discuss it or to obtain additional medical input (since DCPS later claimed that what was provided was inadequate).

DCPS's second reason for declaring N.G. ineligible for special education in 2005 was that it perceived her to be doing well academically in what it considered a general education program.  DCPS–and eventually the hearing officer–allowed as how Buxton, with only 90 students, small classes, individualized attention and structure–was a far cry from the chaotic atmosphere of a large

15

public high school like Wilson, and that it was precisely "what the therapist ordered."  Nevertheless, neither DCPS nor the hearing officer reached the only logical conclusion: That N.G.'s success at Buxton could not be taken at face value, but rather had to be evaluated in terms of N.G.'s identified needs and Buxton's ability to meet them.  The absurdity of DCPS's position can perhaps best be understood with an analogy to physical disability: If a blind student who was failing because she could not read the textbooks is given a reader and thereupon begins to do significantly better academically because she can now access the material, that does not mean the student is no longer blind!  Nor does it mean that the reader can be taken away.  Rather, it means that the accommodation is working and should be continued.  N.G.'s situation was no different.

Because the hearing officer sustained DCPS's finding of ineligibility, he did not order DCPS to place N.G. prospectively at Buxton.  For the reasons discussed above with respect to the ineligibility finding itself, this was error as well, and should be reversed.

DCPS did not properly consider N.G.'s eligibility for special education in 2005, and therefore the MDT team's conclusions cannot stand.

## **CONCLUSION**

For all the foregoing reasons, we respectfully submit that the January 23, 2006 hearing officer's determination in this matter is not supported by the preponderance of the evidence, and that the decision misapplied the applicable law.  We therefore urge the Court to enter judgment in favor of N.G., Gomez and Correa reversing the determination and ordering DCPS to reimburse them for the $86,682.50 in costs they incurred in providing the education N.G. needed but which DCPS did not offer.  Alternatively, the Court should reverse the determination and remand it for further appropriate proceedings.

/s/     *Diana M. Savit*

Diana M. Savit #244970
**Savit & Szymkowicz, LLP**
7315 Wisconsin Avenue
Suite 601N
Bethesda, Maryland 20815
(301) 951-9191
Attorneys for plaintiffs

17