# United States District Court
# for the District of Columbia

| | |
|---|---|
| **N.G.**, *et al.*,<br><br>　　　　**Plaintiffs**<br><br>　　v.<br><br>**CLIFFORD B. JANEY**, Superintendent,<br>District of Columbia Public Schools, *et al.*,<br><br>　　　　**Defendants** | Civil Action No. 06-00312 (EGS) |

### PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

　　Plaintiffs N.G., Manuel Gomez ("Gomez") and Sylvia Correa ("Correa") (collectively, "plaintiffs"), through counsel, have moved the Court to enter summary judgment in their favor, pursuant to Fed. R. Civ. P. 56 and LCvR 7(h), on all issues presented by their complaint. Defendants Clifford B. Janey, the former Superintendent of the District of Columbia Public Schools ("DCPS")[1] and the District of Columbia (collectively, "defendants" or "the District") have partially opposed the motion and simultaneously cross-moved for summary judgment, relying upon the same grounds and arguments that they cited in opposing plaintiffs' motion.[2]

---

[1]　The Court may take judicial notice that defendant Janey is no longer Superintendent of Schools. Instead, the position of Superintendent has been abolished and replaced by the position of Chancellor. The incumbent Chancellor is Michelle Rhee. The Court's records should be amended to reflect this change in the head of the relevant administrative agency, and Ms. Rhee should be substituted as a named defendant. Fed. R. Civ. P. 25(d)(1).

[2]　By the parties' agreement and as approved by the Court in its scheduling orders, the parties' cross-motions are being presented on a schedule in which defendants' initial filing is a combined opposition to plaintiffs' summary judgment motion and cross-motion for summary judgment on its own behalf, while this memorandum serves simultaneously as plaintiffs' opposition to defendants' cross-motion and their reply to defendants' opposition to their own motion.

As we show below, defendants' motion fails to take issue with several of plaintiffs' arguments. Accordingly, under this Court's rules the arguments may be deemed conceded and the Court may rule in plaintiffs' favor on those issues. To the extent this disposition leaves any issues for decision, we respectfully submit that defendants' opposition/cross-motion fails to identify genuine issues of material fact that would preclude entry of summary judgment, and that defendants' legal arguments are without merit.

In our opening motion, we argued that the administrative hearing officer's determination from which plaintiffs have appealed erred in (a) excusing DCPS's 2003 and 2005 failures to find N.G. "disabled" and eligible for special education, related services and/or accommodations under either the Rehabilitation Act of 1973, 29 U.S.C. §794 *et seq.* ("the Rehabilitation Act") or the Individuals with Disabilities Education Act, 20 U.S.C. §1400 *et seq.* ("IDEA"); (b) finding facts that were not supported by the record; (c) disregarding undisputed evidence; and (d) misapplying the relevant law. With respect to the hearing officer's fact-finding and legal reasoning, defendants argue only that the administrative determination was "thorough and complete," (opposition memorandum at p. 21) without addressing the specific problems identified in plaintiffs' motion (*see, e.g.,* pp. 5-13). They have made no effort to show why the specific conclusions that plaintiffs challenge are supported by the record, nor how they reasonably flow from the evidence.

As for plaintiffs' remaining arguments, defendants' reasoning is circular: They say that N.G. was not entitled to the benefits of either the Rehabilitation Act or the IDEA because she was not "proven" disabled, while acknowledging that they did not provide the procedural notice of her and their respective rights to which N.G. and her parents were entitled, nor take the required steps to gather the information that would have allowed DCPS to make an informed decision regarding N.G.'s status and educational needs. Their opposition/cross-motion therefore fails to make a legally sufficient case on defendants' behalf.

## ARGUMENT

A motion for summary judgment rests upon the argument that the material facts of record are undisputed and that the moving party is entitled to judgment in its favor as a matter of law. Fed. R. Civ. P. 56; *Duncan v. Washington Metropolitan Area Transit Authority,* 425 F.Supp.2d 121 (D.D.C. 2006). In this jurisdiction, a party who opposes any motion must squarely meet the arguments made in that motion, or they are deemed conceded. LCvR 7(b); *Jackson v. Snow,* 2006 U.S. Dist. LEXIS 5144 (D.D.C. 2006); *American Council of the Blind v. Snow,* 311 F.Supp.2d 86 (D.D.C. 2004).

A party opposing a summary judgment motion bears the additional burden of bringing to the Court's attention those facts that are genuinely disputed, and must refer to specific portions of the record which illuminate those disputes. LCvR 7(h). Failure to demonstrate that a fact is at issue concedes the moving party's assertion that the fact is undisputed. *M.R.S. Enterprises, Inc. v. Sheet Metal Workers' International Association, Local 40,* 429 F.Supp.2d 72 (D.D.C. 2006); *Duncan v. Washington Metropolitan Area Transit Authority, supra*; *Ramey v. Darkside Productions, Inc.,* 2004 U.S. Dist. LEXIS 10107 (D.D.C. 2004). The non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts; there must be a genuine dispute. *Duncan v. Washington Metropolitan Area Transit Authority*, *supra,* citing *Bias v. Advantage International, Inc.,* 905 F.2d 1558 (D.C. Cir. 1990). The fact in dispute must also be "material"; *i.e.,* it must be a fact that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby,* 477 U.S. 242 (1986); *Constructora Andrade Gutierrez, S.A. v. American International Insurance Company of Puerto Rico,* 247 F.Supp.2d 83 (D.P.R. 2003).

Once the Court satisfies itself that the evidence is undisputed, after drawing all reasonable inferences in favor of the non-moving party and avoiding credibility determinations or weighing the evidence, the Court must determine whether the evidence is so one-sided that one party must prevail

as a matter of law. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000); *Anderson v. Liberty Lobby, supra.*

Applying these standards, the undisputed material facts show that plaintiffs are entitled to judgment in their favor as a matter of law, and defendants are not.

I.      **The material facts are undisputed and favor entry of judgment for plaintiffs.**

   A.      **Plaintiffs' statement of material facts.**

In support of their motion, plaintiffs identified 140 facts of record which they contended were material to deciding the case, and undisputed. The District disputes portions of nine of them. As we show below, our statement of the facts is fully supported by the record and any issues the District can raise about these facts are not material.

Plaintiffs' fact #9. The District argues that this is opinion, not fact. Plaintiffs' factual assertion, however, derives directly from Correa's testimony at the due process hearing, as follows:

   Q.   Did you see anything that caused you concern about [N.] school performance while shew [sic] as at Deal?

   A.   Yeah, I mean, the seventh grade, as I said, we had some inkling. But in the eighth grade, she started having problems that were of–you know, she started saying she didn't like school. She had never said that before, that she wasn't, her teaches [sic] didn't like her and all that. And–but it was manageable. We did have one serious situation and, this is a kid who had never been trouble, ever, from pre-K on. She got into trouble at the end of the eighth grade because she–she was in a Spanish class and the Spanish teacher didn't come for, was late getting into the class and, apparently, was late, very late. And [N.] was up and dancing around up in the front of the class as was–with another student. And at one point they put shavings–pencil shavings into the teacher's water glass or something like that. And the teacher flipped out. And so [N.] was sent, [N.] and this other girl, were sent to another school for the last month of the eighth grade.

   In hind–in hindsight, I think that the ninth grade was the turning point. I didn't recognize it then, but there was a very definite change in the whole. I mean,

4

>even when she was getting into trouble in the seventh and eighth grades, it was all things that were, that a child would do.
>
>But by the ninth grade, she started saying–she would say, everybody hated her. She started getting really down on herself like, not I'm stupid; the principal doesn't like me; the teacher doesn't like me. She was sad, she was visibly sort of turn–like you had turned a light off.
>
>And it got progressively worse...

(R. 617-619)

<u>Plaintiffs' fact #14.</u>   Defendants take issue with plaintiffs' statement that they notified DCPS of the reasons for N.G.'s two-week absence from school during 9th grade when she ingested a bottle of aspirin, claiming that it is unclear that she spoke directly with anyone at school or that any school employee received the information. The original factual assertion does not, however, claim face-to-face conversations; it merely says that DCPS was notified. The hearing testimony of Correa, as quoted in defendants' response to the statement of material facts, was that she spoke directly with those teachers who were available and left notes in the cubbies of those who were not. That Correa did not identify the specific teachers with whom she spoke does not invalidate her testimony that she met with them, particularly when she was not challenged or cross-examined on this point at the hearing; nor does DCPS's speculation that teachers may not have picked up notes left in their cubbies refute the assertion of notice. Indeed, if DCPS is now arguing that it did not know of N.G.'s (thankfully) unsuccessful suicide attempt because teachers did not make use of a simple but effective means of communicating with parents, that hardly helps DCPS's case. In any event, whether the dispute DCPS is trying to create concerns a material fact is questionable.

<u>Plaintiffs' fact #20.</u>   DCPS notes that N.G.'s 10th grade report card, in the record at R. 92, covers the entire school year and therefore does not support the statement of an erratic absence pattern during the first advisory period. The record support for that assertion, however, is not the report card, but Correa's testimony, at R. 624-625.

5

Plaintiffs' fact #27.   DCPS does not dispute the citations to Dr. Alexandra Cargo's January 2003 report concerning N.G.  Instead, it cites other portions of the report which discuss other aspects of N.G.'s history and Dr. Cargo's assessment of her.  This is not a proper basis for objecting to the fact.

Plaintiffs' fact #44.   DCPS complains that when Correa hand-delivered the letters to N.G.'s teachers and the principal, she placed them in the staff members' cubbies and did not place them directly in the intended recipients' hands.  Thus, DCPS argues that the letters were not "hand-delivered."  As Correa testified, however, she "hand-delivered" the letters to the cubbies; thus there is record support for the statement.  Again, however, this dispute is not material to the Court's decision.  The point is that Correa and Gomez made diligent efforts to inform Wilson about N.G.'s disabling condition and her need for help.

Plaintiffs' fact #49.   DCPS complains that this fact represents Dr. Carol Robbins's opinion. While that is correct, it was Dr. Robbins's expert opinion, to which she testified in detail, that N.G. required a small, structured environment in order to succeed in school and that, according to all of the information Dr. Robbins had, that environment was not available to N.G. at Wilson.  There is no evidence to the contrary in the record; indeed, it is of record that Wilson is a large general education school, with hundreds of students and classes of various sizes, and that unless she was deemed eligible for either special education under IDEA or accommodations under the Rehabilitation Act, she would not have been placed in the environment Dr. Robbins recommended unless by happenstance it was offered as part of a course she was taking, based on her grade level and academic ability (but not disability needs).  (R. 726-728)[3]

---

[3] The Court may take judicial notice that Wilson currently reports a student population of 1,398, with 431 students in this year's 11th grade.  This information is reported on Wilson's web site, found at http://dcschoolsearch.dc.gov/schools/detail.asp?pos=32&id=144.

<u>Plaintiffs' fact #74.</u>   DCPS says that this is not a fact, but the opinion of Saint James School ("Saint James"). That is precisely how it is characterized in plaintiffs' statement of material facts. Thus, there is no dispute here.

<u>Plaintiffs' fact #85.</u>   DCPS criticizes the portion of this fact that alleges that N.G. was appropriately placed at The Buxton School ("Buxton"), saying that this is a legal conclusion. The statement is, however, also a factual account of the opinion of two educators at Buxton, as the record shows. Both are familiar with N.G. and the Buxton program, and they are competent to state their opinions. The Court will make the ultimate legal determination of whether their opinions as educators support the conclusion it must reach in deciding this case. DCPS therefore has not identified a material dispute as to this fact.

<u>Plaintiffs' fact #127.</u>   DCPS acknowledges that this fact is correct, but then complains that other information was not elicited, particularly with respect to the classes N.G. might have taken or accommodations N.G. might have received had she returned to Wilson. At the hearing, DCPS's representative testified only that N.G. would have returned to a general education environment at Wilson. As for accommodations, it is DCPS's vehemently asserted position in this case that N.G. is not disabled and therefore not entitled to accommodations under either IDEA or the Rehabilitation Act. Under these circumstances, the dispute DCPS is raising is not material.

**B.     Defendants' statement of material facts.**

In our separate statement of disputed facts, we have identified the facts in the District's statement of material facts not at issue which we contend are actually disputed. For the most part, however, the District's statement of material facts accurately quotes from the administrative record. The real issue is with their materiality. The District quotes heavily from the first evaluation of N.G. in 2003, performed in January by Dr. Cargo, which identified some areas of concern but which avoided a formal diagnosis of a disabling condition. This, in turn, is used to support the District's argument that DCPS did not have "evidence" of N.G.'s disability when Gomez and Correa later

7

requested accommodations for her. The Cargo report is not material on this issue. There is no claim in this case that the Cargo report, without more, would have supported a finding of eligibility for services under either IDEA or the Rehabilitation Act. Rather, the Cargo report is one piece of information–along with N.G.'s April 2003 hospitalization for suicidal ideation, her poor academic performance and spotty school attendance, Dr. Robbins's late spring diagnoses of depression and attention deficit hyperactivity disorder, and Dr. Robbins's recommendations that the school prepare a "504 plan" for N.G. and provide accommodations for her–that collectively placed DCPS on notice of an at-risk student who **might** qualify as disabled and be in need of services in order to benefit from education. The issue here is whether DCPS dropped the ball by failing to take the available information and then using it to gather more. Selective quotes from the Cargo report do not, by themselves, address this.

Similarly, the "facts" concerning DCPS's alleged response to the spring 2003 request for accommodations place more weight on what happened than the situation can bear. As set forth in some detail in plaintiffs' statement of undisputed material facts, after Dr. Robbins diagnosed N.G. with ADHD and depression, she asked Wilson to provide accommodations and to develop a "504 plan" for N.G. Although Wilson proceeded to hold what everyone called a "504" meeting, it did not in any way satisfy the requirements of the Rehabilitation Act, nor did anyone recognize that N.G.'s reported conditions might warrant consideration of her eligibility for IDEA services. Thus, although it is true that DCPS convened a meeting, the meeting fell so far short of what was legally required of DCPS that the facts listed by DCPS are immaterial to its motion.

Finally, the District notes in its statement of material facts that neither Saint James nor Buxton is a special education facility. Again, this is true in a narrow sense, in that neither is certified by a state to provide special education services, but that is immaterial. The District does not dispute that both schools provided appropriate educational environments for N.G., consistent with Dr.

Robbins's recommendations. Furthermore, once DCPS failed to provide an appropriate education for N.G., Gomez and Correa were not legally required to place N.G. in schools that would have met all of the requirements that DCPS might have imposed upon itself. *See Florence County School District Four v. Carter,* 510 U.S. 7 (1993) (private parental placements need not conform to all state requirements).

The District's real complaint about both Saint James and Buxton appears to stem from its belief that they cannot, by definition, provide special education because they are "academically rigorous." *See* defendants' memorandum of points and authorities in opposition to plaintiffs' motion for summary judgment and in support of their cross-motion, at p. 19. This argument offensively presupposes that special education students are inherent incapable of mastering anything other than a watered-down curriculum. Congress explicitly outlawed this analysis in IDEA, finding that the statute's purposes have been frustrated by low expectations for disabled students. 20 U.S.C. §1400(c)(4).

Because none of the facts upon which the District relies–whether disputed or accepted as true–goes to the heart of the issues in this case, the District has not placed before the Court **material** undisputed facts which support entry of judgment in its favor.

## II. The hearing officer erred in ruling that DCPS met its "child find" obligations in 2003

The hearing officer found–and the District argues here–that N.G. and her parents did not present enough information to DCPS in 2003 to put DCPS on notice of her disabilities and her need for special education and/or accommodations. Both the hearing officer and the District focus excessively upon Dr. Cargo's January 2003 report on N.G., which predated her hospitalization for suicidal ideation, her formal diagnosis by Dr. Robbins with ADHD and depression, and Dr.

9

Robbins's May 2003 request (seconded by Gomez and Correa) for "504 accommodations." On June 4, 2003, Dr. Robbins gave further information to DCPS in a second letter that explicitly tied N.G.'s absences to her depression and ADHD, and attributed her academic difficulties to these problems. R. 252. Thus, is simply untrue that, by the end of the school year, DCPS had little more to go on than an inconclusive report and a student with declining grades that appeared to be attributable to skipping classes in order to socialize.

Armed by late spring 2003 with all of this newly developed information, DCPS was obligated under the Rehabilitation Act to **evaluate** N.G. for suspected disabilities (not merely to agree that she could hand in homework late and call the discussion a "504 meeting") and to consider her potential eligibility for special education under IDEA. **Dr. Robbins, Gomez and Correa were not required to identify IDEA to DCPS to activate N.G.'s rights under that statute.** This Court and others have repeatedly told DCPS that under IDEA, it has an affirmative obligation to consider whether a child is disabled and in need of IDEA services whenever information comes its way that suggests this to be the case. *See, e.g., Scott v. District of Columbia, supra* (parental notice that student had been diagnosed with ADHD sufficient to trigger DCPS's child find obligation and to begin process of evaluating for special education). *See also Reid v. District of Columbia,* 401 F.3$^d$ 516 (D.C. Cir. 2005) (DCPS cannot await parental demand before providing special instruction; school system is affirmatively charged with identifying, locating and evaluating children with disabilities). Yet, DCPS persists in arguing that magical incantations are required before it will bestir itself to consider the needs of disabled children. This attitude failed N.G., as it has failed so many other District of Columbia children.

DCPS's obligation is no different under the Rehabilitation Act; however, its failure to evaluate N.G. is, if anything, more egregious because Rehabilitation Act accommodations were requested of the Wilson staff and were completely ignored, except for the "504 plan meeting" that

10

did not in any respect satisfy the requirements of the Rehabilitation Act. *See* 34 C.F.R. §104.35; United States Department of Education Memorandum from Jeannette J. Lim, Acting Assistant Secretary for Civil Rights, Subject: *Clarification of School Districts' Responsibilities to Evaluate Children with Attention Deficit Disorders (ADD)*, created 1/1/00, revised 4/18/06 and found at http://www.wrightslaw.com/info/add.eval.ocrmem.htm.

DCPS complains in its opposition/cross-motion that N.G.'s parents did not present "evidence" to it in 2003 that would have demonstrated her disability and need for special education and accommodations. Requesting services under IDEA and the Rehabilitation Act is not an adversarial proceeding, in which evidence is presented and the school system makes a trial-type judgment. It is, rather, an interactive, information-gathering process in which the burden of accumulating that information falls on the school system–here, DCPS–not the parents, the student, or their private consultants. *See* 20 U.S.C. §1414(b) (describing the manner in which the local educational agency must proceed in evaluating a student).

DCPS further alleges that N.G. did not have a disability that would have entitled her to any services. In that case, DCPS had no business providing Rehabilitation Act accommodations for N.G., as it contends it did. More fundamentally, the undisputed evidence shows that N.G. was, indeed, disabled, as the result of two separate conditions. First, she had been diagnosed with ADHD, recognized under IDEA as a disabling condition under the category of "other health impairment." *See* 34 C.F.R. §300.8(c)(9). This disability was certainly at least a possible explanation for N.G.'s poor attendance and decreasing academic performance, and should have been looked into in that context.

Second, Dr. Robbins had also diagnosed N.G. with depression, and DCPS unquestionably was aware that that depression had manifested itself in an extended hospitalization. While

"depression" is not an enumerated disability under IDEA, it is recognized as one basis for identifying a student as disabled within the IDEA category of "emotional disturbance." *See* 34 C.F.R. §300.8(b)(4)(I):

> Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:
>
> (A) An inability to learn that cannot be explained by intellectual, sensory or health factors.
> (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
> (C) Inappropriate types of behavior or feelings under normal circumstances.
> (D) A general pervasive mood of unhappiness or depression.
> (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

The information available to DCPS about N.G. in spring 2003 certainly warranted questioning whether she qualified as disabled within the meaning of either IDEA or the Rehabilitation Act, and therefore the burden was on DCPS–not N.G.'s family–to carry on with a full evaluation and determination of eligibility. That never happened, and the hearing officer erred in holding that it was not needed.

The Court should note in particular that DCPS does not deny any of the facts which underlie plaintiffs' claims regarding N.G.'s need for services; it merely says that it did not know enough about N.G. in 2003 to connect the dots and identify her serious problems and needs. The District erroneously posits that she was not entitled to those services because "depression" is not a disability within the meaning of IDEA. Because DCPS had the means to learn everything it needed in order to recognize N.G.'s disability and develop a proper program for her–and because it is wrong with respect to its legal obligations to her–it failed in its child find obligations. Whatever Gomez and Correa did to make up for that failure is DCPS's ultimate responsibility.

### III.   The hearing officer erred in affirming DCPS's 2005 ineligibility determination

Assuming, *arguendo,* that DCPS's 2003 failings can be excused, DCPS missed an opportunity to correct its errors in 2005 when it found N.G. ineligible for special education on incomplete information. The District's opposition does not address one of the two grounds upon which plaintiffs relied in our opening memorandum in challenging that decision: DCPS's refusal to table consideration of N.G.'s status pending receipt of information it said it needed (medical records) in order to make a formal diagnosis of N.G.'s ADHD and depression. As we showed earlier, if information that the team believes is needed in order to determine eligibility is missing, but can be obtained, further consideration of the student's status should be held in abeyance until the information is available. DCPS refused to do this, instead finding N.G. ineligible. In its opposition/cross-motion, the District has wisely chosen not to attempt to defend this omission before this Court. Thus, plaintiffs' motion should be granted, at least on this point.

The remaining issue concerns DCPS's separate failure to consider at the 2005 MDT meeting readily available information; *i.e.,* N.G.'s complete academic history, which would have graphically demonstrated that her recent academic success was the product of the appropriate environments her parents had found for her, not the absence of disability. Although the District is correct that an evaluation team must consider current information about the student in determining IDEA eligibility (*see* 20 U.S.C. §1414(c)(1), nothing in the statute precludes historical comparisons which yield deeper understanding of the student. Indeed, in the very IDEA section upon which DCPS relies (the referenced §1414(c)(1)), the individualized education program (IEP) team is admonished to review **existing** data on the child, **including** current information.

At the 2005 multidisciplinary team meeting, DCPS looked exclusively to good reports from Buxton and other professional evaluators which, not surprisingly, showed that N.G. was achieving

13

academic success in an appropriate environment. As even DCPS grudgingly admitted, this told it very little about how N.G. would fare in the large, comprehensive high school (Wilson) that was her public general education option in the absence of special education programming. Nevertheless, DCPS refused to consider prior years' records that would have placed N.G.'s more recent achievements in context.

It is ludicrous to argue, as the District does, that it is legally required to ignore information that would provide insight into a student's status and needs. The hearing officer erred in entering an order that affirmed that absurd result.

Had DCPS conducted the inquiry that is reasonably consistent with IDEA's ultimate purpose of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for persons with disabilities (20 U.S.C. §1400(c)(1)), it would have seen that N.G.'s relative success at Buxton was a snapshot, not her full picture. It would have recognized her ongoing need for precisely the type of environment in which she found herself, and it would have found her eligible for IDEA and/or Rehabilitation Act services. As in 2003, DCPS's failure to do its job placed upon Gomez and Correa the burden of providing those services themselves. That burden should be shifted to the District, consistent with governing law. *Burlington School Committee v. Department of Education,* 471 U.S. 359 (1985).

### IV.   IDEA's pre-withdrawal notice requirement does not apply to plaintiffs' request for tuition reimbursement.

The administrative determination below separately erred in applying 20 U.S.C. §1412(a)(10)(C)(iii)'s notice requirement to N.G. and her parents, and thus finding them ineligible for tuition reimbursement. The cited section provides that–subject to certain enumerated exceptions–the parents of a child who previously received special education who is later withdrawn from the public school system and enrolled in a private school are entitled to be reimbursed for the

cost of that enrollment upon a finding that the agency did not make a free appropriate public education available to the student. The right to reimbursement can be lost if the parents did not give the public agency notice, prior to withdrawing the child, of their dissatisfaction with the child's program and their intent to seek funding for a private placement.

Before invoking this bar to reimbursement, the school system must show that it gave the parents notice of this notice requirement. 20 U.S.C. §1412(a)(10)(C)(iv)(I)(bb). The notice of the notice requirement must be provided consistent with 20 U.S.C. §1415 which, in §1415(d)(1)(A), imposes upon each school system the obligation annually to provide the parents of disabled children copies of the procedural safeguards available to them under IDEA, and also to provide a copy of the safeguards **upon initial referral or parental request for evaluation**. The 2003 notice of N.G.'s ADHD and depression, and request for accommodations for same, satisfied the threshold for giving Gomez and Correa notice of N.G.'s procedural rights, and their own.

It is undisputed that DCPS never gave Gomez or Correa a copy of the procedural safeguards notice under IDEA, because DCPS never recognized N.G.'s potential IDEA eligibility. DCPS now argues that it was not required to give Gomez and Correa this notice because N.G. was ineligible for special education. This reasoning is circular, of course. Notice must be given whenever a child is considered for special education, because there is a right to challenge a denial of eligibility and consequent refusal to provide services. *See* 20 U.S.C. §1415(b)(6)(A) (IDEA guarantees parents to present a complaint with respect to any matter relating, *inter alia,* to the identification or evaluation of a child). In any event, if DCPS was not required to give N.G. and her parents notice of their obligation to notify DCPS before removing her from the public school system, then it cannot in turn blame them for failing to do that of which they were never made aware. 20 U.S.C. §1412(a)(10)(C)(iv)(I)(bb).

15

The hearing officer imposed the pre-withdrawal notice requirement upon Gomez and Correa without considering the effect of IDEA's precondition upon doing so–that DCPS must first have given them notice of the procedural safeguards to which they were entitled. His ruling therefore was erroneous.

DCPS's argument about its obligation to give Gomez and Correa information about the steps they were required to take to preserve their claim for tuition reimbursement misapplies a separate notice requirement, also found in §1415. DCPS cites the requirement that it give notice, before it acts or declines to act with respect to the identification, evaluation, program or placement of a child, of what it plans to do and why it plans to do it (or not do it). This section does not apply to the tuition reimbursement issue; the notice required by this IDEA subsection refers to specific information that must be provided to explain the public agency's decision. 20 U.S.C. §1415(c)(1). Although this section also speaks to the obligation to provide access to information about IDEA's procedural safeguards (which would include the provisions about how one goes about securing the right to a private placement), that obligation exists in addition to the earlier obligation to provide a copy of the safeguards at the time the child was presented for an initial evaluation. 20 U.S.C. §1415(c)(1)(c). Thus, this section does not protect DCPS.

DCPS further argues that Gomez and Correa never secured the protection of its obligation to provide notice of N.G.'s, and their, procedural rights because they never requested IDEA services. As discussed *supra,* this argument is unavailing. Under this Court's rulings, DCPS was on notice that N.G. was a candidate for IDEA eligibility. It cannot default in the obligations this imposed upon it and then blame Gomez and Correa for not doing what it should have told them to do.

Before this Court, DCPS makes a new argument regarding the claim for tuition reimbursement–that the cost of N.G.'s private school enrollment cannot be reimbursed because she

was never found eligible for special education. In doing so, DCPS attempts to combine two separate sections of IDEA. Under 20 U.S.C. §1412(a)(10)(C)(I), a public agency's responsibility to pay for the private special education and related services for children with disabilities who are placed in those schools by their parents, without the consent or referral of the public agency, exists only when the public agency does not make a free appropriate public education available to a particular child. In the case of a child who has previously received special education under public auspices but who is then removed by his parents without the consent or referral of the public agency, the parents can be reimbursed only if (with some exceptions) they gave notice to the school system of their dissatisfaction with the education their child was receiving before removing the child. 20 U.S.C. §1412(a)(10)(C)(ii). These sections operate together but do not cancel each other out.

The clear purpose of the notice requirement is to give the school system a final chance to improve the quality of the child's education before the student is removed from public school and placed beyond the public agency's agency. It cannot–and does not–operate to bar tuition reimbursement for children who have never received special education despite demonstrated need for it and consequently are enrolled in private schools because that is their only option. It is particularly absurd to apply the notice requirement in N.G.'s situation, where DCPS negligently failed to recognize her needs, failed to evaluate her, offered her next to nothing and failed to tell her parents about her IDEA and Rehabilitation Act rights.

How convenient for DCPS if IDEA were to work as the District posits! All DCPS would have to do to avoid paying for private special education schooling for the many students for whom its public services are inadequate would be to do nothing whatsoever for them. They would then leave the system, buy private services as best they could, and be barred from being reimbursed for those costs because the District had never even begun to do what IDEA requires of it. To outline

17

this scenario is to demonstrate its absurdity. Congress did not intend such a manifestly ridiculous result.

## CONCLUSION

For all the foregoing reasons, as well as the reasons set forth in our previously filed motion for summary judgment, plaintiffs respectfully submit that their motion for summary judgment should be granted in its entirety, and that defendants' cross-motion for summary judgment should be denied.

/s/   *Diana M. Savit*
Diana M. Savit #244970
**SAVIT & SZYMKOWICZ, LLP**
7315 Wisconsin Avenue
Suite 601N
Bethesda, Maryland 20815
(301) 951-9191
Attorneys for plaintiffs

## Certificate of Service

I hereby certify that, this 29th day of August, 2007, I electronically filed the foregoing plaintiffs' memorandum of points and authorities in opposition to defendants' motion for summary judgment and in reply to defendants' memorandum of points and authorities in opposition to plaintiffs' motion for summary judgment, and thereby served all counsel of record.

/s/   *Diana M. Savit*

Diana M. Savit