**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                )
N.G., *et al.*,                 )
                                )
            Plaintiffs,         )
                                )
                                )    Civ. No. 06-0312(EGS)
            v.                  )
                                )
DISTRICT OF COLUMBIA, *et al.*[1] )
                                )
            Defendants.         )
_____)


<u>**MEMORANDUM OPINION**</u>

     N.G. and her parents Manuel Gomez and Sylvia Correa bring

this action against the District of Columbia seeking reversal of

a Hearing Officer's decision that the District did not violate

the Individuals with Disabilities Education Act, 20 U.S.C. § 1400

*et seq.* ("IDEA")[2] or the Rehabilitation Act of 1973, 29 U.S.C. §

_____

     [1] At the time the Complaint was filed, Clifford B. Janey was
the Superintendent of the District of Columbia Public Schools and
was named as a defendant along with the District of Columbia.
Ms. Michelle Rhee has since replaced Mr. Janey as the Chancellor
of DCPS, which serves essentially the same functions as were
performed by the former superintendent.  According to Fed. R.
Civ. P 25(d), Ms. Rhee will be substituted for Mr. Janey in her
official capacity as a defendant in this lawsuit.

     [2] The IDEA was amended in 2004, with the majority of changes
going into effect on July 1, 2005 during the pendency of
Plaintiffs' administrative complaint.  In his January 23, 2006
decision, the Hearing Officer relied upon the statute as amended.
*See* HOD p. 3 (citing title of statute as amended, "*Individuals
with Disabilities Education Improvement Act.*").  DCPS also relies
upon the amended version of the statute in its briefs.  *See*

794 *et seq.* Specifically, Plaintiffs allege that the Hearing
Officer's determination which found that the District of Columbia
Public Schools ("DCPS") had fulfilled its duties to N.G. in 2003
and separately affirmed DCPS's 2005 finding of ineligibility for
special education is not supported by the evidence of record or
the applicable law. *See* Pl.'s Mot. 2.  Plaintiffs contend that
the District violated the "Child Find" provision of the IDEA
first in 2003 by failing to recognize N.G.'s "potentially
disabling conditions, and again in 2005, when it failed either to
gather relevant information or to properly interpret the
information it had." *Id.* Accordingly, Plaintiffs contend that
the District's failings required them to find and fund an
appropriate placement for N.G. outside of DCPS.  As is their
right under the IDEA, Plaintiffs now seek reimbursement for the
cost of three years of private school education for N.G.  The
District counters that the Hearing Officer's decision was proper
and should be upheld.  Both parties have moved for summary
judgment.  Upon consideration of the motions, the responses and
replies thereto, the applicable law, and the complete
administrative record in this case, the Court **GRANTS** Plaintiffs'

---

Def.'s Mot. at 20(citing 20 U.S.C. § 1414 (c)(1) as renumbered in
2004 amendments).  It is not evident from Plaintiffs' Motion upon
which version of the statute they rely.  No party has argued that
the amendments are relevant in any substantive way to the issues
before the Court.  Accordingly, the Court relies upon the most
current version of the statute for ease of reference.

motion and **DENIES** Defendants' cross motion.

I.   **Legal Framework**

    A.   **The Individuals with Disabilities Education Act (IDEA)**

The IDEA was enacted to assure that children with educational disabilities obtain a free appropriate public education ("FAPE") designed to meet their unique needs. *See* 20 U.S.C. § 1400, *et seq.; see Reid v. District of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005). The Act requires participating states to educate a wide spectrum of disabled children, "from the marginally hearing impaired to the profoundly retarded and palsied." *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 202 (1982). The benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other, with infinite variations in between. *Id.*

To meet this goal, all public education agencies are required to have in effect policies and procedures to ensure that:

> All children with disabilities residing in the State, including children who are homeless or wards of the state and children with disabilities attending private schools, regardless of the severity of their disability, and who are in need of special education and related services, are identified, located and evaluated and a practical method is developed and implemented to determine which children are currently receiving needed special education and related services.

20 U.S.C. 1412(a)(3)(A). This mandate is known as the "Child Find" obligation, an affirmative obligation of every public school system to identify students who might be disabled and evaluate those students to determine whether they are indeed eligible. As soon as a child is identified as a potential candidate for services, DCPS has the duty to locate that child and complete the evaluation process. Failure to locate and evaluate a potentially disabled child constitutes a denial of FAPE. *See Hawkins ex rel. D.C. v. District of Columbia*, 2008 WL 632588, *6 (D.D.C. March 7, 2008)(finding that DCPS's duty to locate potentially disabled students extends to migrants, homeless students, unenrolled students, and those not yet of school age); *see also District of Columbia v. Abramson*, 493 F. Supp. 2d 80, 85 (D.D.C. 2007)(finding Child Find violation and denial of FAPE where DCPS failed to evaluate student attending a residential therapeutic private school in Connecticut when student maintained his D.C. residency).

Once potentially disabled students are identified and located, the local educational agency must conduct an evaluation to determine whether the child is a child with a disability. 20 U.S.C. § 1414(b)(2)(i). In conducting the evaluation, the local educational agency "shall use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the

4

parent, that may assist in determining" whether the child is disabled under the Act. *Id.* Once the child is determined to be eligible, a team including the child's parents and select teachers, as well as a representative of the local educational agency with knowledge about the school's resources and curriculum, develops an "individualized education program" or "IEP" for the child. *Reid*, 401 F.3d at 519. "The IEP must, at a minimum, provide personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Id.* (quoting *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 203 (1982)). While the grading and advancement system constitutes an important factor in determining educational benefit, not every handicapped child who is advancing from grade to grade in a regular public school is automatically receiving a FAPE. *Rowley*, 458 U.S. at 202.

Parents of disabled children have the right to participate in the identification, evaluation, and placement process. *Scorah v. District of Columbia,* 322 F. Supp. 2d 12, 14 (D.D.C. 2004) (citing 20 U.S.C. § § 1414(f), 1415(b)(1)). "Parents who object to their child's identification, evaluation or educational placement are entitled to an impartial due process hearing at which they have a right to be accompanied and advised by counsel." *Id.* (internal citations omitted). "DCPS shall bear

the burden of proof, based solely on the evidence and testimony
presented at the hearing, that the action or proposed placement
is adequate to meet the educational needs of the student." *Id.*
(quoting 5 D.C. Mun. Regs. § 3022.16).[3]  Parents aggrieved by a
hearing officer's finding and decisions may bring a civil action
in either state or federal court without regard to the amount in
controversy.  20 U.S.C. § 1415(i)(2).  The Supreme Court has held
that Section 1415(e) "confers broad discretion on the court to
order relief appropriate in light of the purposes of the Act."
*See Minor Roca, et al., v. District of Columbia*, 2005 WL
681462,*3 (D.D.C. March 14, 2005)(ordering reimbursement for
private school placement when DCPS failed to properly evaluate
student and formulate appropriate IEP).  This includes the power
"to order school authorities to reimburse parents for their
expenditures on private special education for the child if the
court ultimately determines that such placement, rather than a
proposed IEP, is proper under the Act.'" *Florence County Sch.*
*Dist. Four v. Carter by and Through Carter*, 510 U.S. 7, 11 (1993)
(quoting *School Comm. of Burlington v. Dep't of Educ. of Mass.*,
417 U.S. 359, 369 (1985)).

---

[3]On June 30, 2006, the Board of Education amended 5 Mun.
Regs. § 3030.3 to change the burden of proof at due process
hearings from being borne solely by the Local Education Agency
("LEA") to the responsibility of either the parent or LEA,
depending on which party is seeking relief.  *See* 53 D.C. Reg.
5249.  At the time of Plaintiffs' hearing however, the burden of
proof was on DCPS.

**B.    Standard of Review**

Under Rule 56 of the Federal Rules of Civil Procedure,
summary judgment is appropriate if the pleadings on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law.  Fed. R. Civ. P. Rule
56(c).  Material facts are those that "might affect the outcome
of the suit under the governing law." *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary
judgment bears the initial burden of demonstrating an absence of
a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477
U.S. 317, 322 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir.
1994).  In considering whether there is a triable issue of fact,
the court must draw all reasonable inferences in favor of the
non-moving party. *Id.*

In reviewing cases under the IDEA, courts will receive the
records of the administrative proceedings, hear additional
evidence at the request of a party, and make a decision based on
the preponderance of the evidence.  *See* 20 U.S.C. § 1415
(i)(2)(C).  The role of the reviewing court under the IDEA is
two-fold.  *Scorah,* 322 F. Supp. 2d at 18 (citing *Rowley*, 458 U.S.
at 206).  First, it must determine whether DCPS has complied with
the procedural requirements of the IDEA.  Second, it must
determine whether the individualized educational program

developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits.  *Id.*

Judicial review under IDEA is more rigorous than in typical agency cases.[4]  *Reid*, 401 F.3d at 521.  However, "a party challenging the administrative determination must at least take on the burden of persuading the court that the hearing officer was wrong, and the court upsetting the officer's decision must at least explain its basis for doing so."  *Id.* (citing *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989) ("*Kerkam I*"). Although the Court must give "due weight" to the administrative proceedings, *id.*, a hearing officer's decision "without reasoned and specific findings deserves little deference." *See Kerkam v. Superintendent, D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C. Cir. 1991) ("*Kerkam II*") (internal quotation marks omitted).

---

[4] In the instant case, this Court is not faced with the typical question raised in cases brought under the IDEA, that is, whether a particular IEP adopted by the school district provides a FAPE to a disabled student.  Instead, as in *Kruvant v. District of Columbia*, 2005 WL 3276300 (D.D.C. Aug. 10, 2005)("*Kruvant III*"), one issue before this Court is whether DCPS failed to identify N.G. as an individual with a disability in the first instance. This Court has recognized a "growing body of case law concluding that a traditional *de novo* standard of review applies to such determinations."  *Kruvant III*, at *6; *see also Muller v. Comm. on Special Educ. of the East Islip Union Free Sch. Dist.*, 145 F.3d 95, 101-02 (2d Cir. 1998) (applying *de novo* standard of review to determine whether student met statutory definition of emotionally disturbed).  However, the parties have agreed that the "due weight" standard is the appropriate one for this case, and the Court agrees. Therefore the Court will apply the due weight standard, without reaching whether a *de novo* review could be appropriate for some of the issues in this case.

## II. Discussion

### A. Factual Background

N.G. entered DCPS in 1991, enrolling in Lafayette Elementary School, where she experienced no difficulties and performed well academically. She continued on to Alice Deal Junior High School where she also met academic success, but began to exhibit some emotional and behavioral problems in her eighth grade year. Due to a behavioral incident, N.G. had to spend the last month of eighth grade at Hardy Junior High School. She returned to Deal in ninth grade, but began exhibiting low self-esteem, telling her parents that "everyone hated her" including the principal and her teachers. She was reluctant to go to school and appeared sad. R. 618. In the spring of that year, N.G. attempted suicide by ingesting a bottle of aspirin. She had to have her stomach pumped and was hospitalized in the pediatric mental health unit of Georgetown University Hospital for five days where she was formally diagnosed with clinical depression. N.G. missed approximately two weeks of school due to this incident and her parents notified DCPS of the reason for her absence. *Id.* at 620.

N.G. entered DCPS's Woodrow Wilson Senior High School ("Wilson") in tenth grade for the 2002-2003 school year. After N.G.'s first report card was issued, her parents discovered that her grades were extremely low and that her attendance had been erratic. R. 625. Ms. Correa testified she was shocked by the

9

poor report card and immediately asked N.G.'s teachers for help,
saying she was committed to N.G.'s regular school attendance.
*Id.*  In January 2003, DCPS warned Ms. Correa and Mr. Gomez that
N.G. was at risk for removal from the international studies
program in which she was enrolled unless she improved her grades.
At that time, her grade point average was 1.4, the equivalent of
a D+.  Pl.s' Mot. at 4-5.

Later that month, Mr. Gomez and Ms. Correa had N.G. tested
by Dr. Alexandra Cargo, a clinical psychologist.  Dr. Cargo did
not formally diagnose N.G. with either depression or ADHD, but
her clinical report indicated that while N.G.'s intellectual
abilities were in the superior range, she had "weaknesses in her
organizational and attending skills, restlessness, inefficiencies
in her perceptual organization, a tendency toward
distractibility, lack of attention to details and deadlines, poor
coping resources, emotional lability,[5] chronic irritability and
mild anxiety."  *Id.* at 5.  Dr. Cargo's report indicated that
N.G.'s teachers did not respond to Dr. Cargo's request for
evaluations.  R. 214.  Dr. Cargo also reported that N.G. told her

---

[5] Emotional lability refers to rapid, often exaggerated
changes in mood, where strong emotions or feelings
(uncontrollable laughing or crying, or heightened irritability or
temper) occur that are not related to external stimuli. Acquired
Brain Injury Outreach Service, The State of Queensland
(Queensland Health), *Understanding Emotional Lability,* 2007,
http://www.health.qld.gov.au/abios/documents/behaviour_mgt/labili
ty.pdf

she "cut" school with a friend and often left to go get food or
go to someone's house, that she frequently feels very sad, and
that she is nervous and worried about school and things at home.
*Id.* at 210, 213.  Among other things, Dr. Cargo recommended
individual tutoring and consultation with a psychiatrist for a
possible medication trial to reduce N.G.'s emotional lability,
chronic mild depression, anxiety, and tendency to pick her skin.
Pl's Mot. at 6.  Ms. Correa gave this report to several of N.G.'s
teachers, the school counselor, Dr. Tarason, the Wilson
principal, and Ms. Gaines, the vice principal.  R. 632.

    Following up on Dr. Cargo's indication that Attention
Deficit Hyperactivity Disorder ("ADHD") might be an issue, R.
213, Ms. Correa sought out an ADHD expert, eventually connecting
with Dr. Carol Robbins.  *Id.* at 632.  After conducting her own
evaluations, Dr. Robbins diagnosed N.G. with ADHD and major
depression.  *Id.* at 250.  N.G. began weekly individual therapy
sessions with Dr. Robbins in February and she also began seeing a
child psychiatrist, Dr. Lawrence Brain.  *Id.* at 634.  Dr. Brain
also diagnosed N.G. with ADHD and a mood disorder and prescribed
medication.  *Id.* at 305.

    In April 2003, during a therapy session with Dr. Robbins,
Dr. Robbins determined that N.G. was severely depressed and
evidencing suicidal intent.  *Id.* at 634.  She recommended
immediate hospitalization due to the severity of N.G.'s

condition. *Id.* N.G.'s parents took her to Children's Hospital where N.G. was evaluated by the psychiatrist on call who also recommended immediate hospitalization. *Id.* at 637. N.G. was hospitalized at Children's Hospital for 11 days. According to the discharge summary report, the hospital indicated that N.G. had suffered from "major depressive disorder" since she was twelve years old. *Id.* at 233. Ms. Correa testified that the psychiatrists at Children's Hospital instructed her to "work with the school" to set up a "disability program" and support system for N.G. because she would need a lot of support. *Id.* at 638. In addition to medication and therapy, they also told her that N.G. needed "lots of teacher attention, lots of one-on-one, lots of focused work, [and] small classes." *Id.* at 639.

Immediately after N.G. was hospitalized, Ms. Correa delivered letters to N.G.'s teachers and Dr. Tarason detailing what had happened and requested help gathering N.G.'s assignments and supporting her during this difficult time. R. 226, 640. Four days later, on April 26, 2003, Mr. Gomez wrote a follow up letter to Dr. Tarason expressing disappointment that only one of N.G.'s teachers had responded to the request and also requesting that the school convene a meeting to "review the relevant circumstances and prepare a '504 plan'[6] to support [N.G.] upon

---

[6] Section 504 of the Rehabilitation Act of 1973, as amended, requires that reasonable accommodations be made to ensure that students with disabilities have access to the same services as

her return to school." *Id.* at 227.  Mr. Gomez also indicated
that the circumstances necessitating N.G.'s hospitalization "have
affected her performance practically all year, but we are only
now understanding their full extent." *Id.*

On May 4, 2003, Dr. Robbins wrote to Dr. Tarason informing
him of N.G.'s diagnoses of ADHD and major depression.  R. 250.
She provided N.G.'s treatment history and the various ways in
which N.G.'s conditions affected her, including "inattention,
distractibility, impulsivity, disorganization, inefficiency, poor
time management, inconsistent follow-through, procrastination,
poor working memory, low frustration tolerance, and low self-
esteem." *Id.*  Dr. Robbins also specifically indicated that N.G.
was disabled, stating,

> N.G. is currently experiencing severe clinical
> depression and is in inpatient treatment at Children's
> National Medical Center in Washington, D.C.  Upon
> discharge, she will need to have her handicapping
> conditions addressed by the school, with appropriate
> accommodations made to assist her in reaching her
> academic potential.... A very bright, talented and
> engaging young woman, she has been suffering
> emotionally and academically due to her untreated ADHD
> and depression.  I will be working with her, her
> family, and hopefully the school to make sure that
> appropriate accommodations are made for her....

---

students without disabilities. *See* 29 U.S.C. § 794.  A 504 Plan
details those accommodations. *See Schoenbach v. District of
Columbia*, 309 F. Supp. 2d 71 (D.D.C. 2004).  A special education
classification is not a prerequisite to eligibility for a 504
Plan. *Cummings v. District of Columbia*, 2006 WL 1126811, *2 n.1
(D.D.C. March 31, 2006).

*Id.*  In addition to the general request that Wilson "address"

N.G.'s "handicapping conditions," Dr. Robbins also specifically

proposed some accommodations and further encouraged Dr. Tarason

and N.G.'s teachers to work together to assist her, stating,

> She would benefit greatly from some standard
> educational accommodations (a 504 plan), such as being
> seated near the front of the classroom, being provided
> organizational assistance, being reminded to hand in
> homework assignments, being provided academic
> assistance/tutoring when needed, and being given
> extended time on tests.  Please encourage her teachers
> to work with her to make appropriate modifications to
> her academic requirements, such that she will be able
> to make up work from both prior to and during her
> current psychiatric hospitalization....  As a result of
> her current fragile emotional state, she may well also
> need to make use of a crisis counselor, or have a safe
> place to go if she becomes overwhelmed or upset during
> the school day.

*Id.*  Dr. Robbins concluded her letter encouraging Dr. Tarason to

contact her if additional information was needed "in order for

[N.G.] to qualify for the necessary accommodations." *Id.*

Dr. Robbins wrote a second letter on June 3, 2003, this time

recommending to Ms. Gaines, the vice principal, that N.G. be

allowed to drop her math class without penalty for medical

reasons and suggesting that she be permitted to retake math in

the fall.  R. 252.  In this letter, Dr. Robbins again reiterated

N.G.'s recent ADHD and depression diagnoses, and also indicated

that N.G. was unable to take medication for her ADHD at that

time, "so it is even more difficult for her to focus, manage her

time, motivate herself and be efficient." *Id.; see also* R. 819

(Testimony of Dr. Robbins indicating that N.G. could not take ADHD medication during initial treatment with antidepressants). No one from DCPS contacted Dr. Robbins or N.G.'s parents in response to any of these letters.

On or around May 8, 2003, Wilson convened what "everyone called a 504 conference" in response to Mr. Gomez's request. Pl.'s Mot. at 10.  Ms. Correa testified that she believed the meeting had to do with the Americans with Disabilities Act and understood that the purpose of the meeting would be to discuss "how the school could help us get her in a situation that she could be in and do well in." R. 642.  In addition to N.G.'s parents, the school counselor, three of N.G.'s teachers, and her private tutor attended the meeting.  Her four other teachers did not attend, nor did an administrator or the special education coordinator.  *Id.*

According Ms. Correa's uncontroverted testimony, the focus of the "504 conference" was how to get N.G. to pass the tenth grade.  *Id.* at 643 ("It was a short-term focus of getting her through – it was clear they didn't want her repeating the tenth grade.").  The discussion focused solely on what assignments needed to be completed by when and what could be excused.  *Id.* Ms. Correa testified that no "plan" was made, none of the accommodations recommended by Dr. Robbins were discussed and no one suggested that N.G. be evaluated under the IDEA.  *Id.*  When

asked about the outcome of the meeting, Ms. Correa answered, "I still don't know. Nothing– we didn't come out of there with a plan; we didn't come out of there with a piece ... of paper as a result of that meeting. There wasn't a discussion, there was nothing." R. 645. When Ms. Correa went to meet with the vice principal after Dr. Robbins recommended N.G. drop math to reduce her stress levels, Ms. Correa discovered that the vice principal did not even know a meeting had taken place. *Id.* ("And I had to tell her that we had all these problems and ...that we had had a meeting with the teachers and all that. She didn't know. There was nothing planned.") Following the conference, N.G.'s parents again corresponded by email with the individual teachers who did not attend, requesting accommodations and indicating that "there are very concrete medical reasons for N.G.'s behavior" and "a lot of the acting out that you saw was spurred on by her undiagnosed depression and ADHD." R. 244. Both Dr. Tarason and Ms. Hansen, the school counselor, were copied on these messages. Though she failed four of her classes, the year ended in mid-June and N.G. was promoted to the eleventh grade. *Id*. at 92.

On August 8, 2003, Ms. Correa returned to Wilson to register N.G. for the eleventh grade. According to her hearing testimony, Ms. Correa saw Ms. Hansen, the school counselor, and approached her to discuss how they could help N.G. have a better year. She testified that she told Ms. Hansen, "I want to make sure that

16

this year we do put N.G. in a situation where she gets the kind
of one-on-one help that she needs."  R. 649.  Ms. Correa then
testified, "That woman looked at me like she didn't know me from
Adam.  She looked at me like she didn't know who I was or what I
was talking about." *Id.*  Ms. Hansen then indicated that she was
too busy to meet with Ms. Correa until the third week of school.
At that point, Ms. Correa testified that she said "well, you want
her to commit suicide at the beginning of the year instead of the
end so that maybe we could do something?" *Id.* at 650.  At that
point, Ms. Correa testified that she decided she could not "put
[N.G.] back in this situation" and she decided to try and find a
private school placement for her.  *Id.*

After the 2002-2003 school year ended, N.G.'s parents
consulted Dr. Robbins about the type of school setting that might
be better for N.G.  R. 823.  Dr. Robbins indicated that N.G.
would benefit from small classes, a highly structured
environment, and one-on-one attention from supportive teachers.
Dr. Robbins also indicated that N.G. would benefit from a "safe
environment" to which she could retreat if she became overwhelmed
and upset in class.  *Id.* at 338.  Ms. Correa testified that the
doctors at Children's Hospital also recommended that in light of
N.G.'s depressive disorder, "she needed small classes... to be
able to connect with the teacher, ... the ability to ask for help
and get it.  She needed a support system."  *Id.* at 648.

17

In response to these recommendations and because of their belief that no other options were available through DCPS, *id.,* N.G.'s parents enrolled her at the Saint James School in Hagerstown, Maryland, for the 2003-2004 school year. Saint James is a highly structured boarding school, with an average class size of 12 students and a total student body of 220. R. 354. The school offers a rigorous college preparatory curriculum, family-style meals, mandatory athletics and study hall, and close monitoring of nearly all aspects of each student's life. *Id.* at 356. Saint James admitted N.G. with knowledge of her ADHD, believing its small size, structure, attentive teaching and coaching, and dormitory supervision would be good for her. *Id.* at 359. The headmaster testified in her affidavit that Saint James has accommodated ADHD students in the past. *Id.*

N.G. was admitted on the condition that she repeat the tenth grade because her academic performance at Wilson had been so poor. *Id.* at 654. Ms. Correa observed improvement in N.G. during her time at Saint James, testifying that she was excited about learning again, she started to believe in herself and her grades improved. R. 655. While at Saint James, N.G. received psychological support with a therapist who came to the school one day each week. She also continued to see her psychiatrist for medication therapy and saw Dr. Robbins for additional counseling when she came home. R. 679.

18

While N.G. made improvements at St. James, her parents ultimately determined that the school was too religious and not sufficiently diverse.  R. 658 (Testimony of Ms. Correa expressing concern that N.G. was one of only three Hispanic students at the school).  Accordingly, in 2004, they enrolled N.G. at the Buxton School in Williamstown, Massachusetts, for eleventh grade. Buxton is a very small boarding school, and enrolls only 90 students total for grades nine through 12.  R. 381.  The average class has only six to eight students.  According to the affidavit of a Buxton teacher,

> The typical Buxton student is very bright and does well in an environment that affords a lot of personal contact with adults to foment self-esteem, trust, and basic growth.  This student may not be doing well in a large, impersonal environment, but has the potential for great success in a community that affords personal rights along with imposing personal responsibility.

R. 381.  Dr. Robbins approved of Buxton because it was even smaller than Saint James and was more responsive to the individual differences in the way people learn.  R. 825-826. While N.G. attended Buxton, she continued to receive psychological counseling from a therapist who works with the school but is not on staff.  R. 675.  She also continued to take medication for depression and ADHD.  *Id.* at 306.

On November 23, 2004, Ms. Correa went to Wilson to register N.G. as a non-attending student and to inquire about special education services.  After filling out the registration forms,

Ms. Correa asked for the forms necessary to request special education services. Ms. Correa was first told that Wilson did not have any such forms. R. 253. When Ms. Correa asked to speak to someone else, she was referred to Mr. Williams, the special education coordinator, who told Ms. Correa that a parent cannot request special education services, but rather the referral had to be made by a teacher. *Id.* Ms. Correa then called the D.C. Education Office to clarify this matter and was instructed by that office to call the same Mr. Williams who had turned her away at Wilson. *Id.* Ms. Correa called Mr. Williams again on November 29, 2004 but he did not return her call.

Following this incident, Plaintiffs' retained their current counsel. Plaintiffs' counsel sent a letter to Wilson describing the above interaction and requesting that the school "immediately initiate all appropriate procedures to evaluate N.G.'s eligibility for special education and related services, as well as any additional or different procedures which may be required in furtherance of the nearly two-year-old request for a 504 plan." Plaintiffs' counsel also directed Ms. Correa to go to the Central Assessment Referral and Evaluations ("C.A.R.E") Center in order to request special education services for N.G. Until that point, Ms. Correa testified that she was unaware of the Center's existence or of any of the services it provides, such as testing students to identify problems or placing students with special

20

needs in separate schools.  R. 666.  Ms. Correa signed the
necessary forms at the C.A.R.E. Center on December 27, 2004 to
begin the evaluation process.

DCPS subsequently performed a comprehensive
psychoeducational evaluation, which included a battery of tests
that N.G. took while home from Buxton over the holidays. *Id.* at
667.  Dr. Denise White-Jennings, a DCPS psychologist, also
completed a clinical psychological consultation, which consisted
of reviewing records and forms completed by N.G.'s parents and
teachers.  Pl.s' Mot. at 18.  Dr. White-Jennings never met N.G.
Her May 11, 2005 report included the following "diagnostic
impressions."

> N.G. has a history of depression with past suicide
> attempts and hospitalization.  She has been diagnosed
> with Major Depressive Disorder and prescribed Lexapro
> and Keflex according to Childrens' Hospital records
> from her 2003 hospitalization.  According to parent
> report, N.G. has also been diagnosed with ADHD although
> records were not made available indicating this
> diagnosis.  Current parent and teacher rating scales
> are suggestive of ADHD symtomology however symptoms of
> restlessness, inattention, distractibility can also be
> associated with depression.  N.G. is reported to be in
> ongoing psychotherapeutic treatment.  Current reports
> have been requested, but have not been provided.
> Diagnosis is deferred pending treatment/progress notes
> from her therapist.

R. 295.

DCPS convened a Multidisciplinary Team ("MDT") meeting on
May 16, 2005 at which it determined that N.G. was not eligible
for special education.  The decision was based only upon the

21

psychoeducational evaluation and clinical psychological consultation reports prepared by DCPS along with the quarterly grade reports and teacher rating forms submitted by N.G.'s teachers at Buxton. R. 298, 736. The MDT did not consider medical records submitted by N.G.'s parents. *Id.* at 736. Those records included a 2003 diagnosis of ADHD and mood disorder from Dr. Lawrence Brain, the child psychiatrist who treated N.G. from May 2003 to November 2003, and a medications report from Dr. Silver, the child psychiatrist who treated N.G. from March 2004 through December 2004. Though it appears from the record that Plaintiffs' counsel mailed these reports to DCPS on April 25, 2005, *see* R. 304, the MDT notes represent that DCPS did not receive them until the date of the MDT and therefore the team refused to consider them. *Id.* at 297-98. The MDT also did not consider N.G.'s academic performance at Wilson nor her past academic history even though N.G.'s parents urged its consideration. Pl.'s Mot. at 14; R. 709, 714. The MDT determined that based upon the "information presented," N.G.'s academic performance was commensurate with her educational potential and therefore she was ineligible for special education. R. 301, 309.

On May 24, 2005, Plaintiffs requested through counsel that the MDT meeting be reconvened because the MDT did not fully consider all factors relevant to the determination of the

22

presence or absence of a disability.  R. 307.  In their letter to
Ms. Gloria Everett, the social worker in charge of the MDT,
Plaintiffs complained that

> Although N.G. attended District of Columbia public
> schools from kindergarten through the tenth grade, DCPS
> brought none of her school records to the MDT meeting.
> Consequently, the DCPS team members were unable to
> assess N.G.'s current educational status and success in
> her current placement in context, specifically in
> comparison with the difficulties she experienced while
> enrolled in large classes and chaotic setting of a
> general education high school in which she received no
> emotional support.

R. 308.  Furthermore, Plaintiffs argued that the MDT team should
have considered the medical reports from Dr. Brain and Dr. Silver
that were first mailed to DCPS and also presented by N.G.'s
parents at the meeting.

On June 1, 2005, Ms. Everett responded to this letter,
refusing to reconvene the MDT because DCPS "reviewed all
information presented" during the May 16, 2005 meeting and "the
information presented determined that N.G.'s current academic
performance is commensurate with her educational potential."  *Id.*
at 309.[7]  On June 30, 2005, N.G.'s parents then filed a request

_____

[7] At the due process hearing, Ms. Everett testified that she
went to Wilson sometime after the MDT adjourned to investigate
Plaintiffs' representation that services had been requested for
N.G. when she was a student there.  R. 711.  Ms. Everett
testified that Wilson provided only N.G.'s report card from the
2002-2003 school year and no other information.  She indicated
she had not seen N.G.'s master file maintained by Wilson
containing the voluminous correspondence with N.G.'s parents and
the diagnoses from Dr. Robbins.  R. 721. It is unclear whether
Ms. Everett went to Wilson before or after the request to

for a due process hearing, challenging the ineligibility determination and alleging a Child Find violation. The hearing took place over four days, in September, November, December and January.[8]

On January 23, 2006 the Hearing Officer issued a decision finding that DCPS had not violated the Child Find obligation by failing to identify, evaluate and place N.G. in 2003. The Hearing Officer's Decision ("HOD") separately upheld the MDT's 2005 determination of ineligibility for special education, finding that N.G.'s disabilities did not adversely affect her educational performance. Pursuant to 20 U.S.C. § 1415(i)(2), N.G.'s parents filed suit in this Court to challenge both determinations.

**B.    2003 Child Find Obligation**

The Hearing Officer concluded that DCPS had not defaulted on its Child Find obligation because there was insufficient evidence

reconvene the MDT was made.

[8] The September hearing was cut short after only an hour of preliminary matters because counsel for DCPS informed the Hearing Officer she had another commitment in another court, even though the hearing had been scheduled to take four hours. When the hearing was rescheduled for November, counsel for DCPS failed to appear, due to a "scheduling problem." The December hearing date was a "snow day," and therefore DCPS witnesses did not appear, even though, as Plaintiffs' counsel pointed out, DCPS administrative offices were not closed and no classroom witnesses were to be called. Ms. Correa gave the bulk of her testimony that day, even though customarily, DCPS is required to present its case first because it bears the burden of proof. The complete hearing finally took place on January 13, 2006.

that N.G.'s absences and deteriorating academic performance were
caused by a suspected disability.  In relevant part, the HOD
states:

> Because the "Child Find" requirement is an affirmative
> obligation, a parent is not required to request that a
> school district identify and evaluate a child.
> *Robertson County School System v. King*, 24 IDELR 1036
> (6th Cir. 1996).  However, a local education agency is
> not required to guess which children suffer from a
> handicap that renders them incapable of progressing in
> their education; nor does the Child Find obligation
> relieve a parent and others of an obligation to assist
> school officials in identifying children in need of
> special services.  *Huntsville City Board of Education*,
> 22 IDELR 931 (SEA Ala. 1995).
>
> With respect to this Child Find obligation of DCPS,
> based on the evidence, the student had excessive
> absenteeism during the 2002-2003 school year which
> consequently hurt her grades.  In any event, with so
> many absences, the student was clearly not available
> for learning.  Therefore, with regard to Child Find,
> based on the evidence, DCPS had met its burden: there
> is no evidence to support DCPS failing to identify,
> evaluate and place the student pursuant to Child Find.
> Being absent from school does not mean that a child has
> a disability that warrants special education.

HOD ¶¶ 11-12.  Recognizing the "due weight" the Court must give
to the Hearing Officer's decision, the Court finds that the
Hearing Officer's conclusion on this point represents an
incorrect application of the statute and is unsupported by the
record evidence.

The Court begins with the premise that the Child Find
obligation extends to all children *suspected* of having a

disability, not merely to those students who are ultimately determined to be disabled.  34 C.F.R. § 300.111 (c)(1) ("Child find also must include children who are suspected of being a child with a disability...").  This statutory mandate is clear.  Furthermore, this Court has held on numerous occasions that as soon as a student is identified as a *potential* candidate for special education services, DCPS has a duty to locate that student and complete the evaluation process.  *See,* e.g., *Hawkins,* 2008 WL 623588; *Abramson*, 493 F. Supp. 2d at 85 (explaining that once a child is identified, the local educational agency "is then obligated to move forward with the requirement of [IDEA] § 1414(a)(1) and determine whether the student is in fact a child with a disability").

Plaintiffs argue that N.G. should have been evaluated because her clinical depression met the statutory definition of "serious emotional disturbance" and her ADHD qualified as an "other health impairment."  *See* 20 U.S.C. § 1401(3)(A); 34 C.F.R. § 300.8(c)(4)(i).  The Court agrees, and finds that DCPS was on notice of substantial evidence that N.G. may have qualified for special education in 2003 such that she should have been evaluated.

Under the IDEA,

[t]he term "child with a disability means a child – (i) with mental retardation, hearing impairments (including deafness), speech or language impairments,

26

visual impairments (including blindness), serious
emotional disturbance (referred to in this chapter as
"emotional disturbance"), orthopedic impairments,
autism, traumatic brain injury, other health
impairments, or specific learning disabilities; and

(ii) who, by reason thereof, needs special education
and related services.

20 U.S.C. § 1401(3)(A).  The regulations further define the term

"emotional disturbance" as follows:

(4)(i) Emotional disturbance means a condition
exhibiting one or more of the following characteristics
over a long period of time and to a marked degree that
adversely affects a child's educational performance:

(A) An inability to learn that cannot be
explained by intellectual, sensory, or health
factors.

(B) An inability to build or maintain
satisfactory interpersonal relationships with
peers and teachers.

(C) Inappropriate types of behavior or
feelings under normal circumstances.

(D) A general pervasive mood of unhappiness
or depression.

(E) A tendency to develop physical symptoms
or fears associated with personal or school
problems.

34 C.F.R. § 300.8(c)(4)(i).

In its briefs before this Court, DCPS defends the Child Find

allegation on statutory grounds, contending that "depression is

not one of the enumerated disabilities listed in 20 U.S.C. §

1401(3)(A)(I)" and therefore the fact that DCPS knew of N.G.'s

psychiatric hospitalizations was insufficient to trigger its

Child Find responsibilities.  DCPS fails to respond to

27

Plaintiffs' argument that N.G.'s diagnosis of clinical depression
and history of suicidality classifies her as "emotionally
disturbed" under the implementing regulations.  In fact, DCPS
does not cite the above regulations at all.

The Hearing Officer takes a different course, and while he
acknowledges that the definition of emotional disturbance
includes depression, he ultimately concludes that N.G.'s
"emotional issues as noted by the parents and her therapist did
not manifest themselves in class at Wilson in 2003." HOD ¶ 8.
Though the HOD is somewhat unclear on this point, it appears to
conclude that Wilson had no obligation to evaluate N.G. because
there was insufficient evidence that her "emotional issues" were
adversely impacting her education such that the IDEA may apply.

The Court rejects this conclusion.  The Court finds that
N.G. exhibited at least two of the five characteristics
indicative of "emotional disturbance," i.e., pervasive depression
and inappropriate types of behavior, her academic performance was
clearly adversely affected as a result, and DCPS knew it.  A
review of the evidence admittedly known to DCPS by May of 2003
supports no other conclusion.

DCPS does not dispute that it was on notice that N.G. had
attempted suicide once in the ninth grade resulting in a five-day
psychiatric hospitalization and was again hospitalized for 11

28

days for severe suicidal ideation in the tenth grade.[9]  (It
should go without saying that attempting suicide is an
"inappropriate behavior.") DCPS also knew that beginning in 2002,
N.G.'s academic performance began to deteriorate severely, such
that in 2003, she failed four of her seven classes when she had
previously been an A and B student.  R. 92.  N.G.'s parents wrote
individual letters to each of her teachers and the school
administrators informing them of the seriousness of her condition
and explaining their belief that her poor performance during the
year was a result of her untreated depression and ADHD.
Additionally, as of May 4, 2003, DCPS was also aware of Dr.
Robbins' diagnosis that N.G. suffered from major clinical
depression and was "beginning to be treated with psychostimulant
medication to manage her symptoms of executive dysfunction."  R.
250.  In light of the above evidence, it is unreasonable to
conclude that N.G. could not even have been "suspected" of having
a disability so as to implicate the District's Child Find
obligation.  Accordingly, the Court finds that DCPS violated the
IDEA when it failed to evaluate N.G. in 2003 as potentially
emotionally disturbed.  *See e.g., New Paltz Cent. Sch. Dist. v.*

---

[9] The hospital discharge summary indicates that N.G. had
also attempted suicide in the seventh grade, R. 233, but it is
unclear from the record whether DCPS was aware of this prior
attempt in 2003.  The record indicates that DCPS definitely knew
of the attempt in 2005 as it is mentioned in N.G.'s Clinical
Psychological Consultation conducted by DCPS and dated May 11,
2005.

*Linda St. Pierre, on behalf of M.S.*, 307 F. Supp. 2d 394

(N.D.N.Y. 2004) (finding student was emotionally disturbed upon

review of evidence of substantial decline in academic

performance, inappropriate behavior, signs of depression, and

apparent suicide attempt).

The Court further finds that DCPS should have evaluated N.G.

after being informed of her formal diagnosis of ADHD.  ADHD is

specifically covered as an "other health impairment" under the

IDEA's implementing regulations.  Those regulations provide:

> Other health impairment means having limited strength,
> vitality, or alertness, including a heightened
> alertness to environmental stimuli, that results in
> limited alertness with respect to the educational
> environment, that--
>
> (i) Is due to chronic or acute health problems such as
> asthma, attention deficit disorder or **attention deficit
> hyperactivity disorder**, diabetes, epilepsy, a heart
> condition, hemophilia, lead poisoning, leukemia,
> nephritis, rheumatic fever, sickle cell anemia, and
> Tourette syndrome; and
>
> (ii) Adversely affects a child's educational
> performance.

34 C.F.R. § 300.8(c)(9) (emphasis added).

This Court has repeatedly found that when a district is

aware that a student *may* have a disability, including ADHD, it

has an obligation to evaluate the student, even if that student

is homeless, a migrant, or unenrolled.  *See Hawkins*, 2008 WL

623588.  This Court has also found that the Child Find obligation

extends to students in private school and those attending school

30

out of state. *Abramson*, 493 F. Supp. 2d 80.  Accordingly, the Hearing Officer's conclusion that N.G. could not be evaluated because she was "not available for learning" due to her skipping classes is entirely without merit.  *See* HOD ¶ 12.

In *Nesbit v. District of Columbia*, 2003 U.S. Dist. LEXIS 26306 (D.D.C. March 31, 2003)(Kessler, J.), a prospective student's parent came to the school and inquired as to whether his son could be tested for ADHD.  The school referred the parent to an outside agency to obtain the testing.  The student never enrolled in DCPS, but was instead enrolled in a public charter school.  The court held that DCPS violated the IDEA because it "failed to take any steps to evaluate [the student] after he was identified as potentially in need of special education services" during the parent's first visit to the school.  The court noted that DCPS made no attempt to locate him or evaluate him after he was identified.  *Id.* at *21.  The court concluded, "[e]ven though a parent may help a school district satisfy the IDEA's requirement that it identify children in need of services, the school district is not relieved of its requirement to further locate and evaluate those children." *Id.* at *21-22 (citing *Wolfe v. Taconic-Hill Cent. School Dist.*, 167 F. Supp. 2d 530 (N.D.N.Y. 2001).  If the Child Find obligation can be triggered by a mere inquiry from the parent of an unenrolled student, it is clearly implicated by the voluminous parent and doctor requests for

31

assistance in this record, particularly given N.G.'s ten-year history of DCPS attendance.

In addition to the formal diagnoses, DCPS was also presented with significant other evidence that N.G.'s declining grades and poor attendance were caused by her disabilities. *See, e.g.,* R. 250 (Letter from Dr. Robbins to Dr. Tarason stating, "[N.G.] has been suffering emotionally and academically from her untreated ADHD and depression."); R. 252 (Letter from Dr. Robbins to Ms. Gaines requesting N.G. be able to drop her math class because she was "struggling significantly to make up work" after being hospitalized); R. 226 (Parents' letter to teachers indicating that N.G.'s school work has "undoubtedly already been affected" by her depression); R. 227 (Parents' letter to Dr. Tarason indicating the circumstances which led to N.G.'s hospitalization have affected her performance all year).

The Hearing Officer disregarded this evidence and instead focused almost exclusively on a single observation in Dr. Cargo's report, which had been provided to DCPS four months prior.  The Hearing Officer noted "Dr. Cargo reported that the student was skipping her classes to be with friends to get food or to go to someone's house."  He emphasized this observation throughout the decision, to the exclusion of substantial other evidence, to support his conclusion that DCPS was under no obligation to evaluate N.G. because her absences were not related to any

disability.  HOD ¶ 10.  However, the Court's review of Dr.
Cargo's report indicates that this information was merely an
observation based on what N.G. had relayed to Dr. Cargo "when
asked about school."  R. 210.  The Hearing Officer does not
indicate why this observation should carry more weight than the
professional opinion of Dr. Robbins, the therapist who had
treated N.G. on a weekly basis for several months and who was in
a much better position to evaluate the reason behind her
absences.  The Hearing Officer's analysis of Dr. Cargo's report
is highly selective, noting only information that supports DCPS's
argument that it was not on notice that N.G.'s academic problems
could be disability related.

DCPS argues that because Dr. Cargo did not formally diagnose
N.G. with ADHD or major depression, it had no obligation to
evaluate her.  This argument is also without merit.  Plaintiffs
do not argue that DCPS should have evaluated N.G. on the basis of
Dr. Cargo's report alone.  Rather, they contend that DCPS's
obligation to N.G. arose in May of 2003, after her second
hospitalization for suicidality and after DCPS had been notified
of her formal diagnoses of ADHD and depression.

The HOD concludes that Dr. Robbins' letters were
insufficient notice to Wilson because they "did not enclose any
evaluations that she had conducted."  HOD ¶ 7.  However, there is
absolutely no statutory requirement that a request for services

33

be accompanied by formal psychiatric evaluations.  Furthermore,
Dr. Robbins expressly invited Dr. Tarason to contact her should
he need any further information so that N.G. would qualify for
accommodations.  R. 250.  Again, the burden is on DCPS to
identify and evaluate students suspected of being disabled.  Upon
receiving notice that N.G. had been diagnosed with two
potentially qualifying disabilities, the IDEA requires that DCPS
evaluate N.G. itself.

    Finally, DCPS also makes the unusual argument that because
Dr. Robbins also recommended "educational accommodations" under
Section 504 of the Rehabilitation Act, it had no obligation under
the IDEA to conduct its own evaluation of N.G.'s needs.  Def.'s
Mot. at 16.  This argument is absurd and completely undermines
the purpose of Child Find.  Under Defendants' interpretation, a
school district could excuse itself from the obligation to
evaluate students merely because parents or therapists had
suggested additional, alternative ways to accommodate the child.
This is clearly not what Congress intended by imposing an
affirmative obligation upon school districts to identify,
evaluate, and place potentially disabled students, *see* 20 U.S.C.
§ 1412(a)(3)(A), particularly when the District did not even act
on the suggested accommodations in the first place.

    Moreover, in *Scott v. District of Columbia*, 2006 US Dist.
LEXIS 14900 (D.D.C. 2006), this Court rejected this precise

34

argument.  In *Scott*, the student's parent cooperated with the
school and agreed to the provision of "alternative strategies" to
assist in the management of her son's ADHD.  After two years
without an IEP, the parent sued, contending that the District had
denied her son a FAPE and violated Child Find by failing to
evaluate him for special education.  The Court rejected
defendant's contention that a "parent's acceptance of the use of
alternative strategies relieves a school district of the
obligation to comply with the "Child Find" provisions of the
act."  *Id.* at *24.  The Court also rejected the District's
argument that because the parent had not requested a formal
evaluation in writing, the Child Find obligation was not
triggered.  *Id.* at *20-21 (citing *Reid*, 401 F.3d at 519) (holding
that a district may not "await parental demands" before providing
special instruction).  Accordingly, DCPS's obligation to N.G.
under the IDEA was in no way excused by her therapist's
recommendation that she may also qualify for accommodations under
the Rehabilitation Act.  If anything, her doctor's recommendation
that N.G. be accommodated under that statute only supports a
determination that N.G. was disabled, which should have triggered
the school's evaluation process.

Contrary to the implication in the HOD, DCPS was not forced
to "guess" as to N.G.'s disabilities, *see* HOD ¶ 11, rather it was
explicitly informed of her diagnoses on multiple occasions and

had ample evidence that they adversely impacted her academic performance. *See, e.g.,* R. 244, 247, 250. In addition, DCPS had received explicit requests for assistance from N.G.'s parents and her doctor. Not only does DCPS have the burden of identifying and evaluating children who might have disabilities, at the time of this hearing, it also had the burden of proving that it has met this obligation. *See* 5 D.C. Mun. Regs. § 3022.16. Plaintiffs have shown by a preponderance of the evidence that the Hearing Officer erred when finding DCPS had carried its burden. *See* HOD ¶ 12. Accordingly, Plaintiffs' motion for summary judgment on the 2003 Child Find claim is **GRANTED** and Defendants' Motion is **DENIED**.

### C.  2005 Eligibility Determination

On May 16, 2005, the MDT determined that N.G. was not eligible for special education. The HOD separately affirmed this conclusion, finding that,

> The student has emotional issues due to her depression and therefore it was suggested that she meets the criteria of Emotional Disturbance. Additionally, the student has been diagnosed by Dr. Robbins with ADHD and therefore it is suggested that she meets the criteria of "Other Health Impaired." However, it is not sufficient to be diagnosed with one of the listed disabilities, but additionally, there must be an adverse impact on her on her [sic] educational performance. Based on her records from both Saint James and Buxton, the student's academic performance has not been adversely impacted, but in fact she is doing well. The record is not clear as to the impact, if any, of any medication the student may be taking,

> but again, based on the affidavits of two of the
> student's teachers at Buxton, the student will get back
> on track by simply being told to do so, which does not
> suggest that her condition has an adverse impact on her
> educational performance.

HOD ¶ 20.

Generally, in suits brought under the IDEA, the reviewing court's role follows the two-part structure laid out in *Rowley*, 458 U.S. 176. First, the Court must determine whether the state has complied with the procedures set forth in the Act. Second, the Court examines whether the IEP developed through those procedures is reasonably calculated to enable the child to receive educational benefits. *Id.* at 206-07. "This case involves an ineligibility determination, and thus there is no IEP. Therefore, the Court must adapt the second step of the *Rowley* inquiry and inquire whether the ineligibility determination was proper under the Act." *Kroot By and Through Kroot v. District of Columbia*, 800 F. Supp. 976, 981 (D.D.C. 1992). Plaintiffs argue that the MDT's 2005 ineligibility determination fails under both the procedural and substantive inquiries. The Court agrees.

### 1.    Procedural Errors in MDT process

Plaintiffs allege three primary procedural errors. First, Plaintiffs contend that the MDT should have tabled consideration of N.G.'s eligibility pending receipt of the medical information Dr. White-Jennings indicated was necessary to a final diagnosis.

Pl.'s Reply at 13; *see* R. 295 (Report indicates that "Diagnosis is deferred pending treatment/progress notes from her therapist.").  Second, Plaintiffs allege that the MDT, and later the Hearing Officer, improperly excluded evidence of N.G.'s academic and medical history, without which her current success at Buxton was taken out of context and inappropriately used to deem her ineligible.  Pl.'s Reply at 13-14.  Plaintiffs contend these deliberate omissions directly contravene the IDEA's plain statutory language which requires the evaluating team to gather and consider relevant information, including that provided by the parents. Pl.'s Reply at 13.  Finally, Plaintiffs argue that DCPS improperly refused to reconvene the MDT meeting upon Plaintiffs' request.

DCPS does not specifically address Plaintiffs' first argument that the eligibility determination should have been tabled if more information was needed, but counsel for the District argued at the due process hearing that DCPS was justified in making the eligibility determination "based on what it had." R. 868-69.  Plaintiffs argue that the statute specifically directs the evaluation team to "identify what additional data, if any, are needed to determine whether the child" qualifies,  20 U.S.C. 1414(c)(1), and Defendants' refusal to do so constitutes a violation.  The HOD does not specifically address this point.  DCPS also fails to address Plaintiffs' third

38

argument, regarding the request to reconvene the MDT.  The HOD
notes only that the Hearing Officer found Ms. Everett's testimony
regarding her decision not to reconvene "credible," but does not
conclude whether DCPS should have reconvened the MDT or not.

Regarding Plaintiffs' second argument, DCPS argues that the
MDT and the Hearing Officer properly excluded the information
pertaining to N.G.'s medical history and academic performance at
Wilson because a special education eligibility determination
should be based on a student's "current educational and
behavioral status."  Def.'s Mot. at 20.  Accordingly, DCPS
contends that the Hearing Officer properly considered only N.G.'s
2004-2005 grades and evaluations from Buxton and the two reports
prepared by DCPS.  Def.'s Mot. at 23; HOD ¶ 20.  Though Ms.
Everett conceded at the hearing that evidence of N.G.'s abysmal
academic performance at Wilson during the 2002-2003 school year
along with what she had learned about the suicide attempts,
skipping classes, behavioral problems at home, and ADHD diagnosis
should have triggered a special education evaluation in 2003, she
maintained it was not relevant to a disability determination in
2005.  R. 738-39.  The Hearing Officer agreed, and concluded that
because N.G. was performing well at Buxton, and Buxton is not a
special education school, any disabilities she may have do not

adversely impact her educational performance.[10]

    Plaintiffs strenuously argue that N.G.'s success at Buxton cannot be viewed in a vacuum, and that her ability to perform in a "general education" program at Buxton is the direct result of the accommodations she is receiving there, namely the extremely small classes, highly structured environment, and close relationships with teachers who provide a high level of supervision, along with her continued psychological therapy and medication.  Furthermore, Plaintiffs contend that DCPS should not be able to benefit from its initial default in 2003 by basing N.G.'s ineligibility on the success of the program N.G.'s parents were forced to find for her.  The Court agrees.  Were the Court to find otherwise, this would lead to the incongruous result whereby the District could avoid its obligations by improperly failing to evaluate a student and then, once the parents have taken on the burden that belongs to the school system, rely on the student's improved situation to avoid any further obligation to that student. *See Wirta v. District of Columbia*, 859 F. Supp. 1, 5 (D.D.C. 1994) ("Defendants have offered no authority which

---

    [10] The HOD did not specifically find that N.G. met the definition of either emotionally disturbed or other health impaired, though counsel for DCPS conceded at the hearing that it did not dispute that N.G. had both ADHD and depression.  R. 906. Rather, DCPS argued, and the HOD found, that N.G. did not qualify for special education because her disabilities did not have an impact on her educational performance.  The Court will address this issue in Part 3(b).

permits a school system to conduct evaluations and propose an alternative placement where its failure to do so in the first instance violated the Act.").

The IDEA lays out the requirements for evaluating students suspected of having disabilities. 20 U.S.C. § 1414(c)(1) provides that

> As part of an initial evaluation... the IEP Team and other qualified professionals, as appropriate, shall--
>
> (A) review existing evaluation data on the child, including--
>
>> (i) evaluations and information provided by the parents of the child;
>>
>> (ii) current classroom-based, local, or State assessments, and classroom-based observations; and
>>
>> (iii) observations by teachers and related services providers;

The statute also details how the agency must proceed, stating,

> in conducting the initial evaluation, the local educational agency shall--
>
> (A) use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining--
>
>> (i) whether the child is a child with a disability; and
>>
>> (ii) the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum...;
>
> (B) not use any single measure or assessment as the sole criterion for determining whether a child is a

child with a disability or determining an appropriate
educational program for the child; and

(C) use technically sound instruments that may assess
the relative contribution of cognitive and behavioral
factors, in addition to physical or developmental
factors.

20 U.S.C. 1414(b)(2).

Plaintiffs contend that the MDT failed to comply with the
IDEA's mandate to consider "existing evaluation data on the
child" because it ignored substantial evidence of N.G.'s
disabilities, most significantly, her doctors' diagnoses and her
entire history within the DCPS.

In response, DCPS argues that the MDT properly excluded
evidence of N.G.'s performance at Wilson because the statute
mandates review of "current classroom-based, local, or State
assessments, and classroom-based observations."  20 U.S.C. §
1414(c)(1).  Defendants contend that the word "current" in
subsection (ii) restricts the MDT's analysis to only information
pertaining to the school year in question.  Def.'s Mot. at 20.

The Court rejects this artificially narrow construction of
the statute and finds that such a reading would conflict with
both the plain language and the underlying purpose of the Act.
The restriction for which defendants argue is listed nowhere in
the statute; the word "current" is used only in conjunction with
the classroom-based assessments and observations.  It does not
modify the much broader overall mandate of section (A) to "review

42

existing evaluation data on the child," nor does it restrict the temporal period for "evaluations and information provided by the parents" as called for in subsection (A)(i). *Id.* Furthermore, the Court finds that the arbitrary exclusion of N.G.'s experience within DCPS itself contravenes the statutory mandate to "gather relevant functional, developmental, and academic information that may assist in determining whether the child is a child with a disability." *Id.* § 1414(b)(2)(A).

The Court finds that the MDT, and later the Hearing Officer, excluded significant amounts of relevant information from both before and during the 2004-2005 school year. Notably, the MDT did not consider the report from Dr. Silver detailing his treatment of N.G.'s ADHD and depression which included treatment during the 2004-2005 school year. It also appears that the MDT failed to consider the academic and personal supports N.G. was receiving at Buxton, which would also constitute "current information," and rather focused solely on her performance in light of those accommodations. R. 738-739.

The MDT and the Hearing Officer completely disregarded N.G.'s ongoing emotional and attention difficulties and the ways in which N.G.'s current placement assists her in handling them. N.G.'s teachers at Buxton indicated "significant concerns with attention, restlessness, emotional lability and some oppositional behavior" on the rating scales they completed as a part of the

psychoeducational evaluation.  R. 300.  N.G.'s academic and
personal advisor also testified that N.G.'s emotional state at
Buxton had been "up and down" and that she "has had times when
she was emotionally fragile."  *Id.* at 385.  She further testified
that when this occurs, "a faculty member who is close to her,
often me, speaks with her to figure out the problem, suggests
ideas for coping and reinforces that she can get through the
crisis.  The school also facilitates her sessions with a
therapist in town."  *Id.*  Her advisor concluded that

> without support for her emotional problems and ADHD, I
> believe she would be lost and would feel defeated....
> As a professional... in the educational field for
> nearly 40 years, I have real concerns about whether
> N.G. would be on the verge of graduating from high
> school, as she is at Buxton, were she to be attending a
> large public high school at this time.

*Id.* at 386.  This evidence is completely inconsistent with the
HOD's determination that N.G. is able to correct her "focusing
issues...apparently on her own, once she is told to stay on
task."  HOD ¶ 19.

Dr. Robbins also testified that N.G. was succeeding at
Buxton because she was receiving the support that she needed,
namely, small classes, one-on-one attention, a lot of oversight
even in non-class time hours, an environment that teaches in
different modalities, rapport with her teachers, and a high level
of structure, support and reminders regarding her work.  R. 829-

30.    Dr. Robbins testified that N.G. is "not a standard learner"
and it was her professional opinion that N.G. would "fall apart"
in a large public high school "without these supports and without
the small student-teacher ratio" because "she is overwhelmed by
large settings." *Id.* at 831.  The Hearing Officer offered no
reason to reject this conclusion, which is particularly
significant because Dr. Robbins had seen N.G. regularly for over
two years by the time of the hearing.  *See Gellert, et al. v.
District of Columbia Public Schls.,* 435 F. Supp. 2d 18, 25
(D.D.C. 2006)(Kessler, J)(crediting opinion of student's regular
psychologist that child needed small classes because the doctor
"is obviously familiar with [the student's] situation and able to
provide meaningful insight into the type of environment he needs
to receive FAPE.").  The Hearing Officer did not make a finding
that Dr. Robbins' testimony or the affidavits of the Buxton
officials were incredible, nor did he provide a reason for
discounting this and other similar evidence which places N.G.'s
academic success during 2004-2005 in context.  *See, e.g.,* R. 306
(Letter from Dr. Brain indicating N.G.'s initial ADHD and mood
disorder diagnoses, her gradual improvement in response to
medication and noting that "her entry into St. James, with its
manifest structure was particularly effective in helping her
academic achievement.").  Furthermore, DCPS's own psychologist
testified that because of N.G.'s "exceptional cognitive

45

abilities," she would expect N.G. to do well "if she is in the appropriate educational setting."  She went on to agree that evidence of poor academic performance would indicate that something was wrong.  R. 797.

The MDT and HOD also entirely discounted the documented effect of medication and counseling on N.G.'s progress in managing her ADHD and depression, concluding that the "record is unclear as to the impact, if any, of any medication the student may be taking..."  *Id.* at 20.   However, the record includes evidence from Dr. Brain, Dr. Robbins, and Ms. Correa that N.G.'s ability to focus had improved since the initiation of medication therapy for her ADHD.  Incredibly, the DCPS psychologist who tested N.G. and concluded she was ineligible for special education did not know whether she was taking medication on the date of the testing.

> Q:   Was she on medication that day?
> A:   I can't recall.
> Q:   Did you ask her that question?
> A:   I can't recall that either, really.
> Q:   If you had elicited that information
>      from her, would that be reflected in
>      your report?
> A:   Possibly. Yes.
> Q:   Would you consider it significant to
>      know, in interpreting the results of her
>      testing, whether she was on medication
>      that day?
> A:   Possibly. Yes....
> Q:   If N.G. was on medication, it would have

> affected the performance that you saw on
> the day you tested her?
>
> A:    Well, when kids do take medication, if
>       they need it... it does help them to
>       focus.

R. 795-96.  If the school psychologist evaluating N.G. was
unaware whether or not N.G. was medicated during her
psychological testing, it is safe to assume that the MDT did not
consider the effects of medication on N.G.'s disabilities.  The
child's ability to perform with and without medication would
certainly constitute "relevant functional information." *See* 20
U.S.C. § 1414(b)(2)(A).

     In spite of defendants' insistence that the team considered
only information from the 2004-2005 school year, the Hearing
Officer also explicitly considered N.G.'s academic performance at
Saint James as evidence that her disabilities did not have an
adverse educational impact, even though her performance there
fell outside the 2004-2005 school year.  *See* HOD ¶ 20.  The
Hearing Officer offered no explanation as to why the information
from Saint James was admissible but N.G.'s significant academic
and emotional problems the previous year while attending DCPS
were beyond the scope of the MDT determination.

     The MDT appears not to have even known about N.G.'s academic
performance at Wilson, outside of what her parents urged them to
consider.  They did not bring her master student file to the MDT

47

meeting and refused to reconvene the MDT meeting to consider it
upon Plaintiffs' request.  After being presented with this
information at the hearing, the Hearing Officer explicitly
refused to consider it, basing his determination of N.G.'s
academic performance solely on her experience at Saint James and
Buxton.

In conclusion, the MDT failed to gather "relevant
functional, developmental and academic information that may
assist in determining whether the child is a child with a
disability" and also failed to "review existing evaluation data"
including "information provided by the parents" in direct
contravention of the statutory language.  20 U.S.C. 1414(c)(1).
The Hearing Officer erred in upholding the MDT decision and also
by failing to consider the additional relevant information
presented at the hearing.  Accordingly, the Court finds that the
MDT's determination fails the first prong of the *Rowley* inquiry,
namely, whether the state followed the procedures laid out in the
Act.

**B.        Plaintiff's Eligibility**

The Court must next consider whether the ineligibility
determination was proper.  *Kroot*, 800 F. Supp. at 981.  The Court
determines there is ample record evidence that it was not.  The
Court has already found that N.G. suffers from "serious emotional
disturbance" due to her diagnosis of major depressive disorder,

48

multiple suicide attempts and psychiatric hospitalizations, and behavioral problems. *See Muller*, 145 F.3d at 104 (finding, on similar facts, that student suffered from serious emotional disturbance under higher New York State law standard). The Court also finds no reason to dispute Dr. Brain's and Dr. Robbins's diagnoses of ADHD, which could also qualify her as "other health impaired." Accordingly, the question before the Court is whether her disabilities adversely impacted her educational performance such that she needs special education.[11]

In reaching this issue, both the MDT and the Hearing Officer examined only N.G.'s performance in small, highly-structured, private schools to determine whether her academics were adversely impacted by her disabilities. HOD ¶ 20. As explained above, this analysis is woefully short of what the statute requires. Were this the standard methodology, disabled students who are making progress in an appropriate program could be automatically disqualified from receiving the very services enabling their

---

[11] Were this case in a different procedural posture, the Court may be inclined to remand the eligibility determination to the Hearing Officer with instructions to consider all relevant information. However, N.G. has already graduated from high school and is no longer a DCPS student. Accordingly, and so that Plaintiffs may not be subject to further delay, the Court will exercise its authority to "weigh all relevant factors and grant such relief as it determines is appropriate." *Braham*, 427 F.3d at 13 (instructing district court to make ultimate determination of appropriateness of educational plan rather than remand to hearing officer to minimize further delay) (internal citations omitted).

success.  The evidence considered by the MDT and the Hearing
Officer shows only that N.G. does well in a highly structured
environment, with extremely small classes, a high level of
direction and supervision, access to crisis counseling, ongoing
psychological services, and medication therapy.  The Court makes
this observation not to minimize N.G.'s great progress, but to
support its conclusion that without such supports, which Wilson
admittedly would not provide, N.G.'s disabilities would certainly
adversely impact her educational performance.  Her grades,
attendance, and emotional state from the 2002-2003 school year
are conclusive evidence of the impact of her disabilities.  N.G.
failed four of her seven classes and was only promoted to the
tenth grade because of last minute adjustments to her
requirements.[12]  DCPS has not argued, nor could it, that N.G.
could have realistically been expected to continue to "achieve
passing marks and advance from grade to grade" without some kind
of assistance in the future.  *See Rowley*, 458 U.S. at 204.
Furthermore, as noted above, DCPS has provided absolutely no
authority to persuade the Court to disregard N.G.'s educational
experience within DCPS when determining adverse impact.

      That N.G. can perform well in precisely the school

---

      [12] As discussed below, the Court does not accept defendants'
argument that DCPS provided adequate accommodations under the Act
because it allowed N.G. to drop her math class and complete make-
up assignments after her hospitalization to facilitate her
passing tenth grade.

environment recommended by her doctors does not mean she is not disabled or that her disabilities do not adversely impact her educational performance.  To the contrary, it means that N.G.'s parents have successfully stepped in where DCPS failed and comprised an appropriate educational program for their daughter. The Court finds that N.G.'s disabilities did adversely impact her educational performance such that she needed special education. Plaintiffs have shown by a preponderance of the evidence that the ineligibility determination was not proper under the Act.

### C.        Rehabilitation Act Claims

Plaintiffs also allege that DCPS violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by failing to provide accommodations to N.G. once they were notified of her disabilities.  This claim has received only cursory briefing by the parties.

In order to state a claim under Section 504 of the Rehabilitation Act, a plaintiff must show that he or she was discriminated against "solely by reason of his [or her] handicap." 29 U.S.C. § 794; see *Walker v. District of Columbia*, 969 F. Supp. 794, 797 (D.D.C. 1997).  In the context of children who receive benefits pursuant to the IDEA, the D.C. Circuit has noted that "in order to show a violation of the Rehabilitation Act, something more than a mere failure to provide the free and appropriate education required by the [IDEA] must be shown."

51

*Lunceford v. District of Columbia Bd. of Educ.*, 745 F.2d 1577,
1580 (D.C. Cir. 1984)(quoting *Monahan v. Nebraska*, 687 F.2d 1164,
1170 (8th Cir. 1982)).  Either bad faith or gross misjudgment
should be shown before a § 504 violation can be made out.
Liability will not be imposed so long as the "state officials
involved have exercised professional judgment, in such a way as
not to depart grossly from accepted standards among educational
professionals." *Walker v. District of Columbia*, 157 F. Supp. 2d
11, 35-36 (D.D.C. 2001)(quoting *Monahan*, 687 F.2d at 1170-71).
Plaintiffs have not alleged facts rising to this high standard,
and in fact have not cited this standard at all.  The Court,
therefore, finds that DCPS did not "do anything more than fail to
provide a free and appropriate public education as required by
the IDEA." *Id.* at 36.

However, the Court is compelled to note that though DCPS
claims that it complied with the Rehabilitation Act by holding a
"§ 504 Conference," this argument is wholly inconsistent with the
District's simultaneous insistence that it was not sufficiently
notified of N.G.'s potential disabilities in 2003 such that its
Child Find obligations were triggered.  The Hearing Officer also
adopted this inconsistent position, finding both a "504
Conference" had taken place while also concluding that DCPS did
not have sufficient information to warrant any evaluation of N.G.

**D.**        **Plaintiffs are entitled to tuition reimbursement**

**for the denial of FAPE**

"The IDEA's grant of equitable authority empowers a court to order school authorities to reimburse parents for their expenditures on private special education for the child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Florence County,* 510 U.S. at 11 (internal quotations omitted). "Where a public school system has defaulted on its obligations under the IDEA, a private school placement is proper under the Act if the education by said school is 'reasonably calculated to enable the child to receive educational benefits.'" *Wirta*, 859 F. Supp. at 5 (quoting *Rowley*, 458 U.S. at 207). Plaintiffs argue that because DCPS defaulted on its Child Find obligation in 2003 and again failed to properly evaluate N.G. in 2005, they are entitled to reimbursement for her tuition at Saint James and Buxton. Plaintiffs further argue that both schools constitute appropriate placements under *Rowley*. The Court agrees.

### 1.    IDEA Violations

The Court has already detailed the multiple ways in which DCPS violated the IDEA, and will not repeat them here. In summary, the Court finds that DCPS defaulted on its Child Find obligation in 2003 by failing to test N.G. and then improperly determined her ineligible in 2005 by failing to gather and consider relevant evidence of the adverse impact of her

disabilities on her academic performance.  Plaintiffs have shown
by a preponderance of the evidence that the Hearing Officer's
conclusion on both of their claims was incorrect.

## 2.   Appropriateness of Placements

"Courts have identified a set of considerations relevant to
determining whether a particular placement is appropriate for a
particular student, including the nature and severity of the
student's disability, the student's specialized educational
needs, the link between those needs and the services offered by
the school, the placement's cost, and the extent to which the
placement represents the least restrictive environment." *Branham*,
427 F.3d at 12 (citing *Rowley*, 458 U.S. at 202).  Considering
these factors in light of the record evidence, the Court finds
that N.G.'s placement at Saint James and Buxton was appropriate.

As an initial matter, the Hearing Officer again improperly
shifted the burden of proof to Plaintiffs to show that Wilson was
inappropriate, rather than placing it on DCPS to show that Wilson
was appropriate.  Despite N.G.'s disastrous year at Wilson and
the ample evidence that N.G. was making significant academic and
emotional progress at Saint James and Buxton, the Hearing Officer
concluded that "there was no evidence that Wilson was not an
appropriate placement or that Buxton is an appropriate placement
for a special education student."  HOD ¶ 13.  The Hearing Officer
also concluded that if N.G. had stayed at Wilson, "there is no

evidence to suggest the student would not have received the
accommodations suggested by Dr. Robbins and which apparently
Saint James and Buxton can provide...” *Id.* ¶ 21.[13]  The Court
disagrees.  After a searching review of the record, the Court
finds that there is no evidence N.G. would have received any of
the accommodations suggested by Dr. Robbins had she returned to
Wilson in the fall of 2003.  Not only had DCPS entirely failed to
implement any of those accommodations in the remaining month of
the school year after the supposed “504 Conference” took place,
but DCPS did not even discuss the bulk of those accommodations
which would have given N.G. a hope of future academic progress.
The Hearing Officer excused this failure, concluding that

> it was not clear from the record whether a plan in fact
> was developed.  However, in this regard, it must be
> noted that in view of the date of the meeting, May 16,
> 2003,[14] and that the school year was quickly coming to
> an end, that any plan developed would have been
> implemented in the following year.

HOD ¶ 10.  This conclusion is unsupportable.  There was
absolutely no evidence in the record or presented at the hearing
that a 504 Plan was prepared at all or that DCPS intended to hold

---

[13] The Court notes that the Hearing Officer makes this
finding while simultaneously concluding that Wilson was not
obligated to provide N.G. with any services at all.

[14] The Court’s review of the record indicates that it is more
likely that this conference took place on or about May 8, 2003.

any future proceedings to ensure the creation of such a plan.[15] When Ms. Correa went to re-register N.G. for 2003 and specifically inquired of the school counselor about such a plan, she was first met with a blank stare and then told she could not even meet to discuss the issue until three weeks into the school year.  Even if DCPS theoretically could provide what N.G.'s doctors had determined she needed, they did not make any attempt to do so.  Furthermore, Defendants provide absolutely no authority for the proposition that the requirements of the Rehabilitation Act or the IDEA differ depending upon what time of the school year a disabled student is identified.

Accordingly, based on the substantial record evidence that Wilson had no intention of providing any accommodations to N.G., the Court finds that DCPS did not meet its burden of showing that Wilson was the appropriate placement and that the Hearing Officer erred in finding otherwise.

Finally, the Court concludes that both Saint James and Buxton were appropriate placements for N.G.  Though it is true that neither institution is certified for special education, the Supreme Court has definitively held that state special education

---

[15] Defendants' brief indicates that DCPS considered any obligations it may have had to N.G. to have been fulfilled by enabling her to turn in her homework late and allowing her to drop her math class. Def's Mot. At 18 ("DCPS still accommodated N.G. so that she was able to be promoted to the 11th grade.")

requirements do not apply to private parental placements.[16]
*Florence County*, 510 U.S. at 13.  Based on the evidence presented
regarding N.G.'s clinical depression and ADHD and the ongoing
manifestations of each, the opinion of both Dr. Brain and Dr.
Robbins indicating that N.G. was benefitting from the "manifest
structure" of the programs, the affidavits of her teachers
indicating the ways in which they individually respond to N.G.'s
emotional and attention difficulties, the in-depth evaluations
provided by her teachers evidencing a high level of support and
supervision, and the evidence of her significant academic
progress, the Court concludes that both schools were "reasonably
calculated to enable the child to receive educational benefits."
*Rowley*, 458 U.S. at 207; *see also Wirta,* 859 F. Supp. at 5
(finding private school placement appropriate where student's
grades had improved and student's confidence and willingness to
cooperate had increased).

    Because DCPS violated the IDEA and N.G.'s placement at Saint
James and Buxton was appropriate, N.G.'s parents are entitled to
tuition reimbursement.  Though Courts most often award tuition
reimbursement when schools fail to provide an appropriate IEP,
this Court has repeatedly found that reimbursement is also an

---

[16] Furthermore, the Court notes that Plaintiffs have
submitted evidence which indicates that DCPS has funded at least
one other student at Buxton for three years. *See* Pls.' Mot., Ex.
1.

appropriate remedy for Child Find violations. *See Abramson*, 493 F. Supp. 2d 80 (failure to complete evaluation constituted denial of FAPE which could result in reimbursement); *Alfono et al. v. District of Columbia et al.*, 422 F. Supp. 2d 1 (D.D.C. 2006) (private school tuition reimbursed when school district failed to complete student's IEP prior to the start of the school year). This Circuit, along with several others, has also held that procedural violations of the IDEA can justify reimbursement "if the violations affected the student's substantive rights." *See Lesesne v. District of Columbia, et al.*, 447 F.3d 828 (D.C. Cir. 2006) (acknowledging reimbursement for procedural violations, but denying relief because parent failed to show that procedural violations cause harm). The Plaintiffs have made a significant showing of harm from DCPS's multiple substantive and procedural violations of the IDEA. Plaintiffs have expended considerable amounts of their own money and time to find an appropriate educational environment to meet the unique needs of their disabled daughter. Ms. Correa testified that she did not want to remove N.G. from DCPS, as N.G. had attended her neighborhood schools her entire life and was extremely reluctant to leave her community and life-long friends. Ms. Correa also did not want to place her daughter in a residential school, because she missed her and wanted her close to home. DCPS defaulted on its statutory obligations and in so doing denied her of her

substantive right to a FAPE.

The Supreme Court has recognized the significant financial burden imposed by Congress on school districts that participate in IDEA. *Florence County*, 510 U.S. at 15. But the Court has also acknowledged that school districts that follow the law need not worry about reimbursement claims. "Public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice." *Id.* DCPS did neither and thus reimbursement is appropriate in this case. In accordance with *Florence County*, the Court further finds that the cost of tuition at Saint James and Buxton is not unreasonable. *See* 510 U.S. at 15.

### 3.  Notice Provision

Relying on 20 U.S.C. § 1412(a)(10)(C)(iii), the Hearing Officer denied Plaintiffs' request for tuition reimbursement because Plaintiffs did not give proper notice to DCPS prior to removing N.G. from Wilson and unilaterally placing her in a private school. Section 1412(a)(10)(C)(iii) provides that

> The cost of reimbursement described in clause (ii) may be reduced or denied—
>
> **(I)** if--
>
> **(aa)** at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the

        public agency to provide a free appropriate public
        education to their child, including stating their
        concerns and their intent to enroll their child in a
        private school at public expense; or
        **(bb)** 10 business days ... prior to the removal of the
        child from the public school, the parents did not give
        written notice to the public agency of the information
        described in item (aa);

20 USC § 1412(a)(10)(C)(iii); *See* HOD ¶ 14. The Hearing Officer

determined that "the first time DCPS was put on notice that the

parents had placed the student in a private school was November

23, 2004, more than one full school year after doing so, when the

student was at Buxton, after the student had started to attend

classes." HOD ¶ 14. Therefore, the HOD concluded that because

DCPS was not properly notified under section (iii),

"reimbursement may be reduced or denied."

        However, a closer examination of the statute reveals that

the notice provision does not apply to Plaintiffs' case. The

section (iii) limitations explicitly work to "reduce or deny" the

"reimbursement described in **clause (ii).**" That clause provides,

        (ii) Reimbursement for private school placement

        If the parents of a child with a disability, **who
        previously received special education and related
        services under the authority of a public agency**, enroll
        the child in a private elementary school or secondary
        school without the consent of or referral by the public
        agency, a court or a hearing officer may require the
        agency to reimburse the parents for the cost of that
        enrollment if the court or hearing officer finds that
        the agency had not made a free appropriate public
        education available to the child in a timely manner
        prior to that enrollment.

20 U.S.C. § 1412(a)(10)(C)(ii)(emphasis added). DCPS never

                                    60

provided special education services to N.G., and DCPS recognizes
as much in its Motion. *See* Def.'s Mot. at 19 ("[N.G.]" has **never**
been determined eligible for special education
services.")(emphasis in original).  Accordingly, the Hearing
Officer erred when it applied clause (iii) to bar reimbursement
for N.G.'s private school expenses.  DCPS cannot now hold
Plaintiffs responsible for failing to give notice when DCPS never
provided the services which would make the notice requirement
applicable.

### E.        Attorneys Fees

Because the Plaintiffs have prevailed on their motion for
summary judgment, the Court concludes that they are entitled to
reasonable attorneys' fees and costs.  *Alfono*, 422 F. Supp. 2d at
8; *Herbin v. Dist. of Columbia*, 362 F. Supp. 2d 254, 265 (D.D.C.
2005) (citing 20 U.S.C. § 1415(i)(3)(B)).  The Court accordingly
directs the parties to file further briefing on the matter.
Specifically, the Court orders the Plaintiffs to provide an
affidavit indicating a Bill of Costs.

### III. Conclusion

The Court concludes that DCPS violated the IDEA, that N.G.
suffered harm as a result, and that N.G.'s parents are entitled
to reimbursement for the tuition expended on N.G.'s education at
Saint James School and Buxton School.  Accordingly, Plaintiffs'
Motion for Summary Judgment is **GRANTED** and Defendants' Motion for

Summary Judgment in **DENIED**.  An appropriate Order accompanies

this Memorandum Opinion.


**Signed:**          **Emmet G. Sullivan**
                     **United States District Judge**
                     **March 31, 2008**